JUDGE CEDARBAUM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————X
                                                            :
**CIGPF I CORP.,**                                          :
                                                            :   **12 CV    4845**
                                    **Plaintiff,**          :   Index No. _____
                                                            :
            – against –                                     :
                                                            :   **COMPLAINT**
**BLUESTEM BRANDS, INC.,**                                  :
                                                            :   **(ECF CASE)**
                                    **Defendant.**          :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
———————————————————X

        Plaintiff CIGPF I Corp. ("CIGPF"), for its Complaint against defendant Bluestem

Brands, Inc., f/k/a Fingerhut Direct Marketing, Inc. ("Bluestem" or the "Company"), alleges as

follows:

**NATURE OF THE ACTION**

        1.        This is an action in which CIGPF — a warrant holder and preferred shareholder in

the Company — seeks damages and/or restitution for the Company's (i) breach of its contractual

duties to provide anti-dilution adjustments to CIGPF based on warrants CIGPF holds; (ii) breach

of its contractual obligation to allow CIGPF to purchase its pro rata share of a new issuance of

equity; and (iii) failure to provide material information to CIGPF regarding the terms and

conditions of a third party financing in 2008 in violation of the governing contracts. By reason

of the Company's improper actions, CIGPF is entitled to receive at least 62 million shares of the

Company, applicable strike price adjustments, and/or damages in excess of $8.2 million.

        2.        Specifically, in May 2008, the Company wrongly issued warrants and other

contractual rights related thereto to lenders (the "Lenders") that diluted CIGPF's interest in the

Company. The Company was obligated under governing agreements, discussed below, to disclose to CIGPF the complete and material terms of the equity participation arrangements between the Company and the Lenders but the Company failed to do so. The Company also denied CIGPF its contractual right to purchase on a pro rata basis the equity granted to the Lenders.

3.      The Company failed to disclose to CIGPF that it had entered into an agreement with the Lenders (the "Contingent Fee Letter and Schedule") which characterized the Lenders' equity as a "contingent fee." Such contingent fee, however, when combined with the common stock warrants issued to the Lenders (the "2008 Warrants"), effectively functioned as a new class of stock paid out after the Company's series A and series B preferred shareholders (the "Series A and Series B Preferred Shareholders") but ahead of the Company's common shareholders including CIGPF (upon exercise of its warrants). The Contingent Fee Letter and Schedule and the issuance of the 2008 Warrants to the Lenders are hereafter referred to as the "2008 Equity Transaction." The 2008 Equity Transaction had the effect of diluting CIGPF's warrants in violation of the anti-dilution rights provided for in CIGPF's warrant agreements.

4.      While the Company failed to disclose to CIGPF the terms of the 2008 Equity Transaction or its dilutive effect on CIGPF, the Company fully disclosed the material terms of the 2008 Equity Transaction to other shareholders of the Company.

5.      Years after the 2008 Equity Transaction, the Company provided CIGPF with certain board resolutions from May 2008 which disclosed the existence of the complete economic terms of the 2008 Equity Transaction. The Company's nondisclosure of the complete terms of the 2008 Equity Transaction was consistent with other failures of the Company to timely provide CIGPF with information to which it was entitled under governing agreements

2

(including notices of board meetings and materials), even when such information was specifically requested by CIGPF.

6.      In conjunction with the 2008 Equity Transaction, the Company also wrongfully, and to CIGPF's detriment, amended its Certificate of Incorporation to allow for the issuance of an additional 152,312,347 shares to the officers, directors, employees, or consultants of the Company. Upon information and belief, that amendment was made to protect Company insiders against the dilutive effects of the 2008 Equity Transaction. The issuance of such shares further diluted CIGPF's warrants.

7.      Accordingly, unlike CIGPF, all parties involved in negotiations of the 2008 Equity Transaction — the Company insiders and the Series A and B Preferred Shareholders — had full knowledge of the economic terms of that Transaction and were able to protect their respective positions in the equity structure of the Company, improperly forcing the common shareholders, including CIGPF (upon exercise of its Warrants), to bear the cost of the 2008 Equity Transaction in violation of CIGPF's rights.

8.      In May 2008, CIGPF executed a consent and waiver pursuant to which it consented only to the Company issuing Series B Preferred Stock. While such consent and waiver is irrelevant to the 2008 Equity Transaction, insofar as the Company contends that it extends to such Transaction, CIGPF seeks rescission of that consent and waiver because it was procured without full disclosure and based upon misleading and incomplete information provided by the Company regarding the material terms of the 2008 Equity Transaction.

3

## THE PARTIES

9.      Plaintiff CIGPF is a New York corporation with its principal place of business in New York, New York.

10.     Defendant Bluestem is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that this dispute is between citizens of different states and the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

12.     Venue is proper in this District because Defendant, by agreement, irrevocably consented to venue in the United States District Court for the Southern District of New York with respect to any action brought by Plaintiff concerning the subject matter of this lawsuit and pursuant to 28 U.S.C.A. §1391(b), (c) and (d).

## FACTUAL ALLEGATIONS

### The CIGPF Warrants

13.     Pursuant to Common Stock Purchase Warrant Agreements between Bluestem and CIGPF dated February 24, 2004 and November 1, 2004 (the "Warrant Agreements") (Exhibit 1), CIGPF was issued warrants to acquire common stock of Bluestem in connection with the extension of certain warehouse financing provided to Bluestem (the "Warrants"). The Warrant Agreements grant CIGPF the right to purchase up to an aggregate of 33,116,154 shares of common stock of Bluestem at an exercise price of $0.01 per share (the "Exercise Price").

14.     The Warrant Agreements contain anti-dilution provisions to protect CIGPF against the dilution of the Warrants in the event the Company subsequently issued common stock

4

to other investors without consideration or for a consideration per share less than the Exercise Price.

15.     In that regard, the Warrant Agreements provide for a protective adjustment to CIGPF's Warrants if the "Company shall, at any time or from time to time prior to the Expiration Date, issue any shares of Common Stock (or be deemed to have issued any shares of Common Stock as provided herein), other than Excluded Securities . . . without consideration or for a consideration per share less than the Exercise Price in effect immediately prior to the issuance of Common Stock."

16.     If such price dilution occurs, the Warrant Agreements provide that the Exercise Price shall be adjusted according to a two-step formula provided in the Warrant Agreements.

17.     With respect to price dilution adjustment, the Warrant Agreements provide that Bluestem shall upon any adjustment give written notice thereof to CIGPF within 30 days which notice shall state "(i) the reason for such adjustment and (ii) the Exercise Price, as adjusted and, if applicable, the increased or decreased number of Shares purchasable upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation of each."

18.     The Warrant Agreements also obligate the Company to grant CIGPF broad access to Board of Directors' meetings as well as minutes and materials distributed therein. To that end, the Warrant Agreements state that "[f]or so long as this Warrant (or part thereof) remains outstanding, the Company shall give the Holder written notice of each meeting of the Board of Directors of the Company or any committee thereof at the same time and in the same manner as the members of the Board of Directors of the Company or such committee receive notice of such meetings . . . ."

5

19.     Additionally, the Warrant Agreements require that the Company provide CIGPF with "all written materials and other information given to the directors in connection with such meetings at the same time such materials and information are given to the directors." The Warrant Agreements further state that "[i]f the Company proposes to take any action by written consent in lieu of a meeting of the Board, the Company shall give written notice thereof to the [Warrant] Holder prior to the effective date of such consent describing the nature and substance of such action."

20.     The Warrant Agreements explicitly provide that the "Company shall not, by amendment of its certificate of incorporation or bylaws, or through any other means, directly or indirectly, avoid or seek to avoid the observance or performance of any of the terms of this Warrant and shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment."

## The Stockholders Agreement

21.     In addition to the Warrants, CIGPF owns 4,566,645 shares of Series A Preferred Stock of the Company. In connection with its investments in the Company, CIGPF entered into an Amended and Restated Stockholders Agreement, dated March 24, 2006 (the "2006 Stockholders Agreement") (Exhibit 2) with the Company and certain other investors.

22.     As a party to the 2006 Stockholders Agreement, CIGPF was granted the right to purchase its pro rata share of any future issuances of equity securities that the Company "may, from time to time, propose to sell and issue" (the "Purchase Right") subject to certain exceptions described below.

23.     The 2006 StockholdersAgreement provided that "[e]ach Investor shall have thirty (30) days from the giving of such notice to agree to purchase its Pro Rata Share of the Equity

6

Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company . . . and stating therein the quantity of Equity Securities to be purchased."

24.     The Purchase Right may be waived only with the written consent of "(i) the Investors holding at least seventy five (75%) of the then outstanding Series A Preferred Stock;" (ii) certain Prudential Capital investors under circumstances delineated in the 2006 Stockholders Agreement; and (iii) CIGPF as "Warrant Investor" provided "that consent of [CIGPF] shall not be required for any [waiver] unless such [waiver] affects [CIGPF's Warrants or Shares] in a manner different than the Investors that were originally issued Series A Preferred Stock . . . and in a manner adverse to the interests of [CIGPF] as an equity investor in the Company, it being understood that no such consent shall be required for [a waiver] that adversely affects [CIGPF] and the Investors that were originally issued Series A Preferred Stock in a similar manner given their relative and different equity interests in the Company."

25.     Thus, CIGPF's consent was required to waive its Purchase Right under the 2006 Stockholders Agreement if such waiver affected CIGPF's shares (i) in a manner different than the investors that were originally issued Series A Preferred Stock, and (ii) in a manner adverse to the interests of CIGPF as equity investor in the Company.

26.     With respect to CIGPF, the 2006 Stockholders Agreement required that "all notices, requests, consents, and other communications required or permitted hereunder shall be in writing and shall be hand delivered or mailed postage prepaid by registered or certified mail or by facsimile transmission" to CIGPF I Corp., c/o Citigroup Global Markets, Inc., 390 Greenwich Street, 4th Floor, New York, NY 10013.

7

### The Investor Rights Agreement

27.     In connection with its investments in the Company, CIGPF also entered into an
Investor Rights Agreement with the Company and certain other investors.

28.     The Amended and Restated Investor Rights Agreement dated March 24, 2006 (the
"2006 Investor Rights Agreement") (Exhibit 3) sets forth the circumstances in which CIGPF's
consent was required "in order to effect any amendment, modification, restatement, or waiver, of
the Third Amended and Restated Certificate of Incorporation (the "Certificate") or By-laws of
the Company . . . that alters, changes or repeals the rights, preferences or privileges of the capital
stock of the Company . . . ." In that regard, the 2006 Investor Rights Agreement provided that
CIGPF's written consent was required if such "amendment, modification, restatement, or
waiver" affects CIGPF's Warrants or Shares "in a manner different than the Investors that were
originally issued Series A Preferred Stock . . . and in a manner adverse to the interests of
[CIGPF] as an equity investor in the Company, it being understood that no such consent shall be
required for an amendment or waiver that adversely affects [CIGPF] and the Investors that were
originally issued Series A Preferred Stock in a similar manner given their relative and different
equity interests in the Company."

29.     Thus, CIGPF's consent was required to amend the Third Amended and Restated
Certificate of Incorporation if such amendment affected CIGPF's shares (i) in a manner different
than the investors that were issued Series A Preferred Stock, and (ii) in a manner adverse to the
interests of CIGPF as equity investor in the Company.

30.     With respect to CIGPF, the 2006 Investor Rights Agreement required that "all
notices, requests, consents and other communications required or permitted hereunder shall be in
writing and shall be hand delivered or mailed postage prepaid by registered or certified mail or

8

by facsimile transmission" to CIGPF I Corp., c/o Citigroup Global Markets, Inc., 390 Greenwich Street, 4th Floor, New York, NY 10013.

### The 2008 Series B Financing

31.    In or about May 2008, the Company provided CIGPF with a term sheet stating that Bain Capital and Battery Ventures on the one hand (the "Series B Investors"), and the Company on the other, entered into an agreement whereby the Series B Investors would invest approximately $50 million of new equity capital into the Company in the form of Series B Preferred Stock. The term sheet further stated that other existing security holders of the Company had also expressed an interest in purchasing Series B Preferred Stock in an aggregate amount not to exceed $15 million (the "Series B Financing").

32.    In connection with the Series B Financing, the Company sought amendment of the (i) 2006 Stockholders Agreement; (ii) 2006 Investor Rights Agreement; and (iii) Third Amended and Restated Certificate of Incorporation.

33.    On or about May 15, 2008, based on the information provided by the Company to CIGPF regarding the economic terms of the Series B Financing, and in order to allow the Series B Financing to proceed, CIGPF "waive[d] any and all Purchase Rights under [the 2006 Stockholders Agreement] *solely* with respect to the Series B Financing" (emphasis added) and consented to amendments to the 2006 Stockholders Agreement, the 2006 Investor Rights Agreement, and the Third Amended and Restated Certificate of Incorporation of the Company.

### The 2008 Debt Financing And Equity Transaction

34.    On or about May 15, 2008, the Company entered into a debt financing facility provided by the Lenders, Goldman Sachs Specialty Lending Group and Fortress Credit Corp.

35.    As part of such financing, the Company agreed to the 2008 Equity Transaction whereby it issued to the Lenders warrants for the purchase of 216,045,882 shares of common

9

stock of the Company. The Company was required to provide CIGPF with the requisite notice and terms of the 2008 Equity Transaction under the Warrant Agreements, 2006 Stockholders Agreement, and 2006 Investor Rights Agreement.

36. The material terms of the 2008 Equity Transaction, the effect of which were to dilute and reduce the amount to be paid to CIGPF per warrant, were not disclosed by the Company to CIGPF at the time the Company requested CIGPF's consent and waiver to the Series B Financing nor, indeed, until years after that Transaction had closed. It was not until April 2011 that the Company revealed to CIGPF for the first time that it had entered into the Contingent Fee Letter and Schedule with the Lenders in May 2008.

37. The 2008 Equity Transaction misleadingly characterized the Lender's equity as a contingent fee. In reality, however, this so-called contingent fee, in conjunction with the 2008 Warrants, is in effect an equity derivative instrument linked to the value of the 2008 Warrants which essentially functioned as a new class of stock subordinated to the Series A and Series B Preferred Shareholders but superior to the common shareholders of the Company. The 2008 Equity Transaction had the effect of diluting CIGPF's Warrants in violation of CIGPF's anti-dilution rights provided for in the Warrant Agreements.

38. In the Company's registration statement Form S-1 filed with the Securities and Exchange Commission on October 31, 2011, which was prepared in connection with the Company's expected initial public offering, Bluestem admitted that its agreement with the Lenders was a "derivative liabilit[y]" that "could result in a cash fee payment that varies based on the timing and implied enterprise value relating to certain events involving a defined liquidation, sale or initial public offering."

10

39.     The economic impact of the 2008 Equity Transaction is also illustrated by a third-party valuation report prepared by financial advisory firm Murray, Devine & Co., Inc. (the "Murray Devine Report") which was included with the Company's February 28, 2012 Board of Director meeting materials. The Murray Devine Report details how cash would be distributed among stockholders of the Company in accordance with the Contingent Fee Letter and Schedule given various valuations and at various points in time. The report shows the dilution caused to CIGPF's Warrants which is in violation of the Warrant Agreements.

40.     For instance, according to the Murray Devine Report, the 2008 Equity Transaction contemplates the following payout assuming that on February 3, 2012 — a date chosen by the Report for illustrative purposes — the "Aggregate Equity Value" of the Company was $237,464,200: after repaying outstanding debt in the amount of $30,583,500 and the collection of exercise fees on outstanding derivatives in the amount of $1,471,000, the Series B Preferred Shareholders would have received $73,454,400 representing a full payout of their invested capital plus accrued dividends; the Series A Preferred Shareholders would have received $117,865,100 representing a full payout of their invested capital plus accrued dividends; and the Lenders would have received a fee pursuant to the Schedule of $17,032,000. The common shareholders, which includes CIGPF (upon exercise of its Warrants), would have received nothing as a result of Contingent Fee Letter and Schedule diverting $17,032,000 to the Lenders. Thus, as the Murray Devine Report illustrates, the Lenders have a liquidation preference senior to the common shareholders of the Company.

41.     In a second scenario, the Murray Devine Report describes how the 2008 Equity Transaction affects the value of CIGPF's Warrants assuming a different valuation of the Company. If on February 3, 2012 the "Aggregate Equity Value" of the Company was

11

$280,639,500, then the following payout would have occurred: after repaying outstanding debt in the amount of $30,583,500 and the collection of exercise fees on outstanding derivatives in the amount of $3,962,400, the Series B Preferred Shareholders would have received $73,454,400 representing a full payout of their invested capital plus accrued dividends; the Series A Preferred Shareholders would have received $159,120,600 representing a full payout of invested capital plus accrued dividends; and the Lenders would have received a fee pursuant to the Schedule of $7,220,400. The common shareholders, which includes CIGPF (upon exercise of its Warrants), would have received $14,223,000. In the absence of the Contingent Fee Letter and Schedule, under this same scenario (*i.e.*, a valuation of $280,639,500), the common shareholders would have received $21,443,500. The reduction in payout to the common shareholders is the result of the Contingent Fee Letter and Schedule diverting $7,220,400 to the Lenders. This scenario again demonstrates that the Lenders have a liquidation preference senior to the common shareholders of the Company.

42. The Murray Devine Report contains numerous other scenarios that illustrate the same effect of the 2008 Equity Transaction — that the Lenders are subordinated to the Series A and B Preferred Shareholders but have a liquidation preference senior to the common shareholders of the Company.

43. The 2008 Equity Transaction thus affects CIGPF's shares (i) in a manner different than the investors that were issued Series A Preferred Stock, and (ii) in a manner adverse to CIGPF's shares due to the 2008 Equity Transaction's dilutive effects on CIGPF's Warrants.

44. In 2011, the Company admitted to CIGPF that the intent of the fees payable pursuant to the Contingent Fee Letter as set forth in the Schedule thereto was to "guarantee[] a return" to the Lenders. In the words of the Company's CFO to CIGPF:

12

> The contingent fee letter was created to provide the warrant holders (the four
> lenders participating in the May 2008 refinancing) a fee capped at 10% of the
> equity value of the company. The 10% cap took into consideration the value
> of both the common stock warrants issued to the lenders and the contingent
> fee letter. The understanding between us and the lenders is that the contingent
> fee letter guaranteed a return to the lenders if the company was sold or
> liquidated at a value below that which the Preferred [S]eries A and B
> shareholders would receive more value via redemption rights versus their
> conversion rights.

45.     The 2008 Equity Transaction effectively created a new class of shares of the

Company that is subordinated to the Series A and Series B Preferred Shareholders but senior to

the common shareholders. Under the Contingent Fee Letter and Schedule, so long as the

"Aggregate Equity Value" of the Company exceeds $134,762,000 (the value of the Series A and

Series B Preferred Stock excluding dividends at the closing of the Series B Financing), the

Lenders receive either cash or equity. If the equity value is less than the Series A and Series B

Preferred Shareholders' liquidation preference of $134,762,000, then the Lenders would not

receive a cash payment or realize any value through their equity under the 2008 Equity

Transaction. This shows that the Lenders are always subordinated to the Series A and B

Preferred Shareholders. It is only after meeting various valuation hurdles that the Lenders

receive common equity and actually pay the strike price on their shares. As the "Aggregate

Equity Value" of the Company increases and the ratio begins to shift from cash to equity, the

return to the Lenders increases to compensate them for the costs of exercising the 2008 Warrants.

46.     As the Company's CFO explicitly admitted in a June 22, 2011 email to CIGPF,

the 2008 Equity Transaction is designed to divert proceeds from the common shareholders such

as CIGPF and reallocate them to the Lenders while paying out the Series A and B Preferred

Shareholders:

> As time passes from the initial closing date of the refinancing and preferred A
> and B stock dividends continue to accumulate, the preferred stock redemption
> value increases and therefore the equity value of the company needs to be

13

higher before the preferred will convert to common. Assuming the company value is held constant in years after the financing (let's say $200 million), the common stock warrants are worth less each year due to the build up of preferred dividends. Therefore, more of the 10% fee is paid out via the contingent fee letter than the common stock warrants. This is why [the Schedule] was created, to show the value of the contingent fee letter throughout [its] life of 10 years.

47.    The 2008 Equity Transaction was thus an issuance of equity to the Lenders "for a consideration per share less than the Exercise Price in effect immediately prior to the issuance of Common Stock." Such issuance triggered CIGPF's antidilution rights under 4(d)(i) of the Warrant Agreements. Additionally, because the 2008 Equity Transaction adversely affected CIGPF's Warrants or shares in a manner different from the Series A Preferred Stockholders and in a manner adverse to CIGPF as equity investor in the Company, CIGPF's consent and waiver was required to waive its Purchase Right under the 2006 Stockholders Agreement and to amend the Third Amended and Restated Certificate of Incorporation of the Company under the 2006 Investor Rights Agreement.

## The Company Provided Notice Of The Contingent Fee Letter And Schedule To Other Series A Preferred Shareholders And To The Board of Directors In May 2008 But Not To CIGPF

48.    Not until years after the fact did the Company provide CIGPF with certain 2008 board resolutions and a Consent and Waiver of Holders of Preferred Stock (to which CIGPF was not a signatory) that identified and attached the Contingent Fee Letter and Schedule. Furthermore, unlike CIGPF, which consented solely to the Series B Financing, other Series A Preferred Stockholders executed a consent and waiver specifically consenting to the terms of the 2008 Equity Transaction.

49.    The fact that the Company disclosed the Contingent Fee Letter and Schedule to its Board and to Series A Preferred Stockholders but not to CIGPF demonstrates that the Company understood that the terms of that Letter and Schedule were material and that the Letter and

14

Schedule should have been disclosed to CIGPF. Furthermore, unlike CIGPF, those Series A
Preferred Stockholders to which the Contingent Fee Letter and Schedule were disclosed were
able to adequately protect their interests in the Company given their knowledge of the full
economic terms of the 2008 Equity Transaction.

50.     The Company's nondisclosure of material terms of the 2008 Equity Transaction
was consistent with other failures of the Company to timely provide CIGPF with information to
which it was entitled under the governing agreements (including the terms and conditions of the
2008 Warrants, notices of board meetings, and delivery of related agreements and materials),
even when such information was specifically requested by CIGPF.

The Company's Issuance Of Management Shares
In Connection With The 2008 Equity Transaction

51.     In conjunction with the 2008 Equity Transaction, the Company amended its
Certificate of Incorporation to allow for the issuance of an additional 152,312,347 shares to the
officers, directors, employees, or consultants of the Company. The issuance of such shares was,
upon information and belief, made to protect the Company's insiders against the dilutive effects
of the 2008 Equity Transaction. The issuance of such shares caused a further dilution to
CIGPF's Warrants. Furthermore, the additional 152,312,347 shares described in the definition of
Excluded Shares appear as amended and restated and not as being in addition to the previous
number of shares. As such, CIGPF consented to the amendment *solely* with respect to the Series
B Financing and in reliance on the fact that it was a restatement of, and not in addition to, the
prior number of shares.

52.     Accordingly, unlike CIGPF, all parties involved in negotiations of the 2008 .
Equity Transaction — the Company insiders and the Series A and B Preferred Shareholders —
had full knowledge of the economic terms of that Transaction and were able to protect their

15

respective positions in the equity structure of the Company, improperly forcing the common

shareholders, including CIGPF, to bear the costs of the 2008 Equity Transaction.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract — The Warrant Agreements)

53.    Plaintiff repeats and realleges paragraphs 1 through 52, as if fully set forth herein.

54.    The Warrant Agreements provide for a protective adjustment to CIGPF's

Warrants if the "Company shall, at any time or from time to time prior to the Expiration Date,

issue any shares of Common Stock (or be deemed to have issued any shares of Common Stock

as provided herein), other than Excluded Securities . . . without consideration or for a

consideration per share less than the Exercise Price in effect immediately prior to the issuance of

Common Stock."

55.    If such dilution occurs, the Warrant Agreements provide that the Exercise Price

shall be adjusted according to the two-step formula provided in the Warrant Agreements.

56.    The Warrant Agreements provide that "[u]pon any adjustment of the Exercise

Price and any increase or decrease in the number of Shares purchasable upon the exercise of

[the] Warrant," Bluestem shall within 30 days thereafter give written notice thereof to CIGPF as

shown on the books of the Company which notice shall state "(i) the reason for such adjustment

and (ii) the Exercise Price, as adjusted and, if applicable, the increased or decreased number of

Shares purchasable upon the exercise of this Warrant, setting forth in reasonable detail the

method of calculation of each."

57.    The Warrant Agreements also obligate the Company to grant CIGPF broad access

to Board of Directors' meetings as well as minutes and materials distributed therein. To that end,

the Warrant Agreements state that "[f]or so long as this Warrant (or part thereof) remains

outstanding, the Company shall give the Holder written notice of each meeting of the Board of

16

Directors of the Company or any committee thereof at the same time and in the same manner as the members of the Board of Directors of the Company or such committee receive notice of such meetings . . . ."

58.     Additionally, the Warrant Agreements require that the Company provide CIGPF with "all written materials and other information given to the directors in connection with such meetings at the same time such materials and information are given to the directors." The Warrant Agreements further state that "[i]f the Company proposes to take any action by written consent in lieu of a meeting of the Board, the Company shall give written notice thereof to the [Warrant] Holder prior to the effective date of such consent describing the nature and substance of such action."

59.     The Warrant Agreements explicitly provide that the "Company shall not, by amendment of its certificate of incorporation or bylaws, or through any other means, directly or indirectly, avoid or seek to avoid the observance or performance of any of the terms of the Warrant and shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment."

60.     The 2008 Equity Transaction was an issuance of equity to investors for a "consideration per share less than the Exercise Price in effect immediately prior to the issuance of Common Stock." Such an issuance triggered CIGPF's antidilution rights under 4(d)(i) of the Warrant Agreements.

61.     In breach of the Warrant Agreements, the Company failed to provide to CIGPF at the time of the 2008 Equity Transaction the Board materials which disclosed the material terms of such Transaction and, in addition, the fact that the Company was effectively providing the

17

Lenders with a new class of shares subordinated to the Series A and Series B Preferred Shareholders but senior to the common shareholders.

62.     Furthermore, the Company's issuance of an additional 152,312,347 shares to the officers, directors, employees, or consultants of the Company was, upon information and belief, made to protect these individuals against the dilutive effects of the 2008 Equity Transaction. The issuance of such shares further diluted CIGPF's Warrants.

63.     As a result of the Company's breaches, CIGPF is entitled to be undiluted by recovering at least 62 million shares of the Company, applicable strike price adjustments, and/or damages in excess of $8.2 million.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract — the 2006 Stockholders Agreement)

64.     Plaintiff repeats and realleges paragraphs 1 though 52 of the Complaint as if fully set forth herein.   .

65.     Pursuant to the 2006 Stockholders Agreement, CIGPF was granted the right to purchase its pro rata share of any future issuances of equity securities that the Company "may, from time to time, propose to sell and issue" subject to certain exceptions.

66.     Pursuant to its Purchase Right, CIGPF was entitled to 30 days' advance written notice from the Company of the price, terms and conditions relating to the issuance of any new equity securities.

67.     As set forth above, CIGPF's consent was required to waive its Purchase Right under the 2006 Stockholders Agreement with respect to the 2008 Equity Transaction because the 2008 Equity Transaction affected CIGPF's shares (i) in a manner different than the investors that were originally issued Series A Preferred Stock, and (ii) in a manner adverse to the interests of CIGPF as equity investor in the Company.

18

68.     With respect to CIGPF, the 2006 Stockholders Agreement required that "all notices, requests, consents, and other communications required or permitted hereunder shall be in writing and shall be hand delivered or mailed postage prepaid by registered mail or by facsimile transmission" to CIGPF I Corp., c/o Citigroup Global Markets, Inc., 390 Greenwich Street, 4th Floor, New York, NY 10013.

69.     In breach of the 2006 Stockholders Agreement, the Company failed to provide CIGPF with the requisite notice of the terms of the 2008 Equity Transaction which, unbeknownst to CIGPF at the time, effectively created a new class of shares subordinated to the Series A and Series B Preferred Shareholders but senior to the common shareholders. Had the economic terms of the 2008 Equity Transaction been disclosed to CIGPF, CIGPF would have exercised its Purchase Right pursuant to the 2006 Stockholders Agreement.

70.     As a result of said breaches, CIGPF is entitled to recover at least 62 million shares of the Company, applicable strike price adjustments, and/or damages in excess of $8.2 million.

### THIRD CLAIM FOR RELIEF
### (Breach of Contract — 2006 Investor Rights Agreement)

71.     Plaintiff repeats and realleges Paragraphs 1 though 52 of the Complaint as if fully set forth herein.

72.     The 2006 Investor Rights Agreement sets forth the circumstances in which CIGPF's consent is required "in order to effect any amendment, modification, restatement, or waiver, of the Third Amended and Restated Certificate of Incorporation (the "Certificate") or By-laws of the Company . . . that alters, changes or repeals the rights, preferences or privileges of the capital stock of the Company . . . ."

73.     In that regard, CIGPF's consent was required to amend the Third Amended and Restated Certificate of Incorporation of the Company if such amendment affected CIGPF's

US1107497

shares (i) in a manner different than the investors that were originally issued Series A Preferred Stock, and (ii) in a manner adverse to the interests of CIGPF as equity investor in the Company.

74.     With respect to CIGPF, the 2006 Investor Rights Agreement required that "all notices, requests, consents and other communications required or permitted hereunder shall be in writing and shall be hand delivered or mailed postage prepaid by registered or certified mail or by facsimile transmission" to CIGPF I Corp., c/o Citigroup Global Markets, Inc., 390 Greenwich Street, 4th Floor, New York, NY 10013.

75.     CIGPF's consent was required to amend the Third Amended and Restated Certificate of Incorporation with respect to the 2008 Equity Transaction because that Transaction affected CIGPF's shares (i) in a manner different than the investors that were issued Series A Preferred Stock, and (ii) in a manner adverse to the interests of CIGPF as equity investor in the Company.

76.     The Company breached the 2006 Investor Rights Agreement by not obtaining CIGPF's consent to amend the Third Amended and Restated Certificate of Incorporation with respect to the 2008 Equity Transaction. Had CIGPF known the full economic terms of the 2008 Equity Transaction, it would not have consented to the amendment of the Third Amended and Restated Certificate of Incorporation.

77.     By reason of the foregoing, CIGPF is entitled to damages from the Company's breach of the 2006 Investor Rights Agreement including the recovery of at least 62 million shares of the Company, applicable strike price adjustments, and/or damages in excess of $8.2 million.

20

## FOURTH CLAIM FOR RELIEF
### (Rescission — Consent and Waiver)

78.    Plaintiff repeats and realleges paragraphs 1 through 52, as if fully set forth herein.

79.    On or about May 15, 2008, based on the documents provided by the Company regarding the Series B Financing, CIGPF consented to such Financing and waived its Purchase Right solely with respect to the Series B Financing. The Company has taken the position that Plaintiff's consent and waiver with respect to the Series B Financing extended to the 2008 Equity Transaction. Plaintiff disputes that its waiver of Purchase Right which was given *solely* with respect to the Series B Financing also was a waiver to its Purchase Right associated with the 2008 Equity Transaction. Insofar as the Company contends that such consent and waiver is deemed to extend to the 2008 Equity Transaction, that consent and waiver should be rescinded.

80.    Solely in connection with the Series B Financing, CIGPF also consented to amend the Third Amended and Restated Certificate of Incorporation of the Company. To the extent the Company deems such amendment to affect CIGPF's rights with respect to the 2008 Equity Transaction, CIGPF's consent to such amendment also should be rescinded.

81.    In 2011, CIGPF learned that its consent and waiver to the Series B Financing had been procured based upon materially incomplete information provided to it by the Company and on which CIGPF justifiably relied in executing the consent and waiver. The Company specifically failed to provide CIGPF with the requisite notice and economic terms showing that the Company had in fact entered into an agreement with the Lenders which effectively provided the Lenders with a new class of shares paid after the Series A and Series B Preferred Shareholders but ahead of the common shareholders.

82.    This material information, the effect of which was to dilute and reduce the amount to be paid to CIGPF per warrant, was disclosed to other Series A Preferred Shareholders but was

**21**

never disclosed to CIGPF. Had CIGPF been aware of the full economic terms and conditions of the 2008 Equity Transaction, and had CIGPF known that the Company would contend that its consent and waiver was procured not solely with respect to the Series B Financing, it would not have executed that consent and waiver.

83.     Insofar as the Company contends that CIGPF's consent and waiver with respect to the Series B Financing applies to the 2008 Equity Transaction, such consent and waiver was procured based upon materially misleading information as well as the Company's omission of material facts regarding the economic terms of the 2008 Equity Transaction. Moreover, because the Company knew or should have known that such material information was not provided to CIGPF, CIGPF's consent and waiver is invalid and must be rescinded because (a) the Company misrepresented the material terms of the 2008 Equity Transaction; (b) there was no meeting of the minds between the parties concerning the material terms of the 2008 Equity Transaction; and/or (c) there was a mutual and/or unilateral mistake.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Bluestem for the following relief:

A.     Awarding Plaintiff at least 62 million shares of the Company, applicable strike price adjustments, and/or damages in excess of $8.2 million for breach of the Warrant Agreements, 2006 Stockholders Agreement, and 2006 Investor Rights Agreement;

B.     Insofar as the Company contends that Plaintiff's consent and waiver to the Series B Financing is deemed to extend to the 2008 Equity Transaction, rescission of that consent and waiver;

22

C.     Awarding Plaintiff costs, expenses, and reasonable attorneys' fees; and

D.     Such other and further relief as the Court deems just and proper.


Dated:   New York, New York
         June 20, 2012

                         FRESHFIELDS BRUCKHAUS DERINGER US LLP

                         By:     _Dana Post_____
                                 Marshall H. Fishman
                                 Timothy P. Harkness
                                 Dana L. Post

                         601 Lexington Avenue
                         New York, NY 10022
                         (212) 277-4000
                         marshall.fishman@freshfields.com
                         timothy.harkness@freshfields.com
                         dana.post@freshfields.com

                         *Attorneys for Plaintiff CIGPF I Corp.*

23

# EXHIBIT 1

NEITHER THIS WARRANT NOR THE SHARES OBTAINABLE UPON ITS EXERCISE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS (COLLECTIVELY, THE "ACTS"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER ALL APPLICABLE ACTS OR UNLESS AN OPINION OF COUNSEL IS DELIVERED TO THE COMPANY (AS DEFINED BELOW) IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE COMPANY TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED UNDER ALL APPLICABLE ACTS OR UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A OF THE ACT.  THE RIGHT TO VOTE AND THE SALE OR TRANSFER OF THIS WARRANT AND THE SHARES OBTAINABLE UPON ITS EXERCISE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN STOCKHOLDERS AGREEMENT DATED FEBRUARY 24, 2004 BY AND AMONG THE HOLDER HEREOF AND OTHER STOCKHOLDERS OF THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

February 24, 2004

### FINGERHUT DIRECT MARKETING, INC.

### COMMON STOCK PURCHASE WARRANT

THIS CERTIFIES THAT, for value received, CIGPF I CORP., or its registered assigns (the "Holder"), is entitled to subscribe for and purchase from Fingerhut Direct Marketing, Inc., a Delaware corporation (the "Company"), the Shares (as defined in Section 1 hereof) at the per share exercise price of $0.01 (the "Exercise Price") (as adjusted from time to time pursuant to Section 4 hereof), at any time or from time to time prior to or upon the Expiration Date (as defined in Section 13 hereof, subject to the provisions and upon the terms and conditions hereinafter set forth.

This Warrant is subject to the following terms and conditions:

1.      Shares; When Exercisable.

(a)      As used herein, the term "Shares" means up to an aggregate of 31,689,078 shares of the Company's Common Stock, par value $0.00001 per share (the "Common Stock"), it being understood that (i) the number of Shares issuable hereunder are subject to vesting from time to time pursuant to Section 1(b) hereof and (ii) the number of Shares issuable hereunder and the Exercise Price are subject to adjustment from time to time pursuant to Section 4 hereof.

(b)      This Warrant shall be exercisable at any time (and from time to time) prior to the Expiration Date; provided, however, that the number of Shares exercisable hereunder shall vest (and shall not be exercisable until so vested) in accordance with the following schedule:

(i)      7,922,270 Shares shall vest and become exercisable hereunder upon the "Closing Date" as such term is defined in the Warehouse Loan Agreement, dated as of February 24, 2004 (the

"Loan Agreement"), among the Company, as Borrower and Servicer thereunder and CIGPF I Corp., as Agent and Lender;

    (ii)  an additional 11,883,404 Shares shall vest and become exercisable upon the first extension of the Facility Termination Date pursuant to Section 2.01(b) of the Loan Agreement; and

    (iii)  all Shares remaining unvested shall vest and become exercisable upon the second extension of the Facility Termination Date pursuant to Section 2.01(b) of the Loan Agreement;

provided, however; that notwithstanding the foregoing vesting schedule:

    (iv)  (1)  all Shares shall immediately vest and become exercisable if CIGPF I Corp. declines to extend the first Facility Termination Date for the reason that the entity or entities providing inventory financing have declined to approve a pending or proposed securitization or term financing on terms reasonably satisfactory to CIGPF I Corp. or, if there has been no such pending or proposed securitization or term financing prior to such date, then receipt by CIGPG I Corp. from such entity or entities of an unconditional consent to any future securitization or term financing permitted under the Loan Agreement;

    (2)  all Shares shall immediately vest and become exercisable if the Company does not request an extension of the first or second Facility Termination Dates on the same terms and conditions as then set forth in the Loan Agreement; provided, however, that if CIGPF I Corp.'s acceptance of the Company's request for any such extension is conditioned upon a modification of the terms and conditions of the Loan Agreement and the Company does not renew the Loan Agreement on such modified terms and conditions, then all rights to acquire all Shares (other than Shares which are vested under Section 1(b)(i) of this Warrant and, if applicable, Shares which have previously vested under Section 1(b)(ii) of this Warrant) shall immediately vest and become exercisable by Petters Company Inc. (together with its registered assigns, "PCI"); and upon such event, CIGPF I Corp. and it registered assigns shall not be deemed to the Holder hereunder with respect to such unvested Shares or have any further rights with respect thereto.  In such event, CIGPF I Corp. and its registered assigns, by acceptance hereof, hereby agree within ten (10) days thereafter to tender this Warrant (to the extent not previously vested) to the Company, which shall issue within ten (10) days thereafter (A) a replacement Warrant of like tenor and including the same terms and conditions (other than with respect to vesting terms under this Section 1(b)) to CIGPF I Corp. and its registered assigns solely for the Shares that are vested and exercisable by CIGPF I Corp. and its registered assigns, and (B) a Warrant of like tenor and containing the same terms and conditions (other than with respect to vesting terms under this Section 1(b)) to PCI solely for the Shares for which are vested and exercisable by PCI under this Section 1(b)(iv)(1); provided, however, that the provisions of this Section 1(b)(iv)(1) shall apply in accordance with their terms whether or not CIGPF I Corp. and its registered assigns shall so tender this Warrant;

    (3)  subject to the foregoing, all Shares shall immediately vest and become exercisable immediately upon the occurrence of a Stipulated Event.  As used herein, the term "Stipulated Event" shall mean (a) a "Sale of the Corporation" as defined in the Second Amended and Restated Certificate of Incorporation of the Company or (b) any Event of Default under the Loan Agreement.

2.    Method of Exercise; Payment.

    (a)  Cash Exercise.  The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part, at any time or from time to time, by the surrender of this Warrant (together with a duly executed notice of exercise (the "Notice of Exercise") in the form attached hereto as Exhibit A at the Company's offices at 4400 Baker Road, Minnetonka, Minnesota 55343 (as such address may be

updated from time to time by means of written notice to the Holder pursuant to Section 5(b) hereof), and by payment to the Company of an amount equal to the Exercise Price multiplied by the number of the Shares being purchased, which amount may be paid, at the election of the Holder, by (i) wire transfer or check payable to the order of the Company, (ii) cancellation by the Holder of indebtedness or other obligations of the Company to the Holder pursuant to a written agreement reasonably acceptable to the Company or (iii) any combination of (i) and (ii). The Holder, in whose name any certificate representing the Shares issuable upon any exercise of this Warrant will be issued shall be deemed to have become the holder of record of, and shall be treated for all purposes as the record holder of, the Shares represented thereby (and such Shares shall be deemed to have been issued) immediately prior to the close of business on the date or dates upon which such surrender and payment are made. As used in this Section 2, the term "person" means any individual or any corporation, partnership, trust, limited liability company or other entity or organization of any kind.

(b) Net Issue Exercise. In lieu of exercising this Warrant pursuant to Section 2(a) hereof, the Holder may elect to receive, without the payment of any additional consideration, a number of Shares equal to the value (as determined below) of this Warrant (or the portion thereof being exercised) by surrender of this Warrant at the Company's address set forth in Section 2(a) above together with a duly executed Notice of Exercise in which the appropriate alternative is initialed by the Holder. In such event, the Company shall issue to the Holder the number of Shares computed using the following formula:

$$X = \frac{Y\,(A\text{-}B)}{A}$$

Where X    =    the number of Shares to be issued to the Holder.

Y    =    the number of Shares subject to this Warrant or, if only a portion of this Warrant is being exercised, the portion of this Warrant being exercised (at the time of such calculation).

A    =    the Fair Market Value of one Share (at the date of such calculation).

B    =    the Exercise Price (as adjusted to the date of such calculation).

(c) Automatic Exercise. The Warrant shall automatically be exercised on the Expiration Date by the Holder pursuant to Section 2(b) hereof, if the Fair Market Value per share of the Common Stock, as determined pursuant to Section 2(d) hereof, is greater than the Exercise Price on such date. The Company shall take all actions and execute and deliver all documents necessary to effect the foregoing, and the Holder shall be entitled to receive Shares as if such Holder had exercised this Warrant pursuant to Section 2(b) hereof on such date.

(d) Fair Market Value. For purposes of this Section 2, the Fair Market Value of one Share shall equal:

(i) the average of the closing sale prices of the Common Stock quoted on the Nasdaq Stock Market or in the Over-The-Counter Market Summary or the closing price quoted on any national securities exchange on which such securities are listed, whichever is applicable, as published in the Eastern Edition of The Wall Street Journal for the ten (10) consecutive trading days immediately prior to the date of determination of Fair Market Value (or, if no sales take place on any such trading day, the average of the closing bid and asked prices on such trading day); or

(ii)        if the Common Stock is not traded on the Nasdaq Stock Market or Over-The-Counter or on a national securities exchange, the Fair Market Value shall be equal to the value per share as determined in good faith by the Board of Directors of the Company; provided, however, that:

(1)        if the Holder disagrees in its sole discretion with such determination, then the Company and the Holder shall each retain at its own cost an Independent Accountant, which two Accountants shall cooperate in determining the Fair Market Value of the Shares;

(2)        if such Accountants cannot agree on a Fair Market Value within thirty (30) days of referral of the matter, then the parties agree to submit the dispute to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules; such arbitration shall be tried by a single arbitrator selected by the Accountants, and it is the intent of the parties that, barring extraordinary circumstances, arbitration proceedings will be concluded within 60 days from the date the arbitrator is appointed; and

(3)        "Accountant" and "Independent" shall have the meanings set forth in the Loan Agreement.

(e)        Stock Certificates.  In the event of any exercise of the rights represented by this Warrant, as promptly as practicable on or after the date of exercise and in any event within ten (10) days thereafter, the Company at its expense shall issue and deliver to the Holder entitled to receive the same a certificate or certificates representing the number of Shares issued upon such exercise.  In the event this Warrant is exercised in part, as promptly as practicable on or after the date of exercise and in any event within ten (10) days thereafter, the Company at its sole expense will execute and deliver to the Holder a new Warrant of like tenor exercisable for the number of Shares for which this Warrant may then be exercised.

(f)        Taxes.  The issuance of the Shares upon the exercise of this Warrant, and the delivery of certificates or other instruments representing such Shares, shall be made without charge to the Holder for any tax or other charge of whatever nature in respect of such issuance (other than taxes, if any, based on the net income of the Holder) and the Company shall bear any such taxes in respect of such issuance.

3.        Stock Fully Paid; Reservation of Shares.  All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price therefor, be fully paid and nonassessable, and the issuance of the Shares will be free from all preemptive rights, rights of first refusal or first offer, taxes, liens and charges of whatever nature.  The Company will from time to time take all such action as may be required to assure that the stated or par value per share of Common Stock is at all times equal to or less than the then effective Exercise Price per share of Common Stock issuable upon exercise of this Warrant.  During the period within which the rights represented by this Warrant may be exercised, the Company shall at all times have authorized and reserved for issuance a sufficient number of shares of its Common Stock to provide for the full exercise of the rights represented by this Warrant.  The Company shall take all steps necessary to amend its certificate of incorporation and other organizational documents to provide sufficient reserves of shares of Common Stock issuable upon full exercise of this Warrant.  The Company hereby agrees that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of executing stock certificates to execute and issue the proper certificates for Shares upon the full or each partial exercise of this Warrant.  The Company further covenants and agrees that if any shares of capital stock to be reserved for the purpose of the issuance of shares of Common Stock upon the exercise of this Warrant require approval of any governmental authority under any Federal or state law before such shares may be validly issued or delivered upon exercise, then the Company will in good faith and expeditiously as possible endeavor to secure such approval.  If and so long as the Common Stock issuable upon the exercise of the rights represented by this Warrant is listed on any national securities exchange, the Company will, if permitted

by the rules of such exchange, list and keep listed on such exchange, upon official notice of issuance, all shares of such capital stock.

4.        Adjustment of Exercise Price and Number of Shares.  The number and kind of Shares purchasable upon the exercise of this Warrant and the Exercise Price therefor shall be subject to adjustment from time to time upon the occurrence of certain events, as follows:

        (a)        Adjustment for Consolidation, Merger, Sale or Transfer.  If while this Warrant, or any portion hereof, remains outstanding and unexpired, there shall be (i) a merger or consolidation of the Company with or into another person in which the Company is not the surviving entity, or a reverse merger in which the Company is the surviving entity but the shares of the Company's capital stock outstanding immediately prior to the merger are converted by virtue of the merger into other property, whether in the form of securities, cash, or otherwise, or (ii) a sale or transfer of the Company's properties and assets as, or substantially as, an entirety to any other person in one transaction or a series of related transactions, then, as a part of such merger, consolidation, sale or transfer, all necessary or appropriate lawful provisions shall be made so that the Holder shall thereafter be entitled to receive upon exercise of this Warrant, during the period specified herein and upon payment of the Exercise Price then in effect, the greatest number of shares of stock or other securities or property that a holder of the Shares deliverable upon exercise of this Warrant would have been entitled to receive in such merger, consolidation, sale or transfer if this Warrant had been exercised immediately prior to such merger, consolidation, sale or transfer, all subject to further adjustment as provided in this Section 4.  If the per Share consideration payable to the Holder for Shares in connection with any such transaction is in a form other than cash or marketable securities, then the value of such consideration shall be determined in good faith by the Company's Board of Directors.  The foregoing provisions of this paragraph shall similarly apply to successive consolidations, mergers, sales and transfers and to the stock or securities of any other corporation that are at the time receivable upon the exercise of this Warrant.  In all events, appropriate adjustment shall be made in the application of the provisions of this Warrant (including adjustment of the Exercise Price and number of Shares purchasable pursuant to the terms and conditions of this Warrant) with respect to the rights and interests of the Holder after the transaction, to the end that the provisions of this Warrant shall be applicable after that event, as near as reasonably may be, in relation to any shares or other property deliverable or issuable after such merger, consolidation, sale or transfer upon exercise of this Warrant.

        (b)        Adjustments for Split, Subdivision or Combination of Shares.  If the Company at any time while this Warrant, or any portion hereof, remains outstanding and unexpired shall split or subdivide any class of securities as to which purchase rights under this Warrant exist into a different number of securities of the same class, the number of securities of such class issuable upon exercise of this Warrant immediately prior to such split or subdivision shall be proportionately increased and the Exercise Price for such securities of such class shall be proportionately decreased.  If the Company at any time while this Warrant, or any portion hereof, remains outstanding and unexpired shall combine any class of securities as to which purchase rights under this Warrant exist into a different number of securities of the same class, the number of securities of such class issuable upon exercise of this Warrant immediately prior to such combination shall be proportionately decreased and the Exercise Price for such class of securities shall be proportionately increased.

        (c)        Adjustments for Dividends in Stock or Other Securities or Property.  If while this Warrant, or any portion hereof, remains outstanding and unexpired, the holders of any class of securities as to which purchase rights under this Warrant exist at the time shall have received, or, on or after the record date fixed for the determination of eligible stockholders, shall have become entitled to receive, without payment therefor, other or additional stock or other securities or property (other than cash) of the Company by way of dividend, then and in each case, this Warrant shall represent the right to acquire, in

addition to the number of shares of such class of securities receivable upon exercise of this Warrant, and without payment of any additional consideration therefor, the amount of such other or additional stock or other securities or property (other than cash) of the Company that such holder would hold on the date of such exercise had it been the holder of record of the class of security receivable upon exercise of this Warrant on the date hereof and had thereafter, during the period from the date hereof to and including the date of such exercise, retained such shares and/or all other additional stock available to it as aforesaid during said period, giving effect to all adjustments called for during such period by the provisions of this Section 4.

(d)    Antidilution Adjustments.    The Exercise Price and number of Shares purchasable pursuant to the terms and conditions of this Warrant shall be subject to adjustment from time to time as follows:

(i)    If the Company shall, at any time or from time to time prior to the Expiration Date, issue any shares of Common Stock (or be deemed to have issued any shares of Common Stock as provided herein), other than Excluded Securities (as defined in Section 4(d)(iii)), without consideration or for a consideration per share less than the Exercise Price in effect immediately prior to the issuance of Common Stock, the Exercise Price in effect immediately prior to such issuance shall forthwith be lowered to a price equal to the quotient obtained by dividing: (x) an amount equal to the sum of (1) the total number of shares of Common Stock outstanding (including any shares of Common Stock deemed to have been issued pursuant to Section 4(d)(ii)(D)(1)-(2)) immediately prior to such issuance multiplied by the Exercise Price in effect immediately prior to such issuance, plus (2) the consideration received by the Company upon such issuance, by (y) the total number of shares of Common Stock outstanding (including any shares of Common Stock deemed to have been issued pursuant to Section 4(d)(ii)(D)(1)-(2)) immediately after the issuance of such Common Stock.    If the Company shall, at any time or from time to time prior to the Expiration Date, issue any shares of Common Stock as a stock dividend or upon any stock split or other subdivision or combination of shares of Common Stock, other than a stock dividend on the Company's Preferred Stock at a dividend rate no greater than 8%, the number of Shares issuable under this Warrant shall be increased by such amount required so that the total number of Shares issuable under this Warrant, as a percentage of the aggregate number of Fully Diluted Shares of the Company as of the date of (and after giving effect to) such dividend, shall equal the same percentage of Fully Diluted Shares of the Company as of immediately prior to such dividend.

(ii)    For the purposes of any adjustment of the Exercise Price pursuant to Section 4(d)(i), the following provisions shall be applicable:

(A)    In the case of the issuance of Common Stock for cash, the consideration shall be deemed to be the amount of cash paid therefor before deducting therefrom any discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance and sale thereof.

(B)    In the case of the issuance of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined in good faith by the Board of Directors of the Company, irrespective of any accounting treatment.

(C)    In the case of the issuance of Common Stock without consideration, the consideration shall be deemed to be $0.00001 per share.

(D)    In the case of the issuance of (x) options to purchase or rights to subscribe for Common Stock, (y) securities by their terms convertible into or exchangeable for Common Stock or (z) options to purchase rights to subscribe for such convertible or exchangeable securities:

(1)    the shares of Common Stock deliverable upon exercise of such options to purchase or rights to subscribe for Common Stock shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration (determined in the manner provided in subdivisions (A), (B) and (C) above), if any, received by the Company upon the issuance of such options or rights plus the minimum purchase price provided in such options or rights for the Common Stock covered thereby;

(2)    the shares of Common Stock deliverable upon conversion of or in exchange for any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof shall be deemed to have been issued at the time such securities were issued or such options or rights were issued and for a consideration equal to the consideration received by the Company for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued dividends), plus the additional consideration, if any, to be received by the Company upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in subdivisions (A), (B) and (C) above);

(3)    on any change in the exercise price of Common Stock deliverable upon exercise of any such options or rights or conversions of or exchanges for such securities, other than a change resulting from the antidilution provisions thereof, the applicable Exercise Price shall forthwith be readjusted to such Exercise Price as would have resulted had the adjustment made upon the issuance of such options, rights or securities not converted prior to such change (or options or rights related to such securities not converted prior to such change) been made upon the basis of such change; provided, however, that such readjustment shall not result in an Exercise Price that is greater than the original Exercise Price; and

(4)    on the expiration of all such options or rights, the termination of all such rights to convert or exchange or the expiration of all options or rights related to such convertible or exchangeable securities in each case having been issued by the Company for the same consideration (as determined pursuant to subdivision (A), (B) and (C) above), the applicable Exercise Price shall forthwith be readjusted to such Exercise Price as would have resulted had the adjustment made upon the issuance of such options, rights, securities or options or rights related to such securities not been made; provided, however, that such readjustment shall not result in a Exercise Price that is greater that the original Exercise Price.

(iii)    For purposes of this Section 4(d), the term "Excluded Securities" shall mean Shares of Common Stock excluded the definition of "Additional Shares of Common Stock"

under the Second Amended and Restated Certificate of Incorporation of the Company, as amended from time to time.

(iv)     Upon each adjustment of the Exercise Price pursuant to this Section 4(d), the number of Shares issuable upon exercise of this Warrant shall be equal to (A) the product of the number of Shares the Holder was entitled to purchase immediately before such adjustment and the Exercise Price in effect immediately before such adjustment, divided by (B) the Exercise Price in effect after giving effect to such adjustment.

(e)     Further Adjustments. In case at any time or from time to time the Company shall take any action that affects the Common Stock, other than an action described herein, then, unless such action will have a materially adverse effect upon the rights of the Holder, the number of Shares of into which this Warrant is exercisable shall be adjusted in such a manner and at such time as shall be equitable in the circumstances; provided, however, that such adjustment shall not result in a reduction in the original number of Shares covered by this Warrant.

(f)     Notice of Adjustments. Upon any adjustment of the Exercise Price and any increase or decrease in the number of Shares purchasable upon the exercise of this Warrant, then, and in each such case, the Company, within thirty (30) days thereafter, shall give written notice thereof to the Holder at the address of such Holder as shown on the books of the Company which notice shall state (i) the reason for such adjustment and (ii) the Exercise Price, as adjusted and, if applicable, the increased or decreased number of Shares purchasable upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation of each.

5.     Notices.

(a)     In the event that the Company shall propose at any time:

(i)     to declare any dividend or distribution upon its Common Stock (or other stock or securities at the time receivable upon the exercise of this Warrant) whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(ii)     to redeem or repurchase any class or series of its stock;

(iii)     to offer for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights;

(iv)     to effect a capital reorganization, or merge or consolidate with or into any other corporation, or sell, lease or convey all or substantially all its property or business, or voluntarily liquidate, dissolve or wind up; or

(v)     to effect its first firm commitment underwritten public offering (a "Public Offering") of its Common Stock under the Securities Act of 1933, as amended (the "Securities Act");

then, in connection with each such event, the Company shall send to the Holder: (1) at least twenty (20) days prior written notice of the date on which a record shall be taken for such dividend, distribution, redemption or subscription rights (and specifying the date on which the holders of Common Stock shall be entitled thereto) or for determining rights to vote, if any; and (2) at least twenty (20) days prior written notice of the date when the same shall take place, and the date, if any, to be fixed, on which the holders of

record of Common Stock shall be entitled to exchange their Common Stock for securities or other property deliverable upon the occurrence of such event. Notwithstanding the above, the twenty (20) days notice requirement may be shortened or waived upon the written consent of the Holder.

(b)     In the event the Holder is provided with notice pursuant to Section 5(a)(ii) of a Redemption Request (as defined in the Company's Amended and Restated Certificate of Incorporation, as amended from time to time) with respect to the Series A Preferred Stock of the Company, the Holder may elect to have this Warrant redeemed by the Company at the same time as the Series A Preferred Stock of the Company is redeemed pursuant to the Redemption Request. Holder must make the irrevocable election in writing to the Company within fifteen (15) days of receipt of the notice of the Redemption Request. The redemption of this Warrant shall be in cash for the Fair Market Value of the Shares issuable pursuant to this Warrant, determined in accordance with Section 2 of this Warrant, but otherwise will be redeemed in proportion to the number of shares of Series A Preferred Stock is being redeemed by the Company, at the same times as such redemptions, and subject to all limitations for insufficient funds as provided in the Company's Amended and Restated Certificate of Incorporation.

(c)     Any written notice by the Company required or permitted hereunder shall be given by hand delivery or first class mail, postage prepaid, addressed to the Holder at the address shown on the books of the Company for the Holder.

6.          Notice of Board Meetings. For so long as this Warrant (or part thereof) remains outstanding, the Company shall give the Holder written notice of each meeting of the Board of Directors of the Company or any committee thereof at the same time and in the same manner as the members of the Board of Directors of the Company or such committee receive notice of such meetings; provided, that in the case of telephonic meetings, the Holder need receive only actual notice thereof at the same time and in the same manner as notice is given to the directors. The Holder shall be entitled to receive all written materials and other information given to the directors in connection with such meetings at the same time such materials and information are given to the directors. If the Company proposes to take any action by written consent in lieu of a meeting of the Board, the Company shall give written notice thereof to the Holder prior to the effective date of such consent describing the nature and substance of such action.

7.          Legend. Each certificate evidencing the Shares issued upon exercise of this Warrant, or transfer of such Shares (other than a transfer registered under the Securities Act or any subsequent transfer of shares so registered) shall be stamped or imprinted with a legend in substantially the following form:

> THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE
> SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES
> LAWS (COLLECTIVELY, THE "ACTS"), AND MAY NOT BE OFFERED,
> SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED
> UNLESS AND UNTIL REGISTERED UNDER ALL APPLICABLE ACTS OR
> UNLESS AN OPINION OF COUNSEL IS DELIVERED TO THE COMPANY
> IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE
> COMPANY TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED
> UNDER ALL APPLICABLE ACTS OR UNLESS SOLD PURSUANT TO
> RULE 144 OR RULE 144A OF THE ACT. THE RIGHT TO VOTE AND THE
> SALE OR TRANSFER OF THIS WARRANT AND THE SHARES
> OBTAINABLE UPON ITS EXERCISE IS SUBJECT TO THE TERMS AND
> CONDITIONS OF A CERTAIN STOCKHOLDERS AGREEMENT DATED
> FEBRUARY 24, 2004 BY AND AMONG THE HOLDER HEREOF AND
> OTHER STOCKHOLDERS OF THE COMPANY.  COPIES OF SUCH
> AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE
> SECRETARY OF THE COMPANY.

8.          Removal of Legend. Upon request of a holder of a certificate with the legend required by Section 7 hereof, the Company shall issue to such holder a new certificate therefor free of any transfer legend, if, with such request, the Company shall have received an opinion of counsel (either external counsel or counsel employed by Holder or its affiliate) reasonably satisfactory to the Company in form and substance to the effect that any transfer by such holder of the shares evidenced by such certificate will not violate the Securities Act and any applicable state securities laws.

9.          Fractional Shares. No fractional shares will be issued in connection with any exercise hereunder. Any fraction of a share resulting from any calculation will be rounded up to the next whole share.

10.         Representations, Warranties and Covenants of the Company. The Company hereby represents and warrants to the Holder as follows:

(a)         This Warrant has been duly authorized and executed by the Company and is a valid and binding obligation of the Company enforceable in accordance with its terms;

(b)         Prior to the date that this Warrant becomes exercisable, the Shares will have been duly authorized and reserved for issuance by the Company and, when issued in accordance with the terms hereof, will be validly issued, fully paid and nonassessable, and free from all preemptive rights, rights of first refusal or first offer, taxes, liens and charges of whatever nature;

(c)         The execution and delivery of this Warrant are not, and the issuance of the Shares upon exercise of this Warrant in accordance with the terms hereof will not be, inconsistent with the Company's certificate of incorporation, as then in effect, and its bylaws, as then in effect.

(d)         The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is in good standing as a foreign corporation in each jurisdiction in which the nature of its business makes such qualification necessary. The Company has all requisite legal and corporate power and authority to carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Warrant.

(e)     As of the date of original issuance of this Warrant, this Warrant does not (i) conflict with, result in any breach of any terms or provisions of, or constitute (with or without notice or lapse of time or both) a default under, the certificate of incorporation or bylaws of the Company, or any material contract, agreement, indenture, loan agreement, receivables purchase agreement, mortgage, deed of trust or other agreement or instrument to which the Company is a party or by which it or any of its properties is bound, (ii) result in the creation or imposition of any lien, adverse claim or other encumbrance upon any of the properties of the Company pursuant to the terms of any such contract, agreement, indenture, loan agreement, receivables purchase agreement, mortgage, deed of trust or other agreement or instrument, or (iii) violate any law or order, rule or regulation applicable to the Company of any court or of any federal or state regulatory body, administrative agency, or other governmental instrumentality having jurisdiction over the Company or any of its properties.

(f)     As of the date of issuance of this Warrant, the number of Shares for which this Warrant is or may become exercisable (i) pursuant to Section 1(b)(i) hereof represents one percent (1%) of the total number of shares of capital stock of the Company, (ii) pursuant to Section 1(b)(ii) hereof represents one and a half percent (1.5%) of the total number of shares of capital stock of the Company and (iii) pursuant to Section 1(b)(iii) hereof represents one and a half percent (1.5%) of the total number of shares of capital stock of the Company, in each case outstanding on the date hereof after giving effect to the exercise, exchange or conversion of all outstanding securities, rights, options, warrants (including this Warrant), calls, commitments or agreements of any nature or character (whether debt or equity) that are, directly or indirectly, exercisable or exchangeable for, or convertible into or otherwise represent the right to purchase or otherwise receive, directly or indirectly, any such capital stock or other arrangement to acquire at any time or under any circumstance, capital stock of the Company or any such other securities and assuming that all stock options and/or shares of capital stock reserved for grant or issuance to officers, directors, employees and consultants under all agreements, plans or arrangements theretofore approved by the Board of Directors of the Company have been so granted or issued (as the case may be) (collectively, the "Fully-Diluted Shares").

(g)     The Company shall not, from and after the date of this Warrant, create, incur, assume or suffer to exist, or otherwise become directly or indirectly liable with respect to, any Indebtedness (as defined in the Loan Agreement), without the prior written consent of the Holder, other than Indebtedness permitted under the Loan Agreement. This Section 10(g) shall terminate and be of no further force and effect upon the earlier at (i) termination of the Loan Agreement and the repayment in full by the Company of or the waiver or forgiveness of all obligations thereunder or (ii) upon any transfer or this Warrant by Holder other than to a Permitted Transferee under the Stockholders Agreement (as defined below).

(h)     The issuance of this Warrant or any Shares shall not require or result in the issuance of any capital stock of the Company (other than the Shares) pursuant to the certificate of incorporation or bylaws of the Company, or any contract, agreement, indenture, loan agreement, receivables purchase agreement, mortgage, deed of trust or other agreement or instrument to which the Company is a party or by which it or any of its properties is bound.

(i)     The Company has delivered to Holder's counsel true and complete copies of (i) the Certificate of Incorporation of the Company, (ii) the Company's by-laws, (iii) each warrant the Company has issued, and (iv) each stockholders' agreement the Company has entered into, in each case as amended to the date of this Warrant. Except as set forth in this Warrant there are no options, warrants, puts, calls, rights, convertible or exchange securities, commitments, contracts, agreements, understandings, arrangements or undertakings of any kind to which the Company is a party or by which it is bound (A) obligating the Company to issue, deliver, transfer or sell, or cause to be issued, delivered, transferred or sold, additional shares of capital stock or any other security of (including any security convertible into or exercisable for or exchangeable into any capital stock or other security of) the Company (whether or not

such security has voting rights), (B) obligating the Company to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, agreement, understanding, arrangement or undertaking, or (C) otherwise relating to the Company's capital stock (including, without limitation, any rights of holders thereof).

11.          Rights of Stockholders. Subject to Section 4 hereof, no Holder, as such, shall be entitled to vote or receive dividends or be deemed the holder of the Shares or any other securities of the Company that may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value, consolidation, merger, conveyance, or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until this Warrant shall have been exercised and the Shares purchasable upon the exercise hereof shall have become issuable, as provided herein.

12.          Warrant Put Right. If the Company enters into any business combination whereby the holders of the capital stock of the Company prior to the effective time of the business combination would hold, directly or indirectly, less than fifty percent (50%) of the aggregate capital stock of the surviving entity, the Company shall provide written notice of such business combination to the Holder not less than thirty (30) days prior to the effective time of such business combination. Upon receiving such notice (an "Election Notice") from the Company, the Holder may elect, by providing written notice of such election to the Company within thirty (30) days of the date it receives such notice, to require that the Company purchase this Warrant (or any portion thereof that remains unexercised) from the Holder for an amount, in cash, equal to (a) the aggregate fair market value immediately prior to the effective time of such business combination of the Shares issuable pursuant to this Warrant (such fair market value to be determined as set forth in Section 2(c) hereof) minus (b) the aggregate Exercise Price of this Warrant for such Shares (the "Put Right"); provided in order to effectively exercise the Put Right, the Election Notice shall describe in detail (i) the conflict of interest the Holder would experience if forced to hold equity securities of the surviving entity and (ii) why such conflict of interest has or would have a material adverse effect on the Holder's business operation in the ordinary course, provided, further, however, that the Holder shall have no Put Right if (x) the proposed business combination is not consummated, (y) the consideration payable to the holders of the capital stock of the Company consists solely of cash or capital stock of a corporation or other entity that is publicly traded on the Nasdaq National or SmallCap Market or on a national securities exchange or (z) the Company does not have sufficient cash legally available to fully satisfy the Put Right. Subject to the foregoing, the Company shall pay to the Holder, in immediately available funds, any amounts due as a result of the Holder's exercise of its Put Right no later than the effective time of the business combination. The Put Right shall terminate upon the full exercise of this Warrant. This Section 12 shall terminate and be of no further force and effect upon the earlier of (i) the termination of the Loan Agreement and the repayment by the Company of or the waiver or forgiveness of its obligations thereunder or (ii) upon any transfer of this Warrant by the Holder.

13.          Expiration of Warrant. This Warrant shall expire and shall no longer be exercisable as of 5:00 p.m., Eastern Time, on the date that occurs five years following the "Termination Date" under the Loan Agreement.

14.          Stockholders Agreement.

        (a)          The Holder of this Warrant, by acceptance hereof, agrees to become a party to the Stockholders Agreement, dated as of February 24, 2004, by and among the Company and the Stockholders Party thereto (the "Stockholders Agreement") and thereby subjects this Warrant and any

Common Stock issuable or issued upon exercise hereof to the provisions of the Stockholders' Agreement, as amended from time to time.

15.     Miscellaneous.

(a)     This Warrant shall be governed by and construed for all purposes under and in accordance with the laws of the State of New York without regard to principles of conflicts of law.

(b)     The headings in this Warrant are for purposes of reference only, and shall not limit or otherwise affect any of the terms hereof.

(c)     The representations, warranties, covenants and conditions of the respective parties contained herein or made pursuant to this Warrant shall survive the execution and delivery of this Warrant.

(d)     The terms of this Warrant shall be binding upon and shall inure to the benefit of any successors or assigns of the Company and of the Holder or holders hereof and of the Shares issued or issuable upon the exercise hereof.

(e)     This Warrant, together with all exhibits hereto, constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.

(f)     The Company shall not, by amendment of its certificate of incorporation or bylaws, or through any other means, directly or indirectly, avoid or seek to avoid the observance or performance of any of the terms of this Warrant and shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

(g)     Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of any such mutilation, upon surrender and cancellation of such Warrant, the Company, at its expense, will execute and deliver to the Holder, in lieu thereof, a new Warrant of like date and tenor. Any such new Warrant shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen or destroyed Warrant shall be at any time enforceable by anyone.

(h)     This Warrant and any provision hereof may be amended, waived or terminated only by an instrument in writing signed by the Company and the Holder.

(i)     If any action at law or equity is necessary to enforce or interpret the terms of this Warrant, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which it may be entitled.

(j)     Each of the Company and the Holder hereby irrevocably submits to the jurisdiction of any New York State or Federal court sitting in New York City in any action or proceeding arising out of or relating to this Warrant, and each of the Company and the Holder hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court or in such Federal court. Each of the Company and the Holder hereby irrevocably waives, to the fullest extent permitted under applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding. Each of the Company and the Holder hereby irrevocably consents, to the fullest extent permitted under applicable law, to the service of any summons and complaint and any other

process by the mailing of copies of such process to them at their respective address specified in the Warrant Agreement. Each of the Company and the Holder hereby agrees, to the fullest extent permitted under applicable law, that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

[Signature on following page]

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed by its duly authorized officer.

FINGERHUT DIRECT MARKETING, INC.

By: _____

Name:   Brian Smith

Title:   President

[Signature Page to Warrant]

EXHIBIT A

## NOTICE OF EXERCISE

TO:        Fingerhut Direct Marketing, Inc.
                Attention: President

      1.  The undersigned hereby elects to purchase _____ (leave blank if you choose Alternative No. 2 below) shares of Common Stock of Fingerhut Direct Marketing, Inc. (the "Company") pursuant to the terms of the Common Stock Purchase Warrant dated as of February ___, 2004, issued by the Company (the "Warrant"), and tenders herewith payment of the purchase price of such shares in full. (Initial here if the undersigned elects this alternative). _____

      2.  In lieu of exercising the Warrant for cash or check, the undersigned hereby elects to effect the net issuance provision of Section 2(b) of the Warrant and receive _____ (leave blank if you choose Alternative No. 1 above) shares of Common Stock of the Company pursuant to the terms of the Warrant. (Initial here if the undersigned elects this alternative). _____

      3.  Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

---

(Name)

---

(Address)

      4.  The undersigned hereby represents and warrants that the aforesaid shares of Common Stock are being acquired for the account of the undersigned for investment and not for resale or with a view to distribute such shares or any part thereof, and that the undersigned has no present intention of distributing or reselling such shares, and that the undersigned is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

---

(Signature and Date

NEITHER THIS WARRANT NOR THE SHARES OBTAINABLE UPON ITS EXERCISE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS (COLLECTIVELY, THE "ACTS"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER ALL APPLICABLE ACTS OR UNLESS AN OPINION OF COUNSEL IS DELIVERED TO THE COMPANY (AS DEFINED BELOW) IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE COMPANY TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED UNDER ALL APPLICABLE ACTS OR UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A OF THE ACT. THE RIGHT TO VOTE AND THE SALE OR TRANSFER OF THIS WARRANT AND THE SHARES OBTAINABLE UPON ITS EXERCISE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN STOCKHOLDERS AGREEMENT DATED FEBRUARY 24, 2004 BY AND AMONG THE HOLDER HEREOF AND OTHER STOCKHOLDERS OF THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

November 1, 2004

## FINGERHUT DIRECT MARKETING, INC.

### COMMON STOCK PURCHASE WARRANT

---

THIS CERTIFIES THAT, for value received, CIGPF I CORP., or its registered assigns (the "Holder"), is entitled to subscribe for and purchase from Fingerhut Direct Marketing, Inc., a Delaware corporation (the "Company"), the Shares (as defined in Section 1 hereof) at the per share exercise price of $0.01 (the "Exercise Price") (as adjusted from time to time pursuant to Section 4 hereof), at any time or from time to time prior to or upon the Expiration Date (as defined in Section 13 hereof, subject to the provisions and upon the terms and conditions hereinafter set forth.

This Warrant is subject to the following terms and conditions:

1.        Shares; When Exercisable.

(a)        As used herein, the term "Shares" means up to an aggregate of 1,427,076 shares of the Company's Common Stock, par value $0.00001 per share (the "Common Stock"), it being understood that (i) the number of Shares issuable hereunder are subject to vesting from time to time pursuant to Section 1(b) hereof and (ii) the number of Shares issuable hereunder and the Exercise Price are subject to adjustment from time to time pursuant to Section 4 hereof.

(b)        This Warrant shall be exercisable at any time (and from time to time) prior to the Expiration Date; provided, however, that the number of Shares exercisable hereunder shall vest (and shall not be exercisable until so vested) in accordance with the following schedule:

(i)        356,769 Shares shall vest and become exercisable hereunder on the date hereof;

(ii)    an additional 535,153 Shares shall vest and become exercisable upon the first extension of the Facility Termination Date pursuant to Section 2.01(b) of the Warehouse Loan Agreement, dated as of February 24, 2004 (the "Loan Agreement"), among the Company, as Borrower and Servicer thereunder and CIGPF I Corp., as Agent and Lender; and

(iii)    all Shares remaining unvested shall vest and become exercisable upon the second extension of the Facility Termination Date pursuant to Section 2.01(b) of the Loan Agreement;

provided, however, that notwithstanding the foregoing vesting schedule:

(iv)    (1)    all Shares shall immediately vest and become exercisable if CIGPF I Corp. declines to extend the first Facility Termination Date for the reason that the entity or entities providing inventory financing have declined to approve a pending or proposed securitization or term financing on terms reasonably satisfactory to CIGPF I Corp. or, if there has been no such pending or proposed securitization or term financing prior to such date, then receipt by CIGPG I Corp. from such entity or entities of an unconditional consent to any future securitization or term financing permitted under the Loan Agreement;

(2)    all Shares shall immediately vest and become exercisable if the Company does not request an extension of the first or second Facility Termination Dates on the same terms and conditions as then set forth in the Loan Agreement; provided, however, that if CIGPF I Corp.'s acceptance of the Company's request for any such extension is conditioned upon a modification of the terms and conditions of the Loan Agreement and the Company does not renew the Loan Agreement on such modified terms and conditions, then all rights to acquire all Shares (other than Shares which are vested under Section 1(b)(i) of this Warrant and, if applicable, Shares which have previously vested under Section 1(b)(ii) of this Warrant) shall immediately vest and become exercisable by Petters Company Inc. (together with its registered assigns, "PCI"); and upon such event, CIGPF I Corp. and it registered assigns shall not be deemed to the Holder hereunder with respect to such unvested Shares or have any further rights with respect thereto. In such event, CIGPF I Corp. and its registered assigns, by acceptance hereof, hereby agree within ten (10) days thereafter to tender this Warrant (to the extent not previously vested) to the Company, which shall issue within ten (10) days thereafter (A) a replacement Warrant of like tenor and including the same terms and conditions (other than with respect to vesting terms under this Section 1(b)) to CIGPF I Corp. and its registered assigns solely for the Shares that are vested and exercisable by CIGPF I Corp. and its registered assigns, and (B) a Warrant of like tenor and containing the same terms and conditions (other than with respect to vesting terms under this Section 1(b)) to PCI solely for the Shares for which are vested and exercisable by PCI under this Section 1(b)(iv)(1); provided, however, that the provisions of this Section 1(b)(iv)(1) shall apply in accordance with their terms whether or not CIGPF I Corp. and its registered assigns shall so tender this Warrant;

(3)    subject to the foregoing, all Shares shall immediately vest and become exercisable immediately upon the occurrence of a Stipulated Event. As used herein, the term "Stipulated Event" shall mean (a) a "Sale of the Corporation" as defined in the Second Amended and Restated Certificate of Incorporation of the Company or (b) any Event of Default under the Loan Agreement.

2.    Method of Exercise; Payment.

(a)    Cash Exercise. The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part, at any time or from time to time, by the surrender of this Warrant (together with a duly executed notice of exercise (the "Notice of Exercise") in the form attached hereto as Exhibit A at the Company's offices at 4400 Baker Road, Minnetonka, Minnesota 55343 (as such address may be

updated from time to time by means of written notice to the Holder pursuant to Section 5(b) hereof), and by payment to the Company of an amount equal to the Exercise Price multiplied by the number of the Shares being purchased, which amount may be paid, at the election of the Holder, by (i) wire transfer or check payable to the order of the Company, (ii) cancellation by the Holder of indebtedness or other obligations of the Company to the Holder pursuant to a written agreement reasonably acceptable to the Company or (iii) any combination of (i) and (ii). The Holder, in whose name any certificate representing the Shares issuable upon any exercise of this Warrant will be issued shall be deemed to have become the holder of record of, and shall be treated for all purposes as the record holder of, the Shares represented thereby (and such Shares shall be deemed to have been issued) immediately prior to the close of business on the date or dates upon which such surrender and payment are made. As used in this Section 2, the term "person" means any individual or any corporation, partnership, trust, limited liability company or other entity or organization of any kind.

(b)     Net Issue Exercise. In lieu of exercising this Warrant pursuant to Section 2(a) hereof, the Holder may elect to receive, without the payment of any additional consideration, a number of Shares equal to the value (as determined below) of this Warrant (or the portion thereof being exercised) by surrender of this Warrant at the Company's address set forth in Section 2(a) above together with a duly executed Notice of Exercise in which the appropriate alternative is initialed by the Holder. In such event, the Company shall issue to the Holder the number of Shares computed using the following formula:

$$X = \frac{Y (A-B)}{A}$$

Where X     =     the number of Shares to be issued to the Holder.

Y     =     the number of Shares subject to this Warrant or, if only a portion of this Warrant is being exercised, the portion of this Warrant being exercised (at the time of such calculation).

A     =     the Fair Market Value of one Share (at the date of such calculation).

B     =     the Exercise Price (as adjusted to the date of such calculation).

(c)     Automatic Exercise. The Warrant shall automatically be exercised on the Expiration Date by the Holder pursuant to Section 2(b) hereof, if the Fair Market Value per share of the Common Stock, as determined pursuant to Section 2(d) hereof, is greater than the Exercise Price on such date. The Company shall take all actions and execute and deliver all documents necessary to effect the foregoing, and the Holder shall be entitled to receive Shares as if such Holder had exercised this Warrant pursuant to Section 2(b) hereof on such date.

(d)     Fair Market Value. For purposes of this Section 2, the Fair Market Value of one Share shall equal:

(i)     the average of the closing sale prices of the Common Stock quoted on the Nasdaq Stock Market or in the Over-The-Counter Market Summary or the closing price quoted on any national securities exchange on which such securities are listed, whichever is applicable, as published in the Eastern Edition of The Wall Street Journal for the ten (10) consecutive trading days immediately prior to the date of determination of Fair Market Value (or, if no sales take place on any such trading day, the average of the closing bid and asked prices on such trading day); or

3

(ii)          if the Common Stock is not traded on the Nasdaq Stock Market or Over-The-Counter or on a national securities exchange, the Fair Market Value shall be equal to the value per share as determined in good faith by the Board of Directors of the Company; provided, however, that:

(1)          if the Holder disagrees in its sole discretion with such determination, then the Company and the Holder shall each retain at its own cost an Independent Accountant, which two Accountants shall cooperate in determining the Fair Market Value of the Shares;

(2)          if such Accountants cannot agree on a Fair Market Value within thirty (30) days of referral of the matter, then the parties agree to submit the dispute to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules; such arbitration shall be tried by a single arbitrator selected by the Accountants, and it is the intent of the parties that, barring extraordinary circumstances, arbitration proceedings will be concluded within 60 days from the date the arbitrator is appointed; and

(3)          "Accountant" and "Independent" shall have the meanings set forth in the Loan Agreement.

(e) .      Stock Certificates.   In the event of any exercise of the rights represented by this Warrant, as promptly as practicable on or after the date of exercise and in any event within ten (10) days thereafter, the Company at its expense shall issue and deliver to the Holder entitled to receive the same a certificate or certificates representing the number of Shares issued upon such exercise. In the event this Warrant is exercised in part, as promptly as practicable on or after the date of exercise and in any event within ten (10) days thereafter, the Company at its sole expense will execute and deliver to the Holder a new Warrant of like tenor exercisable for the number of Shares for which this Warrant may then be exercised.

(f)      Taxes.  The issuance of the Shares upon the exercise of this Warrant, and the delivery of certificates or other instruments representing such Shares, shall be made without charge to the Holder for any tax or other charge of whatever nature in respect of such issuance (other than taxes, if any, based on the net income of the Holder) and the Company shall bear any such taxes in respect of such issuance.

3.          Stock Fully Paid; Reservation of Shares.  All of the Shares issuable upon the exercise of the rights represented by this Warrant will, upon issuance and receipt of the Exercise Price therefor, be fully paid and nonassessable, and the issuance of the Shares will be free from all preemptive rights, rights of first refusal or first offer, taxes, liens and charges of whatever nature. The Company will from time to time take all such action as may be required to assure that the stated or par value per share of Common Stock is at all times equal to or less than the then effective Exercise Price per share of Common Stock issuable upon exercise of this Warrant. During the period within which the rights represented by this Warrant may be exercised, the Company shall at all times have authorized and reserved for issuance a sufficient number of shares of its Common Stock to provide for the full exercise of the rights represented by this Warrant. The Company shall take all steps necessary to amend its certificate of incorporation and other organizational documents to provide sufficient reserves of shares of Common Stock issuable upon full exercise of this Warrant.   The Company hereby agrees that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of executing stock certificates to execute and issue the proper certificates for Shares upon the full or each partial exercise of this Warrant. The Company further covenants and agrees that if any shares of capital stock to be reserved for the purpose of the issuance of shares of Common Stock upon the exercise of this Warrant require approval of any governmental authority under any Federal or state law before such shares may be validly issued or delivered upon exercise, then the Company will in good faith and expeditiously as possible endeavor to secure such approval.  If and so long as the Common Stock issuable upon the exercise of the rights represented by this Warrant is listed on any national securities exchange, the Company will, if permitted

4

by the rules of such exchange, list and keep listed on such exchange, upon official notice of issuance, all shares of such capital stock.

4.       <u>Adjustment of Exercise Price and Number of Shares</u>. The number and kind of Shares purchasable upon the exercise of this Warrant and the Exercise Price therefor shall be subject to adjustment from time to time upon the occurrence of certain events, as follows:

(a)       <u>Adjustment for Consolidation, Merger, Sale or Transfer</u>. If while this Warrant, or any portion hereof, remains outstanding and unexpired, there shall be (i) a merger or consolidation of the Company with or into another person in which the Company is not the surviving entity, or a reverse merger in which the Company is the surviving entity but the shares of the Company's capital stock outstanding immediately prior to the merger are converted by virtue of the merger into other property, whether in the form of securities, cash, or otherwise, or (ii) a sale or transfer of the Company's properties and assets as, or substantially as, an entirety to any other person in one transaction or a series of related transactions, then, as a part of such merger, consolidation, sale or transfer, all necessary or appropriate lawful provisions shall be made so that the Holder shall thereafter be entitled to receive upon exercise of this Warrant, during the period specified herein and upon payment of the Exercise Price then in effect, the greatest number of shares of stock or other securities or property that a holder of the Shares deliverable upon exercise of this Warrant would have been entitled to receive in such merger, consolidation, sale or transfer if this Warrant had been exercised immediately prior to such merger, consolidation, sale or transfer, all subject to further adjustment as provided in this Section 4. If the per Share consideration payable to the Holder for Shares in connection with any such transaction is in a form other than cash or marketable securities, then the value of such consideration shall be determined in good faith by the Company's Board of Directors. The foregoing provisions of this paragraph shall similarly apply to successive consolidations, mergers, sales and transfers and to the stock or securities of any other corporation that are at the time receivable upon the exercise of this Warrant. In all events, appropriate adjustment shall be made in the application of the provisions of this Warrant (including adjustment of the Exercise Price and number of Shares purchasable pursuant to the terms and conditions of this Warrant) with respect to the rights and interests of the Holder after the transaction, to the end that the provisions of this Warrant shall be applicable after that event, as near as reasonably may be, in relation to any shares or other property deliverable or issuable after such merger, consolidation, sale or transfer upon exercise of this Warrant.

(b)   .   <u>Adjustments for Split, Subdivision or Combination of Shares</u>. If the Company at any time while this Warrant, or any portion hereof, remains outstanding and unexpired shall split or subdivide any class of securities as to which purchase rights under this Warrant exist into a different number of securities of the same class, the number of securities of such class issuable upon exercise of this Warrant immediately prior to such split or subdivision shall be proportionately increased and the Exercise Price for such securities of such class shall be proportionately decreased. If the Company at any time while this Warrant, or any portion hereof, remains outstanding and unexpired shall combine any class of securities as to which purchase rights under this Warrant exist into a different number of securities of the same class, the number of securities of such class issuable upon exercise of this Warrant immediately prior to such combination shall be proportionately decreased and the Exercise Price for such class of securities shall be proportionately increased.

(c)       <u>Adjustments for Dividends in Stock or Other Securities or Property</u>. If while this Warrant, or any portion hereof, remains outstanding and unexpired, the holders of any class of securities as to which purchase rights under this Warrant exist at the time shall have received, or, on or after the record date fixed for the determination of eligible stockholders, shall have become entitled to receive, without payment therefor, other or additional stock or other securities or property (other than cash) of the Company by way of dividend, then and in each case, this Warrant shall represent the right to acquire, in

addition to the number of shares of such class of securities receivable upon exercise of this Warrant, and without payment of any additional consideration therefor, the amount of such other or additional stock or other securities or property (other than cash) of the Company that such holder would hold on the date of such exercise had it been the holder of record of the class of security receivable upon exercise of this Warrant on the date hereof and had thereafter, during the period from the date hereof to and including the date of such exercise, retained such shares and/or all other additional stock available to it as aforesaid during said period, giving effect to all adjustments called for during such period by the provisions of this Section 4.

(d)    _Antidilution Adjustments_.    The Exercise Price and number of Shares purchasable pursuant to the terms and conditions of this Warrant shall be subject to adjustment from time to time as follows:

(i)    If the Company shall, at any time or from time to time prior to the Expiration Date, issue any shares of Common Stock (or be deemed to have issued any shares of Common Stock as provided herein), other than Excluded Securities (as defined in Section 4(d)(iii)), without consideration or for a consideration per share less than the Exercise Price in effect immediately prior to the issuance of Common Stock, the Exercise Price in effect immediately prior to such issuance shall forthwith be lowered to a price equal to the quotient obtained by dividing: (x) an amount equal to the sum of (1) the total number of shares of Common Stock outstanding (including any shares of Common Stock deemed to have been issued pursuant to Section 4(d)(ii)(D)(1)-(2)) immediately prior to such issuance multiplied by the Exercise Price in effect immediately prior to such issuance, plus (2) the consideration received by the Company upon such issuance, by (y) the total number of shares of Common Stock outstanding (including any shares of Common Stock deemed to have been issued pursuant to Section 4(d)(ii)(D)(1)-(2)) immediately after the issuance of such Common Stock.  If the Company shall, at any time or from time to time prior to the Expiration Date, issue any shares of Common Stock as a stock dividend or upon any stock split or other subdivision or combination of shares of Common Stock, other than a stock dividend on the Company's Preferred Stock at a dividend rate no greater than 8%, the number of Shares issuable under this Warrant shall be increased by such amount required so that the total number of Shares issuable under this Warrant, as a percentage of the aggregate number of Fully Diluted Shares of the Company as of the date of (and after giving effect to) such dividend, shall equal the same percentage of Fully Diluted Shares of the Company as of immediately prior to such dividend.

(ii)    For the purposes of any adjustment of the Exercise Price pursuant to Section 4(d)(i), the following provisions shall be applicable:

(A)    In the case of the issuance of Common Stock for cash, the consideration shall be deemed to be the amount of cash paid therefor before deducting therefrom any discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance and sale thereof.

(B)    In the case of the issuance of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined in good faith by the Board of Directors of the Company, irrespective of any accounting treatment.

(C)    In the case of the issuance of Common Stock without consideration, the consideration shall be deemed to be $0.00001 per share.

6

(D)     In the case of the issuance of (x) options to purchase or rights to subscribe for Common Stock, (y) securities by their terms convertible into or exchangeable for Common Stock or (z) options to purchase rights to subscribe for such convertible or exchangeable securities:

(1)        the shares of Common Stock deliverable upon exercise of such options to purchase or rights to subscribe for Common Stock shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration (determined in the manner provided in subdivisions (A), (B) and (C) above), if any, received by the Company upon the issuance of such options or rights plus the minimum purchase price provided in such options or rights for the Common Stock covered thereby;

(2)        the shares of Common Stock deliverable upon conversion of or in exchange for any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof shall be deemed to have been issued at the time such securities were issued or such options or rights were issued and for a consideration equal to the consideration received by the Company for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued dividends), plus the additional consideration, if any, to be received by the Company upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in subdivisions (A), (B) and (C) above);

(3)        on any change in the exercise price of Common Stock deliverable upon exercise of any such options or rights or conversions of or exchanges for such securities, other than a change resulting from the antidilution provisions thereof, the applicable Exercise Price shall forthwith be readjusted to such Exercise Price as would have resulted had the adjustment made upon the issuance of such options, rights or securities not converted prior to such change (or options or rights related to such securities not converted prior to such change) been made upon the basis of such change; provided, however, that such readjustment shall not result in an Exercise Price that is greater than the original Exercise Price; and

(4)        on the expiration of all such options or rights, the termination of all such rights to convert or exchange or the expiration of all options or rights related to such convertible or exchangeable securities in each case having been issued by the Company for the same consideration (as determined pursuant to subdivision (A), (B) and (C) above), the applicable Exercise Price shall forthwith be readjusted to such Exercise Price as would have resulted had the adjustment made upon the issuance of such options, rights, securities or options or rights related to such securities not been made; provided, however, that such readjustment shall not result in a Exercise Price that is greater that the original Exercise Price.

(iii)        For purposes of this Section 4(d), the term "Excluded Securities" shall mean Shares of Common Stock excluded the definition of "Additional Shares of Common Stock"

under the Second Amended and Restated Certificate of Incorporation of the Company, as amended from time to time.

      (iv)      Upon each adjustment of the Exercise Price pursuant to this Section 4(d), the number of Shares issuable upon exercise of this Warrant shall be equal to (A) the product of the number of Shares the Holder was entitled to purchase immediately before such adjustment and the Exercise Price in effect immediately before such adjustment, divided by (B) the Exercise Price in effect after giving effect to such adjustment.

      (e)      Further Adjustments. In case at any time or from time to time the Company shall take any action that affects the Common Stock, other than an action described herein, then, unless such action will have a materially adverse effect upon the rights of the Holder, the number of Shares of into which this Warrant is exercisable shall be adjusted in such a manner and at such time as shall be equitable in the circumstances; provided, however, that such adjustment shall not result in a reduction in the original number of Shares covered by this Warrant.

      (f)      Notice of Adjustments. Upon any adjustment of the Exercise Price and any increase or decrease in the number of Shares purchasable upon the exercise of this Warrant, then, and in each such case, the Company, within thirty (30) days thereafter, shall give written notice thereof to the Holder at the address of such Holder as shown on the books of the Company which notice shall state (i) the reason for such adjustment and (ii) the Exercise Price, as adjusted and, if applicable, the increased or decreased number of Shares purchasable upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation of each.

5.      Notices.

      (a)      In the event that the Company shall propose at any time:

      (i)      to declare any dividend or distribution upon its Common Stock (or other stock or securities at the time receivable upon the exercise of this Warrant) whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

      (ii)      to redeem or repurchase any class or series of its stock;

      (iii)      to offer for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights;

      (iv)      to effect a capital reorganization, or merge or consolidate with or into any other corporation, or sell, lease or convey all or substantially all its property or business, or voluntarily liquidate, dissolve or wind up; or

      (v)      to effect its first firm commitment underwritten public offering (a "Public Offering") of its Common Stock under the Securities Act of 1933, as amended (the "Securities Act");

then, in connection with each such event, the Company shall send to the Holder: (1) at least twenty (20) days prior written notice of the date on which a record shall be taken for such dividend, distribution, redemption or subscription rights (and specifying the date on which the holders of Common Stock shall be entitled thereto) or for determining rights to vote, if any; and (2) at least twenty (20) days prior written notice of the date when the same shall take place, and the date, if any, to be fixed, on which the holders of

8

record of Common Stock shall be entitled to exchange their Common Stock for securities or other property deliverable upon the occurrence of such event. Notwithstanding the above, the twenty (20) days notice requirement may be shortened or waived upon the written consent of the Holder.

(b)       In the event the Holder is provided with notice pursuant to Section 5(a)(ii) of a Redemption Request (as defined in the Company's Amended and Restated Certificate of Incorporation, as amended from time to time) with respect to the Series A Preferred Stock of the Company, the Holder may elect to have this Warrant redeemed by the Company at the same time as the Series A Preferred Stock of the Company is redeemed pursuant to the Redemption Request. Holder must make the irrevocable election in writing to the Company within fifteen (15) days of receipt of the notice of the Redemption Request. The redemption of this Warrant shall be in cash for the Fair Market Value of the Shares issuable pursuant to this Warrant, determined in accordance with Section 2 of this Warrant, but otherwise will be redeemed in proportion to the number of shares of Series A Preferred Stock is being redeemed by the Company, at the same times as such redemptions, and subject to all limitations for insufficient funds as provided in the Company's Amended and Restated Certificate of Incorporation.

(c)       Any written notice by the Company required or permitted hereunder shall be given by hand delivery or first class mail, postage prepaid, addressed to the Holder at the address shown on the books of the Company for the Holder.

6.        Notice of Board Meetings. For so long as this Warrant (or part thereof) remains outstanding, the Company shall give the Holder written notice of each meeting of the Board of Directors of the Company or any committee thereof at the same time and in the same manner as the members of the Board of Directors of the Company or such committee receive notice of such meetings; provided, that in the case of telephonic meetings, the Holder need receive only actual notice thereof at the same time and in the same manner as notice is given to the directors. The Holder shall be entitled to receive all written materials and other information given to the directors in connection with such meetings at the same time such materials and information are given to the directors. If the Company proposes to take any action by written consent in lieu of a meeting of the Board, the Company shall give written notice thereof to the Holder prior to the effective date of such consent describing the nature and substance of such action.

7.        Legend. Each certificate evidencing the Shares issued upon exercise of this Warrant, or transfer of such Shares (other than a transfer registered under the Securities Act or any subsequent transfer of shares so registered) shall be stamped or imprinted with a legend in substantially the following form:

9

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS (COLLECTIVELY, THE "ACTS"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER ALL APPLICABLE ACTS OR UNLESS AN OPINION OF COUNSEL IS DELIVERED TO THE COMPANY IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE COMPANY TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED UNDER ALL APPLICABLE ACTS OR UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A OF THE ACT. THE RIGHT TO VOTE AND THE SALE OR TRANSFER OF THIS WARRANT AND THE SHARES OBTAINABLE UPON ITS EXERCISE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN STOCKHOLDERS AGREEMENT DATED FEBRUARY 24, 2004 BY AND AMONG THE HOLDER HEREOF AND OTHER STOCKHOLDERS OF THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

8.      Removal of Legend. Upon request of a holder of a certificate with the legend required by Section 7 hereof, the Company shall issue to such holder a new certificate therefor free of any transfer legend, if, with such request, the Company shall have received an opinion of counsel (either external counsel or counsel employed by Holder or its affiliate) reasonably satisfactory to the Company in form and substance to the effect that any transfer by such holder of the shares evidenced by such certificate will not violate the Securities Act and any applicable state securities laws.

9.      Fractional Shares. No fractional shares will be issued in connection with any exercise hereunder. Any fraction of a share resulting from any calculation will be rounded up to the next whole share.

10.      Representations, Warranties and Covenants of the Company. The Company hereby represents and warrants to the Holder as follows:

(a)      This Warrant has been duly authorized and executed by the Company and is a valid and binding obligation of the Company enforceable in accordance with its terms;

(b)      Prior to the date that this Warrant becomes exercisable, the Shares will have been duly authorized and reserved for issuance by the Company and, when issued in accordance with the terms hereof, will be validly issued, fully paid and nonassessable, and free from all preemptive rights, rights of first refusal or first offer, taxes, liens and charges of whatever nature;

(c)      The execution and delivery of this Warrant are not, and the issuance of the Shares upon exercise of this Warrant in accordance with the terms hereof will not be, inconsistent with the Company's certificate of incorporation, as then in effect, and its bylaws, as then in effect.

(d)      The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is in good standing as a foreign corporation in each jurisdiction in which the nature of its business makes such qualification necessary. The Company has all requisite legal and corporate power and authority to carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Warrant.

10

(e)     As of the date of original issuance of this Warrant, this Warrant does not (i) conflict with, result in any breach of any terms or provisions of, or constitute (with or without notice or lapse of time or both) a default under, the certificate of incorporation or bylaws of the Company, or any material contract, agreement, indenture, loan agreement, receivables purchase agreement, mortgage, deed of trust or other agreement or instrument to which the Company is a party or by which it or any of its properties is bound, (ii) result in the creation or imposition of any lien, adverse claim or other encumbrance upon any of the properties of the Company pursuant to the terms of any such contract, agreement, indenture, loan agreement, receivables purchase agreement, mortgage, deed of trust or other agreement or instrument, or (iii) violate any law or order, rule or regulation applicable to the Company of any court or of any federal or state regulatory body, administrative agency, or other governmental instrumentality having jurisdiction over the Company or any of its properties.

(f)     As of the date of issuance of this Warrant, the number of Shares for which this Warrant is or may become exercisable (i) pursuant to Section 1(b)(i) hereof represents one percent (1%) of the total number of shares of capital stock of the Company, (ii) pursuant to Section 1(b)(ii) hereof represents one and a half percent (1.5%) of the total number of shares of capital stock of the Company and (iii) pursuant. to Section 1(b)(iii) hereof represents one and a half percent (1.5%) of the total number of shares of capital stock of the Company, in each case outstanding on the date hereof after giving effect to the exercise, exchange or conversion of all outstanding securities, rights, options, warrants (including this Warrant), calls, commitments or agreements of any nature or character (whether debt or equity) that are, directly or indirectly, exercisable or exchangeable for, or convertible into or otherwise represent the right to purchase or otherwise receive, directly or indirectly, any such capital stock or other arrangement to acquire at any time or under any circumstance, capital stock of the Company or any such other securities and assuming that all stock options and/or shares of capital stock reserved for grant or issuance to officers, directors, employees and consultants under all agreements, plans or arrangements theretofore approved by the Board of Directors of the Company have been so granted or issued (as the case may be) (collectively, the "Fully-Diluted Shares").

(g)     The Company shall not, from and after the date of this Warrant, create, incur, assume or suffer to exist, or otherwise become directly or indirectly liable with respect to, any Indebtedness (as defined in the Loan Agreement), without the prior written consent of the Holder, other than Indebtedness permitted under the Loan Agreement.  This Section 10(g) shall terminate and be of no further force and effect upon the earlier at (i) termination of the Loan Agreement and the repayment in full by the Company of or the waiver or forgiveness of all obligations thereunder or (ii) upon any transfer or this Warrant by Holder other than to a Permitted Transferee under the Stockholders Agreement (as defined below).

(h)     The issuance of this Warrant or any Shares shall not require or result in the issuance of any capital stock of the Company (other than the Shares) pursuant to the certificate of incorporation or bylaws of the Company, or any contract, agreement, indenture, loan agreement, receivables purchase agreement, mortgage, deed of trust or other agreement or instrument to which the Company is a party or by which it or any of its properties is bound.

(i)     The Company has delivered to Holder's counsel true and complete copies of (i) the Certificate of Incorporation of the Company, (ii) the Company's by-laws, (iii) each warrant the Company has issued, and (iv) each stockholders' agreement the Company has entered into, in each case as amended to the date of this Warrant. Except as set forth in this Warrant there are no options, warrants, puts, calls, rights, convertible or exchange securities, commitments, contracts, agreements, understandings, arrangements or undertakings of any kind to which the Company is a party or by which it is bound (A) obligating the Company to issue, deliver, transfer or sell, or cause to be issued, delivered, transferred or sold, additional shares of capital stock or any other security of (including any security convertible into or exercisable for or exchangeable into any capital stock or other security of) the Company (whether or not

11

such security has voting rights), (B) obligating the Company to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, agreement, understanding, arrangement or undertaking, or (C) otherwise relating to the Company's capital stock (including, without limitation, any rights of holders thereof).

11.             Rights of Stockholders. Subject to Section 4 hereof, no Holder, as such, shall be entitled to vote or receive dividends or be deemed the holder of the Shares or any other securities of the Company that may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value, consolidation, merger, conveyance, or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until this Warrant shall have been exercised and the Shares purchasable upon the exercise hereof shall have become issuable, as provided herein.

12.             Warrant Put Right. If the Company enters into any business combination whereby the holders of the capital stock of the Company prior to the effective time of the business combination would hold, directly or indirectly, less than fifty percent (50%) of the aggregate capital stock of the surviving entity, the Company shall provide written notice of such business combination to the Holder not less than thirty (30) days prior to the effective time of such business combination. Upon receiving such notice (an "Election Notice") from the Company, the Holder may elect, by providing written notice of such election to the Company within thirty (30) days of the date it receives such notice, to require that the Company purchase this Warrant (or any portion thereof that remains unexercised) from the Holder for an amount, in cash, equal to (a) the aggregate fair market value immediately prior to the effective time of such business combination of the Shares issuable pursuant to this Warrant (such fair market value to be determined as set forth in Section 2(c) hereof) minus (b) the aggregate Exercise Price of this Warrant for such Shares (the "Put Right"); provided in order to effectively exercise the Put Right, the Election Notice shall describe in detail (i) the conflict of interest the Holder would experience if forced to hold equity securities of the surviving entity and (ii) why such conflict of interest has or would have a material adverse effect on the Holder's business operation in the ordinary course, provided, further, however, that the Holder shall have no Put Right if (x) the proposed business combination is not consummated, (y) the consideration payable to the holders of the capital stock of the Company consists solely of cash or capital stock of a corporation or other entity that is publicly traded on the Nasdaq National or SmallCap Market or on a national securities exchange or (z) the Company does not have sufficient cash legally available to fully satisfy the Put Right. Subject to the foregoing, the Company shall pay to the Holder, in immediately available funds, any amounts due as a result of the Holder's exercise of its Put Right no later than the effective time of the business combination. The Put Right shall terminate upon the full exercise of this Warrant. This Section 12 shall terminate and be of no further force and effect upon the earlier of (i) the termination of the Loan Agreement and the repayment by the Company of or the waiver or forgiveness of its obligations thereunder or (ii) upon any transfer of this Warrant by the Holder.

13.             Expiration of Warrant. This Warrant shall expire and shall no longer be exercisable as of 5:00 p.m., Eastern Time, on the date that occurs five years following the "Termination Date" under the Loan Agreement.

14.             Stockholders Agreement.

      (a)       The Holder of this Warrant, by acceptance hereof, agrees to become a party to the Stockholders Agreement, dated as of February 24, 2004, by and among the Company and the Stockholders Party thereto (the "Stockholders Agreement") and thereby subjects this Warrant and any

Common Stock issuable or issued upon exercise hereof to the provisions of the Stockholders' Agreement, as amended from time to time.

15.        Miscellaneous.

(a)        This Warrant shall be governed by and construed for all purposes under and in accordance with the laws of the State of New York without regard to principles of conflicts of law.

.        (b)        The headings in this Warrant are for purposes of reference only, and shall not limit or otherwise affect any of the terms hereof.

(c)        The representations, warranties, covenants and conditions of the respective parties contained herein or made pursuant to this Warrant shall survive the execution and delivery of this Warrant.

_        (d)        The terms of this Warrant shall be binding upon and shall inure to the benefit of any successors or assigns of the Company and of the Holder or holders hereof and of the Shares issued or issuable upon the exercise hereof.

.        (e)        This Warrant, together with all exhibits hereto, constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.

(f)        The Company shall not, by amendment of its certificate of incorporation or bylaws, or through any other means, directly or indirectly, avoid or seek to avoid the observance or performance of any of the terms of this Warrant and shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

(g)        Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of any such mutilation, upon surrender and cancellation of such Warrant, the Company, at its expense, will execute and deliver to the Holder, in lieu thereof, a new Warrant of like date and tenor. Any such new Warrant shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen or destroyed Warrant shall be at any time enforceable by anyone.

(h)        This Warrant and any provision hereof may be amended, waived or terminated only by an instrument in writing signed by the Company and the Holder.

(i)        If any action at law or equity is necessary to enforce or interpret the terms of this Warrant, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which it may be entitled.

(j)        Each of the Company and the Holder hereby irrevocably submits to the jurisdiction of any New York State or Federal court sitting in New York City in any action or proceeding arising out of or relating to this Warrant, and each of the Company and the Holder hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court or in such Federal court. Each of the Company and the Holder hereby irrevocably waives, to the fullest extent permitted under applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding. Each of the Company and the Holder hereby irrevocably consents, to the fullest extent permitted under applicable law, to the service of any summons and complaint and any other

13        .

process by the mailing of copies of such process to them at their respective address specified in the Warrant Agreement. Each of the Company and the Holder hereby agrees, to the fullest extent permitted under applicable law, that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

[Signature on following page]

14

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed by its duly authorized officer.

FINGERHUT DIRECT MARKETING, INC.

By: _____

Name: BRIAN SMITH

Title: PRESIDENT, CEO

NOTICE OF EXERCISE

TO:        Fingerhut Direct Marketing, Inc.
           Attention: President

     1.  The undersigned hereby elects to purchase _____ (leave blank if you choose Alternative No. 2 below) shares of Common Stock of Fingerhut Direct Marketing, Inc. (the "Company") pursuant to the terms of the Common Stock Purchase Warrant dated as of _____, 2004, issued by the Company (the "Warrant"), and tenders herewith payment of the purchase price of such shares in full. (Initial here if the undersigned elects this alternative). _____

     2.  In lieu of exercising the Warrant for cash or check, the undersigned hereby elects to effect the net issuance provision of Section 2(b) of the Warrant and receive _____ (leave blank if you choose Alternative No. 1 above) shares of Common Stock of the Company pursuant to the terms of the Warrant. (Initial here if the undersigned elects this alternative). _____

     3.  Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

_____
(Name)

_____

_____
(Address)

     4.  The undersigned hereby represents and warrants that the aforesaid shares of Common Stock are being acquired for the account of the undersigned for investment and not for resale or with a view to distribute such shares or any part thereof, and that the undersigned has no present intention of distributing or reselling such shares, and that the undersigned is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

_____
(Signature and Date)

# EXHIBIT 2

# AMENDED AND RESTATED STOCKHOLDERS AGREEMENT

Dated March 24, 2006

Among

Fingerhut Direct Marketing, Inc.

and the Stockholders

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................. 1
ARTICLE II VOTING AGREEMENT .............................................................................. 4
2.1   Election of Directors ............................................................................................ 4
2.2   Committees; Subsidiaries .................................................................................... 5
2.3   Organization of Board of Directors .................................................................... 6
2.4   Grant of Proxy ...................................................................................................... 6
2.5   Prohibited Actions .............................................................................................. 6
ARTICLE III PURCHASE RIGHTS ................................................................................ 7
3.1   Subsequent Offerings .......................................................................................... 7
3.2   Exercise of Rights ................................................................................................ 7
3.3   Issuance of Equity Securities to Other Persons .............................................. 7
3.4   Termination and Waiver of Purchase Rights .................................................... 8
3.5   Transfer of Purchase Rights .............................................................................. 8
3.6   Excluded Securities ............................................................................................ 8
ARTICLE IV RIGHTS OF FIRST REFUSAL AND CO-SALE RIGHTS .................. 9
4.1   Notice of Transfer ............................................................................................... 9
4.2   Right of First Refusal and Co-Sale Rights ...................................................... 10
4.3   Transfer Mechanics ........................................................................................... 11
ARTICLE V GENERAL PROVISIONS CONCERNING TRANSFERS .................... 12
5.1   Exempt Transfers .............................................................................................. 12
5.2   FDM Option Agreement .................................................................................... 13
5.3   FAC Acquisition, LLC ....................................................................................... 13
5.4   Transfers to Competitors .................................................................................. 13
5.5   Stockholder Lockup Agreements in Connection with Initial Public Offering ........... 14
5.6   Consequences of Prohibited Transfer .............................................................. 14
ARTICLE VI LEGEND .................................................................................................. 14
6.1   Certificate Legend ............................................................................................. 14
6.2   Transfer Restriction .......................................................................................... 15
ARTICLE VII MISCELLANEOUS ............................................................................... 15
7.1   Governing Law ................................................................................................... 15
7.2   Amendment ........................................................................................................ 15
7.3   Benefits of Agreement ....................................................................................... 16
7.4   Term .................................................................................................................... 16
7.5   Ownership .......................................................................................................... 16
7.6   Notices ................................................................................................................ 17
7.7   Severability ........................................................................................................ 17
7.8   Entire Agreement .............................................................................................. 17
7.9   Counterparts; Facsimile Signatures ................................................................ 18
7.10  Waiver of Jury Trial .......................................................................................... 18
7.11  Jurisdiction ........................................................................................................ 18
7.12  Additional Stockholders .................................................................................... 18
7.13  Amendment to February Agreement ............................................................... 19
7.14  PCP Investor Consent ....................................................................................... 19

Doc# 2057882\5

## AMENDED AND RESTATED STOCKHOLDERS AGREEMENT

This Amended and Restated Stockholders Agreement (the "Agreement") is made and entered into as of March 24, 2006 by and among Fingerhut Direct Marketing, Inc., a Delaware corporation (the "Company"), the parties listed as Investors on Exhibit A hereto (the "Investors"), and the stockholders listed on Exhibit B hereto (such stockholders collectively, the "Common Stockholders").

## RECITALS

WHEREAS, pursuant to Preferred Stock Purchase Agreements dated as of February 24, 2004 as supplemented by Supplement No. 1 dated October 27, 2004 and Supplement No. 2 dated November 1; 2004 among the Company and certain of the Investors (the "Purchase Agreements"), the Company issued and sold to certain of the Investors shares of its Series A Preferred Stock (as defined below).

WHEREAS, in connection with the Purchase Agreements, the Company, the Investors and the Common Stockholders entered into that certain Stockholders Agreement dated February 24, 2004 (the "February Agreement").

WHEREAS, pursuant to that certain Securities Purchase Agreement of date March 23, 2006 (the "Subordinated Note Agreement") among the Company and Prudential Capital Partners, II, L.P., Prudential Capital Partners Management Fund II, L.P. and Prudential Capital Partners (Parallel Fund) II, L.P. (the "PCP Investor") the PCP Investor will be issued warrants to purchase Series A Preferred Stock (the "PCP Warrants").

WHEREAS, one of the conditions precedent to the obligations of the PCP Investor to purchase certain subordinated notes of the Company under the Subordinated Note Agreement is that the Company, the other Investors and the Common Stockholders whose consent is required to amend the February Agreement enter into this Agreement with the PCP Investor under which the PCP Investor will become an "Investor" as defined in this Agreement.

WHEREAS, in connection therewith, the parties desire to amend and restate the February Agreement in its entirety.

NOW, THEREFORE, in consideration of the mutual promises and obligations contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

"Affiliate" shall have the meaning ascribed to such term in Rule 12b-2 of the General Rules and Regulations under the Exchange Act, and shall include, with respect to any Investor, any managed account, investment fund or other vehicle for which such Investor or any Affiliate or such Investor acts as an investment advisor or portfolio manager.

Doc# 2057882\5

"Amended and Restated Certificate of Incorporation" shall mean the Third Amended and Restated Certificate of Incorporation of the Company as filed with the Delaware Secretary of State concurrently with the execution hereof and attached hereto as Exhibit A.

"As-Converted Basis" shall mean, for the purpose of determining the number of shares of Common Stock outstanding, a basis of calculation which takes into account (a) the number of shares of Common Stock actually issued and outstanding at the time of such determination, and (b) the number of shares of Common Stock that is then issuable upon the exercise or conversion of all outstanding securities or rights convertible into or exercisable for Common Stock, including without limitation, the Series A Preferred Stock and the Warrants, and the number of shares of Common Stock that would be issuable upon the conversion of the Series A Preferred Stock then issuable upon exercise of the PCP Warrants, but excluding stock options and any other warrants for the purchase of any shares of Common Stock or Series A Preferred Stock.

"Bain Capital" means Bain Capital Venture Fund, L.P.

"Battery Ventures" means Battery Ventures VI, L.P.

"Common Stock" shall mean the Company's Common Stock, par value $0.00001 per share.

"Common Stockholders" has the meaning assigned to it in the introductory paragraph of this Agreement.

"Equity Securities" means (i) any Common Stock, preferred stock or other equity security of the Company, (ii) any security convertible, with or without consideration, into any Common Stock, preferred stock or other equity security (including any option to purchase such a convertible security), (iii) any security carrying any warrant or right to subscribe to or purchase any Common Stock, preferred stock or other equity security, or (iv) any such warrant or right.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"FAC LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of FAC Acquisition, LLC, effective as of September 15, 2002, by and among Petters Company, Inc. ("PCI"), Thomas J. Petters and Theodore Deikel.

"FDM Option Agreement" means the Agreement Regarding FDM and FAC, dated as of April 7, 2003, by and among Petters Company, Inc., Thomas J. Petters, Theodore Deikel, and FAC Acquisition, LLC, as amended on February 24, 2004.

"Investor Rights Agreement" means the Amended and Restated Investor Rights Agreement, dated as of the date hereof, by and among the Company and the Investors.

"Investors" has the meaning assigned to it in the introductory paragraph of this Agreement.

"Permitted Transferee" means any of the following Persons to whom or to which a Stockholder Transfers any Shares: (a) an Affiliate of the Transferring Stockholder or any partner,

-2-

member or other owner of the Transferring Stockholder; (b) a family member of the Transferring Stockholder or a trust established for the benefit thereof; (c) a transferee of the Transferring Stockholder by will or the laws of intestate succession; (d) the Company with respect to any Series A Preferred Stock or Warrant held by CIGPF I Corp. or any PCP Investor, being redeemed pursuant to a Redemption Request (as defined in the Amended and Restated Certificate of Incorporation); (e) in the case of Theodore Deikel, (i) Thomas J. Petters or (ii) PCI, in each case solely on the terms and subject to the conditions set forth in the FDM Option Agreement; and (f) in the case of Thomas J. Petters or PCI, (i) Theodore Deikel, solely on the terms and subject to the conditions set forth in the FDM Option Agreement and (ii) up to twenty-five (25) Persons who are employees of any Affiliates of Petters Company, Inc. for an aggregate maximum number of Shares equal to fifteen (15) percent of the shares of Common Stock owned by PCI on an As-Converted Basis; provided, however, that in order to be deemed a Permitted Transferee, (A) each such employee receiving Shares shall be required to execute (1) an irrevocable proxy coupled with an interest in favor of Thomas J. Petters to vote his, her or its Shares and a limited irrevocable power-of-attorney coupled with an interest in favor of Thomas J. Petters to execute in the name of such transferee a written consent in lieu of a meeting of the Stockholders (such proxy and power-of-attorney, the "Voting Documents") , and (2) an agreement to condition any subsequent transfer of such Shares on the proposed transferee executing the Voting Documents prior to such transfer, and (B) each certificate representing the Shares transferred to any such employee must be endorsed with a legend containing the foregoing transfer restrictions.

"Person" shall be construed broadly and shall include without limitation an individual, a partnership, a corporation, an association, a joint stock corporation, a limited liability corporation, a trust, a joint venture, an unincorporated organization and a governmental authority.

"PCP Investor" has the meaning assigned to it in the recitals to this Agreement.

"Pro Rata Share" means, in the case of each Investor, the ratio of (a) the number of shares of Common Stock owned by such Investor on an As-Converted Basis immediately prior to the issuance of any Equity Securities subject to Purchase Rights (as defined in Section 3.1 hereof) to (b) the total number of shares of the Company's Common Stock outstanding on an As-Converted Basis immediately prior to the issuance of such Equity Securities.

"Prospective Buyer" shall mean any Person proposing to purchase Shares from a Prospective Selling Investor.

"Qualified Public Offering" means an underwritten public offering of shares of Common Stock in which the aggregate net proceeds to the Company equal or exceed $50 million and the public offering price per share is not less than $0.31 533 (as adjusted appropriately in the event of any subdivision, combination, reorganization, recapitalization, reclassification, stock dividend or similar event affecting the Common Stock) and after which the Common Stock is listed on the New York Stock Exchange or the Nasdaq National Market.

"Sale of the Company" means (i) a sale of all or substantially all of the assets of the Company, (ii) an acquisition of the Company by one or more persons or entities by means of any

-3-

transaction or series of related transactions (including any reorganization, merger, consolidation) where the voting securities of the Company outstanding immediately preceding such transaction or the voting securities issued with respect to the voting securities of the Company outstanding immediately preceding such transaction represent less than 50% of the voting securities of the Company or surviving entity, as the case may be, following such transaction, or (iii) a transaction or series of related transactions resulting in the transfer of shares representing more than 50% of the voting securities of the Company. A sale (or multiple related sales) of one or more subsidiaries of the Company (whether by way of merger, consolidation, reorganization or sale of all or substantially all assets or securities) which constitutes all or substantially all of the consolidated assets of the Company shall be deemed a sale of substantially all the assets of the Company for purposes of the foregoing definition.

"Series A Preferred Stock" means the Series A Convertible Preferred Stock, par value $0.00001 per share, of the Company.

"Shares" shall mean shares of Common Stock and Series A Preferred Stock, and warrants for the purchase of any shares of Common Stock and Series A Preferred Stock.

"Stockholder" shall mean an Investor or Common Stockholder.

"Transfer" shall mean any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer or disposition of any kind, including, but not limited to, transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly, of any Shares.

"Warrants" shall mean warrants to purchase Common Stock issued to Epsilon Global Equities Limited, CIGPF I Corp., Piper Jaffray & Co. and Cherry Tree Securities, LLC and the PCP Warrants.

## ARTICLE II

## VOTING AGREEMENT

### 2.1    Election of Directors

(a)    The Stockholders agree to vote all shares of Common Stock, Series A Preferred Stock and any other shares of voting securities of the Company now owned or hereafter acquired or controlled by them (collectively, the "Voting Securities"), attend all meetings whether in person or by proxy, and otherwise to use their respective best efforts as stockholders or directors of the Company, to cause and maintain the size of the Board of Directors to be eight (8) (except as provided below), and to cause and maintain the election to the Board of Directors of the Company of:

(i)    two (2) individuals designated by the holders of a majority of the outstanding shares of Series A Preferred Stock held by Bain Capital, Battery Ventures and their Affiliates (collectively, the 'Preferred Directors"); provided, that (A) for so long as

Bain Capital and its Affiliates own any shares of Series A Preferred Stock (or Common Stock issued on conversion thereof), Bain Capital shall be entitled to designate one Preferred Director (the "Bain Director"), and (B) for so long as Battery Ventures and its Affiliates own any shares of Series A Preferred Stock (or Common Stock issued on conversion thereof), Battery Ventures shall be entitled to designate the other Preferred Director(the "Battery Director");

(ii)     for so long as Thomas J. Petters or any of his Affiliates owns any shares of the Series A Preferred Stock or Common Stock issued on conversion thereof, two (2) individuals designated by Thomas J. Petters (each, a "Petters Director," and collectively, the 'Petters Directors");

(iii)    the Chief Executive Officer of the Company, who shall initially be Brian Smith; and

(iv)    three (3) individuals, each with relevant experience in the same industry as the Company, designated by seventy five percent (75%) of the directors designated pursuant to subsections (i) and (ii) of this Section 2.1(a), including both Preferred Directors, it being understood that such individuals shall not otherwise be affiliated with the Company or any of the Investors.

For so long as any shares of the Series A Preferred Stock remain outstanding, the directors designated pursuant to Section 2.l(a)(i) shall be the "Series A Directors" as defined in the Amended and Restated Certificate of Incorporation.

(b)     No party hereto shall vote to remove any member of the Board of Directors designated in accordance with the procedures set forth in Section 2.1(a); provided, however that if the parties originally designating a director as provided in Section 2.1(a) elect to remove such director, the parties hereto agree to vote to remove such director from the Board of Directors of the Company.

(c)     Any vacancy on the Board of Directors created by the resignation, removal, incapacity or death of any director designated under Section 2.1(a) shall be filled by another person designated by the parties originally designating such director, so long as such originally designating parties are entitled to make such designation pursuant to Section 2.1(a).

(d)     The Company shall promptly take any and all actions in its power necessary to cause the election, appointment or removal of any person designated to the Board of Directors in accordance with this Section 2.1.

## 2.2    Committees; Subsidiaries

(a)     Each Stockholder shall use all reasonable efforts to cause each director of the Company originally nominated by such Stockholder to take, and the Company shall take, such corporate actions as may be reasonably required to ensure that (i) the Board of Directors has at all times a compensation committee and an audit committee, and (ii) both the Bain Director and the Battery Director shall be appointed to each such committee and to any committee of the Board of Directors existing on the date hereof or created in the future.  The approval of the

compensation committee shall be required for all increases in executive compensation, executive bonuses and all option grants (including the vesting schedules with respect to such option grants). The approval of the audit committee shall be required for the engagement of the Company's auditors and prior to the issuance of the audit each year.

(b)     The Company and each Stockholder shall take, and each Stockholder shall use all reasonable efforts to cause each director of the Company originally nominated by such Stockholder to take, such corporate actions as may be reasonably required to ensure that the composition of the board of directors of all direct and indirect subsidiaries of the Company is identical to the composition of the Board of Directors to the extent practicable.

**2.3     Organization of Board of Directors.**  Unless the Investors holding seventy five percent (75%) of the then outstanding Series A Preferred Stock otherwise agree, the Board of Directors of the Company shall be organized and maintained such that Brian Smith shall be the Chief Executive Officer of the Company. The Chief Executive Officer of the Company shall serve as a member of the Board of Directors and shall be responsible for managing the operations of the Company and for leading, coordinating, and organizing the agenda for, all meetings of the Board of Directors.

**2.4     Grant of Proxy**

(a)     Each Stockholder hereby grants to a Person designated from time to time by the holders of a majority of the then outstanding Series A Preferred Stock held by Bain Capital, Battery Ventures and their Affiliates, an irrevocable proxy coupled with an interest to vote his, her or its Voting Securities, and limited irrevocable power-of-attorney, coupled with an interest, to execute in the name of such Stockholder a written consent in lieu of a meeting of the Stockholders which proxy and power-of-attorney shall be valid and remain in effect until the provisions of this Article II expire pursuant to Section 7.5, for the sole purpose of electing or removing a Preferred Director in accordance with the rights granted under Section 2.1(a)(i).

(b)     Each Stockholder hereby grants to a Person designated from time to time by Thomas J. Petters, an irrevocable proxy coupled with an interest to vote his, her or its Voting Securities, and limited irrevocable power-of-attorney, coupled with an interest, to execute in the name of such Stockholder a written consent in lieu of a meeting of the Stockholders, which proxy and power-of-attorney shall be valid and remain in effect until the provisions of this Article II expire pursuant to Section 7.5, for the sole purpose of electing or removing a Petters Director in accordance with the rights granted under Section 2.l(a)(ii).

**2.5     Prohibited Actions.**  To the extent permitted by law, the Company agrees not to give effect to any action by any Stockholder or any other Person that is in contravention of this Article II.

## ARTICLE III

## PURCHASE RIGHTS

**3.1**     **Subsequent Offerings.** Each Investor shall have a right of first refusal (the "Purchase Rights") to purchase its Pro Rata Share of all Equity Securities, that the Company may, from time to time, propose to sell and issue after the date of this Agreement, other than the Equity Securities excluded by Section 3.6 hereof.

**3.2**     **Exercise of Rights**

(a)     If the Company proposes to issue any Equity Securities, it shall first give each Investor written notice of its intention, describing the Equity Securities, the price and the terms and conditions upon which the Company proposes to issue the same. Each Investor shall have thirty (30) days from the giving of such notice to agree to purchase its Pro Rata Share of the Equity Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company (the "Company Notice") and stating therein the quantity of Equity Securities to be purchased. Notwithstanding the foregoing, the Company shall not be required to offer or sell such Equity Securities to any Investor who would cause the Company to be in violation of applicable federal securities laws by virtue of such offer or sale or to not qualify for an exemption from the registration requirements of such securities laws on which the Company wishes to rely.

(b)     If not all of the Investors elect to purchase their Pro Rata Share of the Equity Securities, then the Company shall promptly notify in writing the Investors who do so elect and shall offer such Investors (the "Purchasing Investors") the right to acquire such unsubscribed shares. Each Purchasing Investor shall have fifteen (15) days after receipt of such notice to notify the Company (the "Purchasing Investor Notice") of its election to purchase all or a portion thereof of the unsubscribed shares. If the Purchasing Investors have, in the aggregate, elected to purchase more than the number of unsubscribed shares being offered in such notice, then the unsubscribed shares shall be allocated according to each Purchasing Investor's Pro Rata Share up to the number of unsubscribed shares set forth in the notice to the Purchasing Investors, provided that for purposes of this Section 3.2(b). The denominator in clause (b) of the defined term "Pro Rata Share" shall be the total number of shares of Common Stock owned by all the Purchasing Investors on an As-Converted Basis. The Purchasing Investors shall then effect the purchase of the Equity Securities at the closing of the issuance of Equity Securities described in the notice delivered by the Company pursuant to Section 3.2(a). On the date of such closing, the Company shall deliver to the Purchasing Investors the certificates representing the Equity Securities to be purchased by the Purchasing Investors, each certificate to be properly endorsed for transfer, and at such time, the Purchasing Investors shall pay the purchase price for the Equity Securities.

**3.3**     **Issuance of Equity Securities to Other Persons.** If the Investors fail to exercise in full their Purchase Rights, the Company shall have sixty (60) days thereafter to sell the Equity Securities in respect of which the Investors' rights were not exercised, at a price and upon general terms and conditions no more favorable to the purchasers thereof than specified in the Company's notice to the Investors pursuant to Section 3.2 hereof. If the Company has not sold

-7-

such Equity Securities within sixty (60) days of the notice provided pursuant to Section 3.2, the Company shall not thereafter issue or sell any Equity Securities without first again complying with this Article III.

**3.4**     **Termination and Waiver of Purchase Rights.** The Purchase Rights established by this Article III shall terminate immediately following the closing of a Qualified Public Offering. The Purchase Rights established by this Article III may be amended, or any provision waived, with the written consent of (i) the Investors holding at least seventy five percent (75%) of the then outstanding Series A Preferred Stock; (ii) the Investor holding the Warrant issued to CIGPF I Corp. (the "Warrant Investor"), as long as such Warrant is held by CIGPF I Corp. or its Permitted Transferee, and is exercisable for at least seventy five percent (75%) of the Common Stock originally issuable upon exercise of the Warrant, provided, however, that consent of the Warrant Investor shall not be required for any amendment or waiver of any provision of Article III unless such amendment or waiver affects the Warrant Investor or the Warrant Investor's Shares in a manner different than the Investors that were originally issued Series A Preferred Stock or the Series A Preferred Stock and in a manner adverse to the interests of the Warrant Investor as an equity investor in the Company, it being understood that no such consent shall be required for an amendment or waiver that adversely affects the Warrant Investor and the Investors that were originally issued Series A Preferred Stock in a similar manner given their relative and different equity interests in the Company; and (iii) the PCP Investor, if required under Section 7.14.

**3.5**     **Transfer of Purchase Rights.** The Purchase Rights of each Investor under this Article III may be transferred to any Affiliate of such Investor or in connection with a Transfer of Shares made in compliance with the provisions of Article IV hereof; provided, that any such transferee shall furnish the Company and the Investors with a written agreement, reasonably satisfactory to the Investors, to be bound by and comply with all provisions of this Agreement as if such transferee were an Investor.

**3.6**     **Excluded Securities.** The Purchase Rights established by this Article III shall have no application to any of the following Equity Securities (collectively, the "Excluded Securities"):

         (a)     shares of Common Stock issued in connection with any stock split, stock dividend or recapitalization by the Company;

         (b)     up to 115,497,051 shares of Common Stock (and/or options, warrants or other Common Stock purchase rights issued pursuant to such options, warrants or other rights) issued to employees, officers or directors of, or consultants or advisors to the Company or any subsidiary, pursuant to stock purchase or stock option plans or other arrangements that are approved by the Board of Directors;

         (c)     any Equity Securities issued pursuant to any rights or agreements outstanding as of the date of this Agreement or upon the conversion of any Equity Security issued pursuant to any such rights or agreements (including any Series A Preferred Stock issued upon the exercise of any Warrant or any Common Stock issued upon the conversion of any such Series A Preferred Stock); options and warrants (including the Warrants) outstanding as of the date of this Agreement and stock issued pursuant to any such rights or agreements sold or

granted after the date of this Agreement, provided, however, that the Purchase Rights established by this Article III shall apply with respect to the initial sale or grant by the Company of such rights or agreements;

(d) any Equity Securities issued in connection with business acquisitions, mergers or strategic partnerships approved by the Board of Directors and the Investors holding seventy five percent (75%) of the Series A Preferred Stock;

(e) any Common Stock issued upon conversion of the Series A Preferred Stock;

(f) any Common Stock issued pursuant to an initial public offering ("IPO Common Stock"); provided, however, that IPO Common Stock shall not be deemed to be Excluded Securities with respect to the availability of the Investors' Purchase Rights in this Article III unless the Investors and their Affiliates are offered the right to purchase their pro rata share of up to five percent (5%) of the shares of Common Stock offered in such offering at the offering price per share net of underwriters' commissions or discounts; or

(g) any other Equity Securities designated as Excluded Securities by (i) the Investors holding seventy five percent (75%) of the then outstanding Series A Preferred Stock; (ii) the Warrant Investor, as long as such Warrant is held by CIGPF I Corp. or its Permitted Transferee, and is exercisable for at least seventy five percent (75%) of the Common Stock originally issuable upon exercise of the Warrant, provided, however, that consent of the Warrant Investor shall not be required for the designation of Excluded Securities unless such designation affects the Warrant Investor or the Warrant Investor's Shares in a manner different than the Investors that were originally issued Series A Preferred Stock or the Series A Preferred Stock and in a manner adverse to the interests of the Warrant Investor as an equity investor in the Company, it being understood that no such consent shall be required for a designation of Excluded Securities that adversely affects the Warrant Investor and the Investors that were originally issued Series A Preferred Stock in a similar manner given their relative and different equity interests in the Company; and (iii) the PCP Investor, if required under Section 7.14.

## ARTICLE IV

### RIGHTS OF FIRST REFUSAL AND CO-SALE RIGHTS

**4.1** **Notice of Transfer.** No Stockholder (a "Selling Stockholder") may Transfer any Shares other than as set forth in Section 5.1 hereof unless (i) such Selling Stockholder shall have received a bona-fide arm's length offer (an "Offer") to purchase such Shares from a third party who has agreed to become party to this Agreement and to be bound by all the terms and conditions hereof and who the Selling Stockholder reasonably believes has the financial capacity to fund such purchase, (ii) such Selling Stockholder gives written notice (the "Notice") to each of the Investors and the Company at least thirty (30) days prior to the closing of such proposed Transfer as described below, and (iii) such Selling Stockholder otherwise complies with this Article IV. The Notice shall describe in reasonable detail the proposed Transfer including, without limitation, the number and class or series of Shares to be transferred (the "Offered

Shares"), the nature of such Transfer, the consideration to be paid, and the name and address of each prospective purchaser or transferee.

## 4.2   Right of First Refusal and Co-Sale Rights

(a)   For a period of ten (10) days following receipt of any Notice, the Company shall have the right (the "Company Refusal Right") upon written notice to the Selling Stockholder to elect to purchase all or any part of the Offered Shares on the same terms and conditions set forth in the Notice, and for a period of twenty (20) days following the receipt of the Notice, each Investor shall have, upon written notice to the Selling Stockholder, either (a) the right (the "Right of First Refusal"), subject to the Company Refusal Right, to elect to purchase all or any part of the Offered Shares on the same terms and conditions as set forth in the Notice; or (b) except with respect to a PCP Investor, CIGPF I Corp. or any Permitted Transferee thereof that is the Selling Stockholder and that holds less than 5% of the Common Stock on an As-Converted Basis, the right (the "Co-Sale Right") to elect to sell on such terms all or any part of that number of Shares then owned by such Investor (the "Co-Sale Shares") equal to the product obtained by multiplying (i) the aggregate number of Offered Shares by (ii) a fraction the numerator of which is the number of shares of Common Stock owned by all of the Investors (on an As-Converted Basis) and the denominator of which is the total number of shares of Common Stock owned by the Selling Stockholder and all of the Investors (on an As-Converted Basis). Notwithstanding the foregoing, if the Selling Shareholder is a PCP Investor, CIGPF I Corp. or a Permitted Transferee thereof and such Selling Shareholder holds less than 5% of the Common Stock on an As-Converted Basis, the Company Refusal Right and the Right of First Refusal shall be applicable to all, but not less than all, of the Offered Shares.

(b)   If the Company does not elect to purchase all of the Offered Shares within the ten (10) day period specified above, the Selling Stockholders shall promptly give written notice to the Investors setting forth the number of Offered Shares not purchased by the Company (the "Remaining Shares"). The Remaining Shares shall be allocated among the Investors who have exercised the Right of First Refusal (the "Participating Investors") as follows: there shall first be allocated to each Participating Investor a number of Remaining Shares equal to the lesser of (i) the number of Remaining Shares which the Participating Investor has elected to purchase and (ii) such Participating Investor's Refusal Right Pro Rata Share (as defined below) of the Remaining Shares. The balance of the Remaining Shares which the Participating Investors have elected to purchase shall be allocated to the Participating Investors who have elected to purchase more than their Refusal Right Pro Rata Share of the Remaining Shares pro rata based on the number of Remaining Shares which each Participating Investor has elected to purchase in excess of such Participating Investor's Refusal Right Pro Rata Share of the Remaining Shares. Each Participating Investor's "Refusal Right Pro Rata Share" shall be equal to the fraction (i) the numerator of which is the number of shares of Common Stock owned by such Participating Investor (on an As-Converted Basis) and (ii) the denominator of which is the total number of shares of Common Stock owned by all of the Participating Investors (on an As-Converted Basis).   In the event the Company or the Participating Investors do not elect to purchase all of the Offered Shares of a Selling Shareholder that is a PCP Investor, CIGPF I Corp. or a Permitted Transferee thereof and who holds less than 5% of the Common Stock on an As-Converted Basis, then none of the Offered Shares shall be subject to any purchase rights of the Company or any Investor.

-10-

(c)     Except with respect to a Selling Shareholder that is a PCP Investor, CIGPF I Corp or a Permitted Transferee thereof and that holds less than 5% of the Common Stock on an As-Converted Basis, each Investor who has exercised the Co-Sale Right (a "Co-Sale Participant") shall be entitled to sell a number of Co-Sale Shares equal to the lesser of (a) the number of Offered Shares which the Co-Sale Participant has elected to sell and (b) such Co-Sale Participant's Co-Sale Pro Rata Share of the Offered Shares which are not purchased by the Company pursuant to the Company Refusal Right or by the Participating Investors pursuant to the Right of First Refusal (the "Co-Sale Remaining Shares"). Each Participant's "Co-Sale Pro Rata Share" shall be equal to: the fraction (i) the numerator of which is the number of shares of Common Stock owned by such Co-Sale Participant (on an As-Converted Basis) and (ii) the denominator of which is the total number of shares of Common Stock owned by the Selling Stockholder and all of the Investors (on As-Converted Basis).

(d)     Any proposed Transfer at a different price or on terms and conditions more favorable to the transferee(s) than specified in the Notice, or not completed within the time specified in this Section 4.2, as well as any subsequent proposed Transfer of any Shares by a Stockholder, shall again be subject to the Company Refusal Right and the Right of First Refusal and Co-Sale Rights of the Investors, and shall require compliance by the Selling Stockholder with the procedures described in this Article IV.

(e)     The exercise or non-exercise of the Right of First Refusal or the Co-Sale Rights by the Investors in respect of one or more Transfers of Shares made by any Selling Stockholder shall not adversely affect their rights to participate in subsequent Transfers of Shares subject to this Article IV.

**4.3     Transfer Mechanics**

(a)     If (i) the Company and/or the Participating Investors elect to purchase all of the Offered Shares subject to the Notice or (ii) the Company and/or the Participating Investors elect to purchase less than all the Offered Shares and the prospective purchaser identified in the Notice does not agree to purchase any of the Offered Shares not so purchased, the following provisions shall apply: The Company and/or Participating Investors shall effect the purchase of the Offered Shares and/or Remaining Shares on a date specified by the Selling Stockholder by notice to the Company and/or the Participating Investors not earlier than the later of (x) ten (10) days after such notice or (y) thirty (30) days after the receipt of the Notice by the Investors. On the date of such purchase, the Selling Stockholder shall deliver to the Company and/or the Participating Investors, as applicable, the certificates representing the Shares to be purchased by the Company and/or the Participating Investors, each certificate to be properly endorsed for transfer, in exchange for payment by the Company and/or the Participating Investors, as applicable, of the purchase price for the Shares.

(b)     If (i) the Company and the Participating Investors do not elect to purchase any of the Offered Shares or (ii) the Company and/or the Participating Investors elect to purchase less than all of the Offered Shares and the prospective purchaser agrees to purchase less than all of the Offered Shares, the following provisions shall apply: The Selling Stockholder may, not later than forty (40) days following delivery to the Company and each of the Investors of the Notice, enter into an agreement providing for the closing of the Transfer to the third party

purchaser(s) identified in the Notice of any Offered Shares with respect to which neither the Company Refusal Right nor the Right of First Refusal has been exercised, together with the closing of the purchase of any Shares to be sold by any Co-Sale Participant, such purchase to occur within thirty (30) days of such agreement at a price and on terms and conditions no more favorable to the transferee(s) thereof than specified in the Notice. Simultaneously with such purchase there shall occur the purchase of any Shares with respect to which the Company Refusal Right or the Right of First Refusal has been exercised. On the date of such purchase, each Co-Sale Participant shall be paid that portion of the sale proceeds to which such Co-Sale Participant is entitled by reason of its participation in such sale and the Company and/or each Participating Investor, as applicable, shall pay the Selling Stockholder the purchase price to be paid by such Person for the Offered Shares purchased by them. Upon receipt of such payment, each Co-Sale Participant shall promptly deliver to the Selling Stockholder for Transfer to the prospective purchaser(s) and, if applicable, the Selling Stockholder shall deliver to the Company and/or the Participating Investors, one or more certificates properly endorsed for transfer which represent the Shares to be sold by each such Person pursuant to this Article IV. To the extent that any prospective purchaser or purchasers prohibits such assignment or otherwise refuses to purchase Shares from a Co-Sale Participant exercising its Co-Sale Rights hereunder, such Selling Stockholder shall not sell to such prospective purchaser or purchasers any Shares unless and until, simultaneously with such sale, such Selling Stockholder shall purchase such Shares from such Co-Sale Participant on the same terms and conditions specified in the Notice.

(c)     If the consideration to be paid for the Shares by the third party purchaser shall be other than cash, the Company or the Participating Investors, as applicable, exercising the Company Refusal Right or the Right of First Refusal may in lieu of such consideration pay cash equal to the fair market value of such consideration as mutually agreed between the Selling Stockholder and the holders of a majority of the Shares as to which the Right of First Refusal and Company Refusal Right have been exercised. If such mutual agreement cannot be reached, the Appraisal Procedure set forth in the Company's Amended and Restated Certificate of Incorporation shall be followed mutatis mutandis and the time periods in Article 4.2 shall be extended by the time needed to determine such fair value.

## ARTICLE V

## GENERAL PROVISIONS CONCERNING TRANSFERS

### 5.1     Exempt Transfers

(a)     A Stockholder may Transfer Shares without complying with the provisions of Article IV if such Transfer is to any Permitted Transferee; provided that in the event of any Transfer made pursuant to this Section 5.1, (A) the Transferring Stockholder shall inform the Company and the Investors of such Transfer prior to effecting it, and (B) the transferee shall furnish the Company with a written agreement, reasonably satisfactory to the Company, to be bound by and comply with all provisions of this Agreement as if such transferee were a Common Stockholder or Investor, as the case may be, based on the status of the Transferring Stockholder. Such Transferred Shares shall remain Shares hereunder.

-12-

(b)     Notwithstanding the foregoing, the provisions of Article IV hereof shall not apply to the sale of any Shares to the public pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under Securities Act of 1933, as amended (the "Securities Act").

5.2     **FDM Option Agreement.** Each of Petters Company, Inc., Thomas J. Petters, Theodore Deikel and FAC Acquisition, LLC agrees not to amend or waive any provision of the FDM Option Agreement without the prior written consent of (i) the Investors holding seventy five percent (75%) of the Series A Preferred Stock owned by Investors other than the parties to the FDM Option Agreement; (ii) the Warrant Investor, as long as such Warrant is held by CIGPF I Corp. or its Permitted Transferee, and is exercisable for at least seventy five percent (75%) of the Common Stock originally issuable upon exercise of the Warrant, provided, however, that consent of the Warrant Investor shall not be required for any amendment or waiver of any provision of the FDM Option Agreement unless such amendment or waiver affects the Warrant Investor or the Warrant Investor's Shares in a manner different than the Investors that were originally issued Series A Preferred Stock or the Series A Preferred Stock and in a manner adverse to the interests of the Warrant Investor as an equity investor in the Company, it being understood that no such consent shall be required for an amendment or waiver that adversely affects the Warrant Investor and the Investors that were originally issued Series A Preferred Stock in a similar manner given their relative and different equity interests in the Company; and (iii) the PCP Investor, if required under Section 7.14.

5.3     **FAC Acquisition, LLC.** Thomas J. Petters agrees that he shall remain the Manager (as defined in the FAC LLC Agreement) of FAC Acquisition, LLC until and unless the appointment of a different Manager is approved by the Investors holding seventy five percent (75%) of the Series A Preferred Stock owned by Investors other than the parties to the FAC LLC Agreement, and each of Petters Company, Inc., Thomas J. Petters, and Theodore Deikel agrees not to amend or waive any provision of the FAC LLC Agreement affecting the economic or voting rights of the parties thereto, except with respect to any real estate assets acquired by FAC Acquisition, LLC from Fingerhut Companies, Inc., without the consent of (i) the Investors holding seventy five percent (75%) of the Series A Preferred Stock owned by Investors other than the parties to the FAC LLC Agreement; (ii) the Warrant Investor, as long as such Warrant is held by CIGPF I Corp. or its Permitted Transferee, and is exercisable for at least seventy five percent (75%) of the Common Stock originally issuable upon exercise of the Warrant, provided, however, that consent of the Warrant Investor shall not be required for any amendment or waiver of any provision of the FAC LLC Agreement unless such amendment or waiver affects the Warrant Investor or the Warrant Investor's Shares in a manner different than the Investors that were originally issued Series A Preferred Stock or the Series A Preferred Stock and in a manner adverse to the interests of the Warrant Investor as an equity investor in the Company, it being understood that no such consent shall be required for an amendment or waiver that adversely affects the Warrant Investor and the Investors that were originally issued Series A Preferred Stock in a similar manner given their relative and different equity interests in the Company; and (iii) the PCP Investor, if required under Section 7.14.

5.4     **Transfers to Competitors.** Any other provision of this Agreement to the contrary notwithstanding, prior to a Qualified Public Offering, no Transfer of Shares may be made by any

Stockholder to a competitor of the Company or any person or entity that invests in any such competitor, as determined in good faith by the Board of Directors of the Company.

**5.5** **Stockholder Lockup Agreements in Connection with Initial Public Offering.** Each Stockholder agrees that, subject to any early release provisions that apply generally to stockholders of the Company, it will not, if reasonably requested by the managing underwriter, for a period of up to 180 days following the effective date of the registration statement for an initial public offering directly or indirectly sell, offer to sell, grant any option for the sale of, or otherwise dispose of any Common Stock or securities convertible into Common Stock, except for (i) Registrable Securities (as defined in the Investor Rights Agreement) sold pursuant to such registration statement, (ii) transactions relating to Common Stock or other securities acquired in open market transactions after the completion of the initial public offering, and (iii) Transfers to Affiliates, partners, members and stockholders of such Stockholder (each of whom shall have furnished to the Company and the managing underwriter their written consent to be bound by this Agreement and the Investor Rights Agreement), provided that the Company's officers, directors and all holders of more than 1% of the shares of Common Stock (calculated for this purpose as if all securities convertible into or exercisable for Common Stock, directly or indirectly, are so converted or exercised) of the Company enter such lockup agreements for the same period and on the same terms, and provided further that any waiver or termination of the prohibitions contained in this Section 5.5 by the Company or any underwriter shall apply to each Stockholder.

**5.6** **Consequences of Prohibited Transfer.** Any attempt by a Stockholder to Transfer Shares in violation of the terms of this Agreement shall be void, and the Company agrees that it will not effect such a Transfer nor will it treat any alleged transferee as the holder of such Shares.

## ARTICLE VI

## LEGEND

**6.1** **Certificate Legend.** Each certificate representing the Shares subject to the terms of this Agreement shall be endorsed with the following legend or legend(s) containing substantially similar information (in addition to any legend required under applicable securities laws or otherwise):

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A OF SUCH ACT. THE RIGHT TO VOTE AND THE SALE OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN AMENDED AND RESTATED STOCKHOLDERS AGREEMENT DATED MARCH 24, 2006 BY AND AMONG THE HOLDER HEREOF AND OTHER STOCKHOLDERS OF THE

Doc# 2057882\5

COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON
WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

This legend shall be removed upon termination of this Agreement. Each party to this Agreement
consents to the Company making a notation on its records and giving instructions to any transfer
agent of the Company's securities and capital stock in order to implement the restrictions on
transfer established in this Agreement.

**6.2     Transfer Restriction.** The Stockholders agree that the Company may instruct its transfer
agent to impose transfer restrictions on Shares represented by certificates bearing the legend
referred to in Section 6.1 above to enforce the provisions of this Agreement and the Company
agrees to promptly do so. The legend shall be removed upon termination of this Agreement.

## ARTICLE VII

## MISCELLANEOUS

**7.1     Governing Law.** This Agreement shall be governed by and construed in accordance
with the laws of the State of New York.

**7.2     Amendment**

(a)     Except as otherwise expressly provided, any provision of this Agreement
may be amended and the observance thereof may be waived (either generally or in a particular
instance and either retroactively or prospectively), only by the written consent given (i) as to the
Company, only by the Company; (ii) as to the Investors, only by (x) the Investors holding
seventy five percent (75%) of the then outstanding Series A Preferred Stock, (y) the Warrant
Investor, as long as such Warrant is held by CIGPF I Corp. or its Permitted Transferee, and is
exercisable for at least seventy five percent (75%) of the Common Stock originally issuable upon
exercise of the Warrant, provided, however, that consent of the Warrant Investor shall not be
required for any amendment or waiver of any provision of this Agreement unless such
amendment or waiver affects the Warrant Investor or the Warrant Investor's Shares in a manner
different than the Investors that were originally issued Series A Preferred Stock or the Series A
Preferred Stock and in a manner adverse to the interests of the Warrant Investor as an equity
investor in the Company, it being understood that no such consent shall be required for an
amendment or waiver that adversely affects the Warrant Investor and the Investors that were
originally issued Series A Preferred Stock in a similar manner given their relative and different
equity interests in the Company and (z) the PCP Investor, if required under Section 7.14; and (iii)
as to the Common Stockholders, by persons holding a majority of the Common Stock then
outstanding; provided, however, that no consent from the Common Stockholders shall be
required for any amendment or waiver of any provision of this Agreement unless such
amendment or waiver creates additional obligations for or materially diminishes the rights of the
Common Stockholders under this Agreement; and provided further, however, that no consent of
any Investor or Common Stockholder shall be necessary for any amendment and/or restatement
which is solely for the purpose of including holders of Common Stock of the Company as
"Common Stockholders" and parties hereto.

-15-

(b)  Notwithstanding Section 7.2(a)(ii)(y) above or any other right of the Warrant Investor to consent to adverse amendments, modifications and waivers as more specifically set forth herein, no consent shall be required of the Warrant Investor for actions by the Company to authorize and issue additional series of equity securities that are either (i) pari passu in preference and right or (ii) senior in preference and right to the Series A Preferred Stock (with the Company to deliver copies of such written consent to any Investors who did not execute the same).

(c)  Notwithstanding Section 7.2(a)(iii) above, no consent from the Common Stockholders shall be required for any amendment or waiver of any provision of this Agreement unless such amendment or waiver creates additional obligations for or materially diminishes the rights of the Common Stockholders under this Agreement; and provided further, however, that no consent of any Investor or Common Stockholder shall be necessary for any amendment and/or restatement which is solely for the purpose of including holders of Common Stock of the Company as "Common Stockholders" and parties hereto.

(d)  Notwithstanding Section 7.2(a) above, no consent of any Common Stockholder shall be necessary for any amendment and/or restatement that is solely for the purpose of including holders of Series A Preferred Stock or other preferred stock of the Company as "Investors" and parties hereto.

(e)  The rights of each of Bain Capital and Battery Ventures to designate a director pursuant to Section 2.1(a)(i) and to have a designated director on each committee of the Board of Directors pursuant to Section 2.2 may not be amended, modified or waived in any manner without the prior written consent of such designating Investor.

(f)  The right of Thomas J. Petters to designate directors pursuant to Section 2.1 (a)(ii) may not be amended, modified or waived in any manner without the prior written consent of Thomas J. Petters.

(g)  Any amendment or waiver effected in accordance with this Section 7.2 shall be binding upon each Investor, its successors and assigns, the Company and the Common Stockholders.

7.3  **Benefits of Agreement.** This Agreement and the rights and obligations of the parties hereunder shall inure to the benefit of, and be binding upon, their respective successors, assigns and legal representatives.

7.4  **Term.** This Agreement shall continue in full force and effect from the date hereof through the earliest of the following dates, on which date it shall terminate in its entirety:

(a)  the date of the closing of a Qualified Public Offering; and

(b)  the date of the consummation of a Sale of the Company.

7.5  **Ownership.** Each Common Stockholder represents and warrants that he is the sole legal and beneficial owner of those Shares he currently holds subject to this Agreement and that no other person has any interest in such Shares.

-16-

**7.6    Notices.** All notices, requests, consents and other communications required or permitted hereunder shall be in writing and shall be hand delivered or mailed postage prepaid by registered or certified mail or by facsimile transmission to the Company at:

> Fingerhut Direct Marketing, Inc.
> 4400 Baker Road
> Minnetonka, MN 55343
> Attention:    Edward Wozniak
> Facsimile No.: 952-294-2761
>
> with a copy to:
>
> Lindquist & Vennum P.L.L.P.
> 4200 IDS Center
> 80 South 8th Street
> Minneapolis, MN 55402
> Attention:    Charles P. Moorse
> Facsimile No.: 612-371-3207

to each Investor at its address set forth on Exhibit A hereto with a copy to:

> Ropes & Gray LLP
> One International Place
> Boston, Massachusetts 02110
> Attention:    Joel F. Freedman, Esq.
> Facsimile No.: 617-951-7050

to each Common Stockholder at its address set forth on Exhibit B hereto, or at such other address as the Company or the Stockholders each may specify by written notice to the other parties hereto. Any notice, request, consent and other communication shall for all purposes of the Agreement be treated as being effective or having been given when delivered if delivered personally, upon receipt of facsimile confirmation if transmitted by facsimile, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and postage prepaid as aforesaid. All communications shall be sent to the party to be notified at the address as set forth on the signature page hereof or at such other address as such party may designate by ten (10) days advance written notice to the other parties hereto.

**7.7    Severability.** If any provision of this Agreement shall be found by any court of competent jurisdiction to be invalid or unenforceable, the parties hereby waive such provision to the extent that it is found to be invalid or unenforceable. Such provision shall, to the maximum extent allowable by law, be modified by such court so that it becomes enforceable, and, as modified, shall be enforced as any other provision hereof, all the other provisions hereof continuing in full force and effect.

**7.8    Entire Agreement.** This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof, and no party shall

be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein.

**7.9     Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, with the same effect as if all parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument. This Agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

**7.10     Waiver of Jury Trial.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, THE INVESTORS AND THE COMPANY HEREBY WAIVE, AND COVENANT THAT NEITHER THE COMPANY NOR THE INVESTORS WILL ASSERT, ANY RIGHT TO TRIAL BY JURY ON ANY ISSUE IN ANY PROCEEDING, WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE, IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, ANY OTHER AGREEMENT OR THE SUBJECT MATTER HEREOF OR THEREOF OR IN ANY WAY CONNECTED WITH, RELATED OR INCIDENTAL TO THE DEALINGS OF THE INVESTORS AND THE COMPANY           · HEREUNDER OR THEREUNDER, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN TORT OR CONTRACT OR OTHERWISE. The Company and Common Stockholders acknowledge that they have been informed by the Investors that the provisions of this Section 7.10 constitute a material inducement upon which the Investors are relying and will rely in entering into this Agreement. Any Investor, Common Stockholder or the Company may file an original counterpart or a copy of this Section 7.10 with any court as written evidence of the consent of the Investors, Common Stockholders and the Company to the waiver of its right to trial by jury.

**7.11     Jurisdiction.** Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal or state court located in the State of New York, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 7.6 shall be deemed effective service of process on such party.

**7.12     Additional Stockholders.** Unless otherwise directed by the Investors holding seventy five percent (75%) of the then outstanding Series A Preferred Stock, the Company shall require any Person who acquires any shares of capital stock of the Company from the Company to become a party to this Agreement as a Common Stockholder by executing and delivering a counterpart of this Agreement, except for any officer, director or employee of, or consultant to, the Company or any Subsidiary who receives restricted stock or other stock-based awards or

-18-

exercises any stock options, provided that the terms of such award or option have been approved by the Investors holding seventy five percent (75%) of the then outstanding Series A Preferred Stock (including, without limitation, based on such award or option or other agreement containing provisions regarding rights of first refusal and co-sale with respect to the shares subject thereto).

**7.13  Amendment to February Agreement.** By execution and delivery of this Agreement, the Company and each of the undersigned Stockholders who were parties to the February Agreement hereby approve and consent to this Agreement as an amendment of the February Agreement approved in accordance with Section 7.2 of the February Agreement. This Agreement supersedes and replaces in its entirety the February Agreement.

**7.14  PCP Investor Consent.** Notwithstanding any provision of this Agreement, the Investor Rights Agreement or the Amended and Restated Certificate of Incorporation (collectively, the "Investor Documents"), the Company and each Stockholder agree that, excluding any actions under Article II of this Agreement, each amendment, modification or supplement to, restatement of, or waiver, approval, consent, determination, direction, election, acceptance or other agreement under any Investor Document (each an "Investor Approval") which is required to be given or made by the holders of seventy-five percent (75%) of the then outstanding Series A Preferred Stock (the "Approving Investors") to be effective shall not be effective unless consented to in writing by the PCP Investor or its Permitted Transferees, so long as the PCP Investor or its Permitted Transferees hold (pursuant to the PCP Warrant, the Series A Preferred Stock issuable upon exercise thereof or the Common Stock issuable upon conversion of the Series A Preferred Stock) at least 75% of the shares of Common Stock, on an As-Converted Basis, originally issuable upon exercise of the PCP Warrant, if either (a) such Investor Approval relates to or is given in connection with any transaction in which any Approving Investor or any Affiliate of any such Approving Investor (excluding an arms' length transaction with a portfolio company of Bain or Battery Ventures which is consented to by the PCP Investor or its Permitted Transferee, which consent shall not be unreasonably withheld) is participating, other than supporting or approving such transaction as a holder of Shares of the Company or as an officer or director of the Company, and other than participation as a Stockholder under this Agreement or as an "Investor" under the Investor Rights Agreement, provided, however, no consent of the PCP Investor shall be required if the PCP Investor has been provided the opportunity to participate in such transaction in a proportionate and otherwise similar manner to such Investor or (b) such Investor Approval does not have a like effect upon all holders of each class of the Company's capital stock, as compared to each other holder of such class of capital stock, on a proportionate basis in accordance with the number of shares of such class of capital stock held by each and for the purposes of the foregoing, the PCP Warrants shall be deemed to be part of the class of the Series A Preferred Stock. Notwithstanding and in addition to the foregoing, the Certificate of the Company (i) may be amended to decrease the annual dividend rate on the Series A Preferred Stock provided for in Section 1.2 thereof without the consent of the PCP Investor, and (ii) may not be amended to increase such annual dividend rate without the consent of the PCP Investor.

[The remainder of this page has been intentionally left blank]

Doc# 20578825

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**THE COMPANY**

FINGERHUT DIRECT MARKETING, INC.

By: _____

Name: Brian Smith

Title:   Chief Executive Officer and President

## THE INVESTORS

BAIN CAPITAL VENTURE
FUND, L.P.
By:  Bain Capital Venture Partners, L.P
    its general partner.

By:  Bain Capital Investors, LLC
    its general partner

By: _____
Name:
Title:   Authorized Person

BCIP ASSOCIATES III, LLC
By:  BCIP Associates III
    its manager

BCIP ASSOCIATES III-B, LLC
By:  BCIP Associates III-B
    its manager

By:  Bain Capital Investors, LLC
    their Managing Partner

By: _____
Name:
Title:   Authorized Person

BROOKSIDE CAPITAL PARTNERS
FUND, L.P.

By: _____
Name:
Title:

RGIP, LLC

By: _____
Name:
Title:

BATTERY VENTURES
VI, L.P.
By:  Battery Partners, VI, LLC
    General Partner

By: _____
Name:
Title:

BATTERY INVESTMENT
PARTNERS VI, LLC

By: _____
Name:
Title:  Member Manager

_____
Kermit L. Stofer

PETTERS COMPANY, INC.

By: _____
Name:
Title:

FAC ACQUISITION, LLC

By: _____
Name:
Title:

RTB HOLDINGS, LLC

By:
Name:
Title:

_____
Theodore Deikel

_____
Brian Smith

Doc# 2057882\5

## THE INVESTORS

BAIN CAPITAL VENTURE
FUND, L.P.
By:  Bain Capital Venture Partners, L.P
      its general partner.

By:  Bain Capital Investors, LLC
      its general partner

By:  _____
Name:
Title:   Authorized Person

BCIP ASSOCIATES III, LLC
By:  BCIP Associates III
      its manager

BCIP ASSOCIATES III-B, LLC
By:  BCIP Associates III-B
      its manager

By:  Bain Capital Investors, LLC
      their Managing Partner

By:  _____
Name:
Title:   Authorized Person

BROOKSIDE CAPITAL PARTNERS
FUND, L.P.

By:  _____
Name:

Title:

RGIP, LLC

By:  _____
Name:
Title:  Managing Member


BATTERY VENTURES
VI, L.P.
By:  Battery Partners, VI, LLC
      General Partner

By:  _____
Name:
Title:

BATTERY INVESTMENT
PARTNERS VI, LLC

By:  _____
Name:
Title:  Member Manager

_____
Kermit L. Stofer

FETTERS COMPANY, INC.

By:  _____
Name:
Title:

FAC ACQUISITION, LLC

By:  _____
Name:
Title:

RTB HOLDINGS, LLC

By:
Name:
Title:

_____
Theodore Deikel

_____
Brian Smith

-21-

**THE INVESTORS**

BAIN CAPITAL VENTURE
FUND, L.P.
By: Bain Capital Venture Partners, L.P
    its general partner.

By: Bain Capital Investors, LLC
    its general partner

By: _____
Name: _____
Title:   Authorized Person

BCIP ASSOCIATES III, LLC
By: BCIP Associates III
    its manager

BCIP ASSOCIATES III-B, LLC
By: BCIP Associates III-B
    its manager

By: Bain Capital Investors, LLC
    their Managing Partner

By: _____
Name: _____
Title:   Authorized Person

BROOKSIDE CAPITAL PARTNERS
FUND, L.P.

By: _____
Name:

Title:

RGIP, LLC

By: _____
name:
Title:

BATTERY VENTURES
VI, L.P.
By: Battery Partners, VI, LLC
    General Partner

By: _____
Name: Olwer D. Curme
Title: Member Manager

BATTERY INVESTMENT
PARTNERS VI, LLC

By: _____
Name: Olwer D. Curme
Title: Member Manager

_____
Kermit L. Stofer

PETTERS COMPANY, INC.

By: _____
Name:
Title:

FAC ACQUISITION, LLC

By: _____
Name:
Title:

RTB HOLDINGS, LLC

By: _____
Name:
Title:

_____
Michael D. Lal

_____
Brian Smith

-21-

## THE INVESTORS

**BAIN CAPITAL VENTURE
FUND, L.P.**
By: Bain Capital Venture Partners, L.P
    its general partner.

By: Bain Capital Investors, LLC
    its general partner

By: _____
Name: _____
Title:   Authorized Person

**BCIP ASSOCIATES III, LLC**
By: BCIP Associates III
    its manager

**BCIP ASSOCIATES III-B, LLC**
By: BCIP Associates III-B
    its manager

By: Bain Capital Investors, LLC
    their Managing Partner

By: _____
Name: _____
Title:   Authorized Person

**BROOKSIDE CAPITAL PARTNERS
FUND, L.P.**

By: _____
Name:

Title:

**RGIP, LLC**

By: _____
Name:
Title:

**BATTERY VENTURES
VI, L.P.**
By: Battery Partners, VI, LLC
    General Partner

By: _____
Name:
Title:

**BATTERY INVESTMENT
PARTNERS VI, LLC**

By: _____
Name:
Title:  Member Manager

_Kermit J Stofer_
Kermit L. Stofer

**PETTERS COMPANY, INC.**

By: _____
Name:
Title:

**FAC ACQUISITION, LLC**

By: _____
Name:
Title:

**RTB HOLDINGS, LLC**

By: _____
Name:
Title:

_____
Theodore Deikel

_____
Brian Smith

-21-

## THE INVESTORS

BAIN CAPITAL VENTURE
FUND, L.P.
By: Bain Capital Venture Partners, L.P
    its general partner.

By: Bain Capital Investors, LLC
    its general partner

By: _____
Name:
Title:   Authorized Person

BCIP ASSOCIATES III, LLC
By: BCIP Associates III
    its manager

BCIP ASSOCIATES III-B, LLC
By: BCIP Associates III-B
    its manager

By: Bain Capital Investors, LLC
    their Managing Partner

By: _____
Name:
Title:   Authorized Person

BROOKSIDE CAPITAL PARTNERS
FUND, L.P.

By: _____
Name:

Title:

RGIP, LLC

By: _____
Name:
Title:

BATTERY VENTURES
VI, L.P.
By: Battery Partners, VI, LLC
    General Partner

By: _____
Name:
Title:

BATTERY INVESTMENT
PARTNERS VI, LLC

By: _____
Name:
Title:  Member Manager

_____
Kermit L. Stofer

PETTERS COMPANY, INC.
By: _____
Name:  Thomas J. Petters
Title:  Chief Executive Officer

FAC ACQUISITION, LLC
By: _____
Name:  Thomas J. Petters
Title:  Manager

RTB HOLDINGS, LLC
By: _____
Name:  Thomas J. Petters
Title:  Manager

_____
Theodore Deikel

_____
Brian Smith

## THE INVESTORS

BAIN CAPITAL VENTURE
FUND, L.P.
By:  Bain Capital Venture Partners, L.P
        its general partner.

By:  Bain Capital Investors, LLC
        its general partner

By: _____
Name: _____
Title:   Authorized Person

BCIP ASSOCIATES III, LLC
By:  BCIP Associates III
        its manager

BCIP ASSOCIATES III-B, LLC
By:  BCIP Associates III-B
        its manager

By:  Bain Capital Investors, LLC
        their Managing Partner

By: _____
Name: _____
Title:   Authorized Person

BROOKSIDE CAPITAL PARTNERS
FUND, L.P.

By: _____
Name:

Title:

RGIP, LLC

By: _____
Name:
Title:

BATTERY VENTURES
VI, L.P.
By:  Battery Partners, VI, LLC
        General Partner

By: _____
Name:
Title:

BATTERY INVESTMENT
PARTNERS VI, LLC

By: _____
Name:
Title:  Member Manager

_____
Kermit L. Stofer

PETTERS COMPANY, INC.

By: _____
Name:
Title:

FAC ACQUISITION, LLC

By: _____
Name:
Title:

RTB HOLDINGS, LLC

By:
Name:
Title:

_____
Theodore Deikel

Brian Smith

EPSILON GLOBAL
EQUITIES LIMITED

By: _____
Name:
Title:

CIGPF I CORP.

By: _____
Name:     James F. Vicecinte
Title:     Vice President

CHERRY TREE SECURITIES, LLC

By: _____
Name:
Title:

PIPER JAFFRAY & CO

By: _____
Name:
Title:

PRUDENTIAL CAPITAL
PARTNERS II, L.P.

By: _____
Name:
Title:

PRUDENTIAL CAPITAL PARTNERS
MANAGEMENT FUND II, L.P.

By: _____
Name:
Title:

PRUDENTIAL CAPITAL PARTNERS
(PARALLEL FUND) II, L.P.

By: _____
Name:
Title:

-22-

EPSILON GLOBAL
EQUITIES LIMITED

By: _____
Name:
Title:

PRUDENTIAL CAPITAL
PARTNERS II, L.P.

By: Stetson Street Partners, L.P.,
    its general partner

By: _____
    Vice President

CIGPF I CORP.

By: _____
Name:
Title:

PRUDENTIAL CAPITAL PARTNERS
MANAGEMENT FUND II, L.P.

By: Mulberry Street Holdings, LLC,
    its general partner

By: Prudential Investment Management,
    Inc., its managing member

By: _____
    Vice President

CHERRY TREE SECURITIES, LLC

By: _____
Name:
Title:

PRUDENTIAL CAPITAL PARTNERS
(PARALLEL FUND) II, L.P.

By: Stetson Street Partners, L.P.,
    its general partner

By: _____
    Vice President

PIPER JAFFRAY & CO

By: _____
Name:
Title:

## THE COMMON STOCKHOLDERS

NONE

Doc# 2057882\5

Exhibit A

## NAMES AND ADDRESSES OF INVESTORS

BAIN CAPITAL VENTURE FUND, L.P.
BCIP ASSOCIATES III, LLC
BCIP ASSOCIATES III-B, LLC
c/o Bain Capital, LLC
111 Huntington Avenue
Boston, MA 02199
Phone: 617-516-2000
Fax: 617-516-2010
Attention: Michael Krupka

BROOKSIDE CAPITAL PARTNERS FUND, L.P.
c/o Bain Capital, LLG
111 Huntington Avenue
Boston, MA 02199
Phone: 617-516-2000
Fax: 617-516-2010
Attention: Doni Ferrante

RGIP, LLC
c/o Ropes & Gray LLP
One International Place
Boston, MA 02116
Phone: 617-951-7000
Fax: 617-951-7050
Attention: R. Bradford Malt

BATTERY VENTURES VI, L.P.
BATTERY INVESTMENT PARTNERS VI, LLC
c/o Battery Ventures
20 William Street, Suite 200
Wellesley, MA 02481
Phone: 781-577-1000
Fax: 781-577-1001
Attention: Oliver Curme

PETTERS COMPANY, INC.
FAC ACQUISITION, LLC
RTB HOLDINGS, LLC
4400 Baker Road
Minnetonka, MN 55343
Phone: 952-932-3161
Fax: 952-975-4047
Attention: David E. Baer

Theodore Deikel
4400 Baker Road
Minnetonka, MN 55343
Phone: 952-932-3100
Fax: 952-

Doc# 2057882\5

Exhibit B

## NAMES AND ADDRESSES OF COMMON STOCKHOLDERS

NONE

Doc# 2057882\5

# EXHIBIT 3

## AMENDED AND RESTATED INVESTOR RIGHTS AGREEMENT

This Amended and Restated Investor Rights Agreement (the "Agreement") is made as of March 24, 2006, by and among Fingerhut Direct Marketing, Inc., a Delaware corporation (the "Company"), and the parties listed as Investors on Exhibit A hereto (the "Investors").

WHEREAS, pursuant to a Preferred Stock Purchase Agreement dated as of February 24, 2004 as supplemented by Supplement No. 1 dated October 27, 2004 and Supplement No. 2 dated November 1, 2004 among the Company and certain of the Investors (the "Purchase Agreements"), the Company issued and sold shares of Series A Preferred Stock (as defined below) to certain of the Investors;

WHEREAS, in connection with the Purchase Agreements, the Company and the Investors entered into that certain Investor Rights Agreement dated February 24, 2004 (the "February Agreement");

WHEREAS, pursuant to that certain Securities Purchase Agreement of date March 23, 2006 (the "Subordinated Note Agreement"), the Company and Prudential Capital Partners, II, L.P., Prudential Capital Partners Management Fund II, L.P. and Prudential Capital Partners (Parallel Fund) II, L.P. (the "PCP Investor") will be issued warrants to purchase Series A Preferred Stock (the "PCP Warrants"); and

WHEREAS, one of the conditions precedent to the obligations of the PCP Investors to purchase certain subordinated notes of the Company pursuant to the Subordinated Note Agreement is that the Company and the other Investors whose consent is required to amend the February Agreement enter into this Agreement with the PCP Investor pursuant to which the PCP Investor becomes an "Investor" under this Agreement; and

WHEREAS, in connection with the transactions with the PCP Investor, the parties desire to amend and restate the February Agreement in its entirety.

NOW, THEREFORE, in consideration of the mutual promises and obligations contained herein, the parties hereto agree as follows:

1.    Definitions.

1.1    "Affiliate" shall have the meaning ascribed to such term in Rule 12b-2 of the General Rules and Regulations under the Exchange Act, and shall include, with respect to any Investor, any managed account, investment fund or other vehicle for which such Investor or any Affiliate or such Investor acts as an investment advisor or portfolio manager.

1.2    "Bain Capital" means Bain Capital Venture Fund, L.P.

1.3    "Battery Ventures" means Battery Ventures VI, L.P.

1.4    "Commission" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

1.5    "Common Stock" means the Common Stock, par value $0.00001 per share, of the Company.

1.6    "Exchange Act" shall mean the Securities Exchange Act of 1934 and the rules and regulations of the Commission thereunder, and any successor to such statute or such rules and regulations.

1.7    "Form S-1", "Form S-3", "Form S-4" and "Form S-8" mean respective forms under the Securities Act and any successor registration forms to the form in question.

1.8    "Fully Diluted Basis" means, for the purposes of determining the number of shares of Common Stock outstanding, a basis of calculation which takes into account (a) shares of Common Stock actually issued and outstanding at the time of such determination, and (b) that number of shares of Common Stock that is then issuable upon conversion of all then outstanding shares of Series A Preferred Stock upon exercise of any option, warrant or other right to acquire Common Stock or upon conversion of any Series A Preferred Stock then issuable upon the exercise of any PCP Warrant.

1.9    "GAAP" means U.S. generally accepted accounting principles consistently applied.

1.10    "Holder" means any person party to this Agreement owning the Registrable Securities or any assignee thereof in accordance with Section 8 hereof.

1.11    "Initial Public Offering" means the first registered offering of securities of the Company under the Securities Act.

1.12    "Investors" has the meaning assigned to it in the introductory paragraph of this Agreement.

1.13    "Majority Participating Holders" means, with respect to any registration of Registrable Securities, the Holder or Holders at the relevant time of at least a majority of the Registrable Securities to be included in the registration statement in question.

1.14    "Permitted Transferee" has the meaning assigned to it in the Stockholders Agreement.

1.15    "Qualified Public Offering" means an underwritten public offering of shares of Common Stock in which the net aggregate proceeds to the Company equal or exceed $50 million and the public offering price per share is not less than $0.31533 (as adjusted appropriately in the event of any subdivision, combination, reorganization, recapitalization, reclassification, stock dividend or similar event affecting the Common Stock) and after which the Common Stock is listed on the New York Stock Exchange or the Nasdaq National Market.

1.16    "Register", "registered", and "registration" refer to a registration effected by preparing and filing a registration statement or similar document in compliance with the Securities Act, and the automatic effectiveness or the declaration or ordering of effectiveness of such registration statement or document.

2

1.17    "Registrable Securities" means (i) any Common Stock issued or issuable upon conversion of the Series A Preferred Stock held by a Holder, (ii) any Common Stock issuable upon conversion of the Series A Preferred Stock issuable upon exercise of any Warrants held by a Holder, (iii) any Common Stock issued or issuable upon exercise of any Warrants issuable held by a Holder, and (iv) any Common Stock or other securities issued or issuable with respect to any Registrable Securities by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or otherwise, in each case held by any party to this Agreement. Further, for purposes of Sections 2.2 and 3 only, Registrable Securities shall also include all other shares of Common Stock held by a Holder. The Registrable Securities of any Holder shall cease to be Registrable Securities when (i) a registration statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of in accordance with such registration statement; (ii) such securities shall have been distributed to the public pursuant to Rule 144; or (iii) such securities may be sold by such Holder and all of its Affiliates without registration under the Securities Act pursuant to Rule 144(k) under the Securities Act and such Holder and all of its Affiliates collectively own less than 1% of the Company's outstanding Common Stock; or (iv) such securities may be sold by such Holder and all of its Affiliates without registration under the Securities Act pursuant to Rule 144 under the Securities Act and such Holder and all of its Affiliates collectively own less than 1% of the Company's outstanding Common Stock. For purposes of this Agreement, the number of shares of Registrable Securities outstanding at any time shall be determined by adding the number of shares of Common Stock or other securities outstanding that are the maximum number of shares of Common Stock or other securities issuable pursuant to then convertible securities which upon issuance would be, Registrable Securities and the maximum number of shares of Common Stock issuable upon the conversion of any Series A Preferred Stock issuable upon the exercise of any then outstanding Warrant, all of which shares of Common Stock shall be considered to be then outstanding for the purposes hereof.

1.18    "Registration Expenses" means all expenses incident to performance of or compliance with Sections 2, 3 and 4 hereof by the Company, including without limitation all registration and filing fees, all listing fees, all fees and expenses of complying with securities or blue sky laws, all printing and automated document preparation expenses, all messenger and delivery expenses, the fees and disbursements of counsel for the Company and of its independent public accountants, including the expenses of any special audits required by or incident to such performance and compliance, and the fees and disbursements of one counsel for the Holders on whose behalf Registrable Securities are being registered, but excluding underwriting discounts and commissions and applicable transfer taxes, if any, which shall be borne by the sellers of the Registrable Securities in all cases.

1.19    "Rule 144" means Rule 144 promulgated under the Securities Act, and any successor rule or regulation thereto, and in the case of any referenced section of such rule, any successor section thereto, collectively and as from time to time amended and in effect.

1.20    "Securities Act" means the Securities Act of 1933 or any successor federal statute, and the rules and regulations of the Commission thereunder, and in the case of any referenced section of any such statute, rule or regulation, any successor section thereto, collectively and as from time to time amended and in effect.

Doc# 20584875

1.21    "Series A Preferred Stock" means the Series A Convertible Preferred Stock, par value $0.00001 per share, of the Company.

1.22    "Stockholders Agreement" means that certain Amended and Restated Stockholders Agreement, dated as of March 24, 2006, to which the Company is a party, as the same may be amended from time to time.

1.23    "Subsidiary" means any corporation, association trust, limited liability company, partnership, joint venture or other business association or entity (i) at least 50% of the outstanding voting securities of which are at the time owned or controlled directly or indirectly by the Company or (ii) with respect to which the Company possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management of such person.

1.24    "Warrants" means any warrants to purchase Common Stock issued to Epsilon Global Equities Limited, CIGPF I Corp., Piper Jaffray & Co. and Cherry Tree Securities, LLC and any PCP Warrant.

2.    Request for Registration.

2.1    Registrations on Form S-1. At any time after the earlier of (i) January 9, 2006 or (ii) 120 days after the Initial Public Offering, the Holders of at least twenty percent (20%) of the then outstanding Registrable Securities may, by written notice to the Company, request that the Company effect the registration on Form S-1 of a number of Registrable Securities for which the gross aggregate offering price is reasonably expected to be at least $10,000,000. If the Holders initiating such registration intend to distribute the Registrable Securities in an underwritten offering, they shall so state in their request. Promptly after receipt of such notice, the Company will give written notice of such requested registration to all other Holders of Registrable Securities. The Company will then as provided in Section 4 use all reasonable commercial efforts to effect the registration under the Securities Act of the Registrable Securities which the Company has been requested to register by such Holders, and all other Registrable Securities which the Company has been requested to register by other Holders of such Registrable Securities by notice delivered to the Company within ten (10) days after the giving of such notice by the Company.

2.2    Registration on Form S-3. At any time after the Company becomes eligible to file a Registration Statement on Form S-3, one or more Holders of at least ten percent (10%) of the then outstanding Registrable Securities may by written notice to the Company, request that the Company effect the registration on Form S-3 of a number of Registrable Shares for which the gross aggregate offering price is reasonably expected to be at least $1,000,000. If the Holders initiating such registration intend to distribute the Registrable Securities in an underwritten offering, they shall so state in their request. Promptly after receipt of such notice, the Company will give written notice of such requested registration to all other Holders of Registrable Securities. The Company will then as provided in Section 4 use all reasonable commercial efforts to effect the registration under the Securities Act of the Registrable Securities which the Company has been requested to register by such Holders, and all other Registrable Securities which the Company has been requested to register by other Holders of Registrable Securities by

notice delivered to the Company within ten (10) days after the giving of such notice by the Company.

2.3    Postponement. The Company may postpone for a period of up to 60 days the filing of any registration required to be filed pursuant to this Section 2 if the Board of Directors of the Company in good faith determines that such postponement is necessary in order to avoid premature disclosure of a financing, acquisition, recapitalization, reorganization or other material transaction, the disclosure of which would have a materially detrimental effect on the Company; provided, however, that the Company may not exercise such right of postponement within any period of 365 days (i) more frequently than twice or (ii) for more than an aggregate of 60 days for all postponements within any such 365-day period. If the Company elects to postpone the filing of a registration statement pursuant to this Section 2.3, two-thirds of the Holders of Registrable Securities who requested such registration statement may withdraw such request and upon such withdrawal, such request shall be deemed not to have been made for any purpose of this Agreement.

2.4    Number of Requests; Form.

2.4.1.    Section 2.1 Registrations. The Company shall not be required to effect more than two (2) registrations pursuant to Section 2.1. Each registration requested pursuant to Section 2.1 shall be effected by the filing of a registration statement on Form S-1 (or any other form which includes substantially the same information as would be required to be included in a registration statement on such form as currently constituted), unless the use of a different form has been agreed to in writing by the Majority Participating Holders. No registration of Registrable Securities under Section 2.1 shall be deemed to be a registration for any purpose of this Section 2.4.1(i) which shall not have become and remained effective in accordance with the provisions of this Agreement, or (ii) pursuant to which Holders of Registrable Securities are not able to include at least 75% of the Registrable Securities which such Holders desired to include in such registration.

2.4.2.    Section 2.2 Registrations. The Company shall not be required to effect more than two (2) registrations pursuant to Section 2.2 in any twelve (12) month period. Each registration requested pursuant to Section 2.2 shall be effected by the filing of a registration statement on Form S-3 (or any other form which includes substantially the same information as would be required to be included in a registration statement on such form as currently constituted), unless the use of a different form has been agreed to in writing by the Majority Participating Holders, or unless the Form S-3 is not available as a result of actions of or inaction by the Company in which case such registration shall be on Form S-1 without regard to the limitation on registrations on Form S-1 set forth on Section 2.4.1. No registration of Registrable Securities under Section 2.2 shall be deemed to be a registration for any purpose of this Section 2.4.2 (i) which shall not have become and remained effective in accordance with the provisions of this Agreement, or (ii) pursuant to which Holders of such Registrable Securities are not able to include at least 75% of the Registrable Securities which such Holders desired to include in such registration.

2.5    Payment of Expenses. The Company hereby agrees to pay all Registration Expenses in connection with all registrations effected pursuant to Sections 2.1 and 2.2; provided, however, that the Company shall not be required to pay for any expenses of such registration proceeding if the registration request is withdrawn at any time at the request of the Majority Participating Holders, and all participating Holders shall bear such expenses, unless the Majority Participating Holders agree to treat such withdrawn registration as a registration which was effected pursuant to Section 2.1 or 2.2, as the case may be, which agreement shall bind all Holders of Registrable Securities. Notwithstanding the foregoing, if the Holders have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time the demand for registration was made or if there shall have occurred a material adverse change in market conditions from those existing as such time in the good faith judgment of the Majority Participating Holders makes it undesirable to proceed with the proposed offering, then the Holders shall not be required to pay any of such expenses. The withdrawn registration shall not count as a registration effected pursuant to Section 2.1 or 2.2, as the case may be.

3.    Piggyback Registration. If the Company at any time proposes to register any of its equity securities under the Securities Act, for its own account or for the account of any holder of its securities other than Registrable Securities, on a form which would permit registration of Registrable Securities for sale to the public under the Securities Act, or proposes to register any securities in a so-called "unallocated" or "universal" shelf registration statement, the Company will each such time give notice to all Holders of Registrable Securities of its intention to do so. Such notice shall describe such securities and specify the form, manner and other relevant aspects of such proposed registration. Any such Holder may, by written response delivered to the Company within ten (10) days after the giving of any such notice by the Company, request that all or a specified part of the Registrable Securities held by such Holder be included in such registration. The Company thereupon will use its best efforts as a part of its filing of such form to cause to be included in such registration under the Securities Act all Registrable Securities which the Company has been so requested to register by the Holders of Registrable Securities, to the extent required to permit the disposition (in accordance with the methods to be used by the Company or other holders of securities in such registration) of the Registrable Securities to be so registered. The Company shall be under no obligation to complete any offering of its securities it proposes to make and shall incur no liability to any Holder for its failure to do so. No registration of Registrable Securities effected under this Section 3 shall relieve the Company of any of its obligations to effect registrations of Registrable Securities pursuant to Section 2.1 or 2.2 hereof.

3.1    Excluded Transactions. The Company shall not be obligated to effect any registration of Registrable Securities under this Section 3 incidental to the registration of any of its securities in connection with mergers, acquisitions, exchange offers, dividend reinvestment plans or stock option or other employee benefit plans.

3.2    Payment of Expenses. The Company hereby agrees to pay all Registration Expenses in connection with each registration of Registrable Securities requested pursuant to this Section 3.

4.    Registration Procedures.

Doc# 2058487\5

6

4.1     Company Obligations.  If and whenever the Company is required to use all reasonable commercial efforts to effect the registration of any Registrable Securities under the Securities Act as provided in Sections 2 or 3 hereof, the Company will as expeditiously as reasonably possible:

4.1.1.   Registration Statement.  Prepare and (in the case of a registration pursuant to Section 2 hereof, promptly and in any event within 45 days after a request for registration is delivered to the Company under Section 2.1 or within 20 days after a request for registration is delivered to the Company under Section 2.2) file with the Commission a registration statement with respect to such Registrable Securities and use all reasonable commercial efforts to cause such registration statement to become effective as soon as possible thereafter.  Such registration statement shall be for an offering to be made on a continuous or delayed basis (a so-called "shelf registration statement") if the Company is eligible for the use thereof and the Majority Participating Holders have requested a shelf registration statement.

4.1.2.   Amendments and Supplements to Registration Statement.  Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities and other securities, if any, covered by such registration statement until the later of(i) such time as all such Registrable Securities have been disposed of by the seller or sellers thereof in accordance with the intended methods of disposition set forth in such registration statement (but in no event for a period of more than 180 days after such registration statement becomes effective) which 180 day period shall be extended by the number of days that the sale of Registrable Securities is suspended as described in Section 4.4 or (ii) the expiration of the time when a prospectus relating to such registration is required to be delivered under the Securities Act.

4.1.3.   Cooperation.  Use its best efforts to cooperate as may be reasonably requested by the seller in the disposition of the Common Stock covered by such registration statement, including without limitation in the case of an underwritten offering causing key executives of the Company to participate under the direction of the managing underwriter in a "road show" scheduled by such managing underwriter in such locations and of such duration as in the reasonable judgment of such managing underwriter are appropriate for such underwritten offering.

4.1.4.   Furnishing of Copies of Registration Statements and Other Documents. Furnish to each seller of such Registrable Securities such number of conformed copies of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus included in such registration statement (including each preliminary prospectus and any summary prospectus), each in conformity with the requirements of the Securities Act, such documents incorporated by reference in such registration statement or prospectus and such other documents as such seller may reasonably request in order to facilitate the

disposition of the Registrable Securities of such seller covered by such registration statement.

4.1.5.   State Securities Laws. Use its best efforts to register or qualify such Registrable Securities under such securities or "blue sky" laws of such jurisdictions as the sellers shall reasonably request, and do any and all other acts and things which may be necessary or advisable to enable each seller to consummate the disposition in such jurisdictions of the Registrable Securities of such seller covered by such registration statement; provided, however, that the Company shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation or subject the Company to taxation in any jurisdiction in which it is not so qualified or would not otherwise be so subject.

4.1.6.   Opinion of Counsel; Comfort Letter. Use its best efforts to obtain all legal opinions, auditors consents and comfort letters and experts cooperation as may be required, including furnishing to each underwriter of Registrable Securities on the date that the registration statement with respect to such Registrable Securities becomes effective, (i) an opinion, dated as of such date, of counsel for the Company and (ii) a "cold comfort" letter, dated as of such date, signed by the independent public accountants of the Company, in each case in form and substance as is customarily given to underwriters in an underwritten public offering and addressed to holders of Registrable Securities.

4.1.7.   Notice of Prospectus Defects. Immediately notify each seller of Registrable Securities covered by such registration statement, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing, and at the request of any such seller prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

4.1.8.   Stop Orders. In the event of the issuance of any stop order suspending the effectiveness of such registration statement, or any order suspending or preventing the use of any related prospectus or suspending the qualification of any Registrable Securities included in such registration statement for sale in any jurisdiction, use its best efforts promptly to obtain the withdrawal of such order.

4.1.9.   General Compliance with Federal Securities Laws; Section 11(a) Earning Statement. Otherwise use its best efforts to comply with the Securities Act, the Exchange Act and all other applicable rules and regulations of the Commission, and make available to its securities holders, as soon as reasonably practicable, an earning statement covering

8

the period of at least twelve (12) months after the effective date of such registration statement, which earning statement shall satisfy Section 11(a) of the Securities Act and any applicable regulations thereunder, including Rule 158.

4.1.10. Underwriting Agreement. In the event of any underwritten offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering.

4.1.11. Exchange Listing. Use its best efforts to cause such Registrable Securities to be listed on each securities exchange on which any equity security of the Company is then listed or, if the Company does not have a class of equity securities listed on a national securities exchange, apply for qualification and use its best efforts to qualify such Registrable Securities for listing on the New York Stock Exchange or inclusion on the Nasdaq National Market or comparable trading system.

4.1.12. Due Diligence. Make available for inspection by any seller of Registrable Securities, any underwriter participating in any disposition pursuant to such registration statement and any attorney, accountant or other agent retained by any such seller or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with such registration statement, in each case subject to the requirement that recipients execute appropriate confidentiality agreements.

4.1.13. Transfer Agent. Provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration statement.

4.1.14. Company Lockup. In the case of an underwritten offering, except as may otherwise be agreed by the managing underwriter, will refrain, for a period from fifteen (15) days before the effective date of the registration sale until up to 120 days after such effective date, from directly or indirectly selling, offering to sell, granting any option for the sale of or otherwise disposing of any Common Stock or securities convertible into Common Stock other than (i) pursuant to Company employee equity plans, (ii) in connection with acquisitions, or (iii) in any transaction involving the issuance of restricted securities if in such case the recipient of such securities agrees in writing to be bound by the provisions of this Section 4.1.14.

4.2     Participation by Selling Holders. The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish the Company such information regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing and which shall be required by the Securities Act (or similar state laws) or by the Commission in connection therewith.

4.3     Conversion only Upon Consummation of Offering. No Holder shall be required by this Agreement to convert any Registrable Security into Common Stock except at the

applicable closing or closings of an underwritten registered offering and except upon the sale of such Registrable Security in the case of other registered offerings.

4.4    Discontinue Selling. Each seller of Registrable Securities agrees that, upon written notice of the happening of any event as a result of which the Prospectus included in any registration statement contains an untrue statement of a material fact or omits any material fact necessary to make the statements therein not misleading, or upon the issuance of a stop order suspending the effectiveness of any registration statement, such seller will use commercially reasonable efforts to forthwith discontinue disposition of Registrable Securities until such seller is advised in writing by the Company that the use of the prospectus may be resumed and if applicable is furnished with a supplemented or amended prospectus as contemplated by Section 4.1.7 hereof. If the Company shall give any notice to suspend the disposition of Registrable Securities pursuant to a prospectus, the Company shall extend the period of time during which the Company is required to maintain the registration statement effective pursuant to this Agreement by the number of days during the period from and including the date of the giving of such notice to and including the date such seller either is advised by the Company that the use of the prospectus may be resumed or if applicable receives the copies of the supplemented or amended prospectus contemplated by Section 4.1.7.

5.    Additional Procedures in Connection with Underwritten Offerings; Holder Lockups; Cutbacks.

5.1    Registrations Upon Request Pursuant to Section 2. In the case of a registration pursuant to Section 2 hereof, whenever the Majority Participating Holders shall request that such registration shall be effected pursuant to an underwritten offering, such registration shall be so effected, and only securities which are to be distributed by the underwriters designated by such Majority Participating Holders may be included in such registration. If requested by such underwriters, the Company and each participating seller will enter into an underwriting agreement with such underwriters for such offering containing such representations and warranties by the Company and such participating sellers and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions, including, without limitation, customary indemnity and contribution provisions; provided, however that the liability of each Holder in respect of any indemnification, contribution or other obligation of such Holder arising under such underwriting agreement (i) shall be limited to losses arising out of or based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, any such preliminary prospectus, final prospectus, summary prospectus, amendment or supplement, incorporated document or other such disclosure document or other document or report, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Holder expressly for inclusion therein and (ii) shall not in any event exceed an amount equal to the net proceeds to such Holder (after deduction of all underwriters' discounts and commissions) from the disposition of the Registrable Securities disposed of by such Holder pursuant to such registration.

5.2    Piggyback Registrations Pursuant to Section 3. In connection with the exercise of any registration rights granted to Holders of Registrable Securities pursuant to Section 3 hereof, if the registration is to be effected by means of an underwritten offering of Common Stock on a firm commitment basis, the Company may condition participation in such registration by such

10

Doc# 20584875

Holders upon inclusion of the Registrable Securities being so registered in such underwriting. The Holders of Registrable Securities participating in any registration pursuant to Section 3 shall be parties to the underwriting agreement entered into by the Company and any other selling stockholders in connection therewith containing such representations and warranties by the Company and such participating sellers and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions, including, without limitation, customary indemnity and contribution provisions; provided, however, that the liability of each Holder in respect of any indemnification, contribution or other obligation of such Holder arising under such underwriting agreement (i) shall be limited to losses arising out of or based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, any such preliminary prospectus, final prospectus, summary prospectus, amendment or supplement, incorporated document or other such disclosure document or other document or report, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Holder expressly for inclusion therein and (ii) shall not in any event exceed an amount equal to the net proceeds to such Holder (after deduction of all underwriters' discounts and commissions) from the disposition of the Registrable Securities disposed of by such Holder pursuant to such registration.

    5.3    Selling Holder Lockups. In each registration pursuant to Section 2 or Section 3 effected on a firm commitment underwritten offering, each Holder agrees that, as a condition to the inclusion of any of such Holder's Registrable Securities in such offering, such Holder shall agree, if reasonably requested by the managing underwriter, subject to any early release provisions that apply generally to stockholders of the Company, for a period from 15 days prior to the effective date of the registration statement until up to 120 days after such effective date, not to directly or indirectly sell, offer to sell, grant any option for the sale of, or otherwise dispose of any Common Stock or securities convertible into Common Stock except for (i) Registrable Securities sold pursuant to such registration statement, (ii) transactions relating to Common Stock or other securities acquired in open market transactions, (iii) transfers to Affiliates, partners, members and stockholders of such Holder, each of whom shall have furnished to the Company and the managing underwriter their written consent to be bound by this Agreement including this Section 5.3 and (iv) transfers to charitable organizations, each of which shall have furnished to the Company and the managing underwriter their written consent to be bound by this Agreement including this Section 5.3, provided that the Company's officers, directors and all holders of other securities included in such registration agree to enter into such lockup agreements for the same period and on the same terms, and provided further that any waiver or termination of the prohibitions contained in this Section 5.3 by the Company or any underwriter shall apply to each Holder.

    5.4    Cutbacks.

        5.4.1.    Section 2 Cutbacks. If the managing underwriter advises the Company that the number of shares to be included in a registration pursuant to Section 2 should be limited due to market conditions or otherwise, (i) all shares other than Registrable Securities shall first be excluded, and (ii) thereafter, if additional shares must be excluded from such registration, all Holders of Registrable Securities shall share pro rata in the number of shares of Registrable Securities to be excluded from such registration pursuant

11

to this clause (ii), such sharing to be based on the respective numbers of Registrable Securities owned by such Holders.

    5.4.2.  <u>Section 3 Cutbacks</u>. If the managing underwriter advises the Company that the number of shares to be included in a registration pursuant to Section 3 should be limited due to market conditions or otherwise,

    (a)    if the registration was initiated by the Company, (i) all shares of securities held by shareholders of the Company other than Holders of Registrable Securities shall first be excluded, (ii) next, if additional shares must be excluded from such registration, all Holders of Registrable Securities shall share pro rata in the number of shares of Registrable Securities to be excluded from such registration pursuant to this clause (ii), such sharing to be based on the respective numbers of Registrable Securities owned by such holders and (iii) thereafter, if additional shares must be excluded from such registration, shares to be issued by the Company shall be excluded; provided, however, that no exclusion provided for herein shall reduce the amount of Registrable Securities to be included in such registration to an amount that is less than twenty five (25) percent of the total amount of shares to be included in such registration, unless in connection with the Initial Public Offering;

    (b)    if the registration was initiated by shareholders of the Company other than Holders of Registrable Securities, (i) shares to be issued by the Company shall first be excluded, (ii) next, if additional shares must be excluded from such registration, all Holders of Registrable Securities shall share pro rata in the number of shares of Registrable Securities to be excluded from such registration pursuant to this clause (ii), such sharing to be based on the respective numbers of Registrable Securities owned by such holders, and (iii) thereafter, if additional shares must be excluded from such registration, shares to be registered by shareholders of the Company other than Holders of Registrable Securities shall be excluded pro rata based on the number of shares to be determined or as agreed by such other shareholders among themselves.

6.    <u>Indemnification and Contribution</u>.

    6.1    <u>Indemnities of the Company</u>. In the event of any registration of any Registrable Securities under the Securities Act pursuant to Section 2 or 3 hereof, and in connection with any registration statement or any other disclosure document produced by or on behalf of the Company or any of its subsidiaries including, without limitation, reports required by and other documents filed under the Exchange Act, and other documents pursuant to which any debt or equity securities of the Company or any of its subsidiaries are sold (whether or not for the account of the Company), the Company will, and hereby does, indemnify and hold harmless each Investor and each holder or seller of Registrable Securities, their respective direct and indirect partners, members, stockholders, directors, advisory board members, officers, representatives on the Board of Directors of the Company, and each other Person, if any, who

12

controls or is alleged to control any such Investor, holder or seller within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (each such Person being referred to herein as a "Covered Person"), against any losses, claims, damages or liabilities (or actions or proceedings in respect thereof), joint or several, to which such Covered Person may be or become subject under the Securities Act, the Exchange Act, any other securities or other law of any jurisdiction, common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions or proceedings in respect thereof) arise out of or are based upon (i) any untrue statement or alleged untrue statement of any material fact contained or incorporated by reference in any registration statement under the Securities Act, any preliminary prospectus or final prospectus included therein, or any related summary prospectus, or any amendment or supplement thereto, or any document incorporated by reference therein, or any other such disclosure document (including without limitation reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or other document or report, or (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation of any federal, state, foreign or common law rule or regulation applicable to the Company or any of its subsidiaries and relating to action or inaction in connection with any such registration, disclosure document or other document or report, and will reimburse such Covered Person for any legal or any other expenses incurred by it in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding; provided, however, that the Company shall not be liable to any Covered Person in any such case for any such loss, claim, damage, liability, action or proceeding to the extent that it arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, any such preliminary prospectus, final prospectus, summary prospectus, amendment or supplement, incorporated document or other such disclosure document or other document or report, in reliance upon and in conformity with written information furnished to the Company or any of its subsidiaries by or on behalf of such Covered Person expressly for inclusion therein. The indemnities of the Company contained in this Section 6.1 shall remain in full force and effect regardless of any investigation made by or on behalf of such Covered Person and shall survive any transfer of Registrable Securities.

6.2     Indemnities to the Company.  In the event of any registration of Registrable Securities pursuant to Section 2 or 3, each selling Holder will, and hereby does, indemnify and hold harmless the Company, each director of the Company, each officer of the Company who shall sign such registration statement and each other Person (other than such seller), if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, with respect to any statement in or omission from such registration statement, any preliminary prospectus, final prospectus or summary prospectus included therein, or any amendment or supplement thereto, or any document incorporated by reference therein, or any other such disclosure document (including without limitation reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or other document or report, if such statement or Omission was made in reliance upon and in conformity with written information furnished to the Company by or on behalf of such seller expressly for inclusion therein. Such indemnity contained in this Section 6.2 shall remain in full force and effect regardless of any investigation made by or on behalf of the Company or any such director, officer or controlling Person and shall survive any transfer of Registrable Securities.

13

6.3     Indemnification Procedures. Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a claim of the type referred to in the foregoing provisions of this Section 6, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party, give written notice to each such indemnifying party of the commencement of such action; provided, however, that the failure of any indemnified party to give notice to such indemnifying party as provided herein shall not relieve such indemnifying party of its obligations under the foregoing provisions of this Section 6, except and solely to the extent that such indemnifying party is actually prejudiced by such failure to give notice. In case any such action is brought against an indemnified party, each indemnifying party will be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified, to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to such an indemnifying party), and after notice from an indemnifying party to such indemnified party of its election so to assume the defense thereof, such indemnifying party will not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof, provided, however, that (i) if the indemnified party in good faith determines that there may be a conflict between the positions of such indemnifying party and the indemnified party in conducting the defense of such action or that there may be defenses available to such indemnified party different from or in addition to those available to such indemnifying party, then counsel for the indemnified party shall conduct the defense to the extent in good faith determined by such counsel to be necessary to protect the interests of the indemnified party and such indemnifying party shall employ separate counsel for its own defense, (ii) in any event, the indemnified party shall be entitled to have counsel chosen by such indemnified party participate in, but not conduct, the defense and (iii) the indemnifying party shall bear the legal expenses incurred in connection with the conduct of, and the participation in, the defense as referred to in clauses (i) and (ii) above. If, within a reasonable time after receipt of the notice, such indemnifying party shall not have elected to assume the defense of the action, such indemnifying party shall be responsible for any legal or other expenses incurred by such indemnified party in connection with the defense of the action, suit, investigation, inquiry or proceeding. No indemnifying party will consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

6.4     Contribution. If the indemnification provided for in Sections 6.1 or 6.2 hereof is unavailable to a party that would have been an indemnified party under any such Section in respect of any losses, claims, damages or liabilities (or actions or proceedings in respect thereof) referred to therein, then each party that would have been an indemnifying party thereunder shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions or proceedings in respect thereof) in such proportion as is appropriate to reflect the relative fault of such indemnifying party on the one hand and such indemnified party on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions or proceedings in respect thereof). The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such indemnifying party or such indemnified party and the parties' relative intent, knowledge, access

14

to information and opportunity to correct or prevent such statement or omission. The parties agree that it would not be just and equitable if contribution pursuant to this Section 6.4 were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the preceding sentence. The amount paid or payable by a contributing party as a result of the losses, claims, damages or liabilities (or actions or proceedings in respect thereof) referred to above in this Section 6.4 shall include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

    6.5    Limitation on Liability of Holders of Registrable Securities. The liability of each Holder in respect of any indemnification or contribution obligation of such Holder arising under this Section 6 shall not in any event exceed an amount equal to the net proceeds to such Holder (after deduction of all underwriters' discounts and commissions) from the disposition of the Registrable Securities disposed of by such Holder pursuant to such registration less any other damages paid by such Holder with respect to claims relating to such registration.

7.    Reports Under Securities Exchange Act of 1934. With a view to making available to the Holders the benefits of Rule 144 and any other rule or regulation of the Commission that may at any time permit a Holder to sell securities of the Company to the public without registration, and with a view to making it possible for Holders to register the Registrable Securities pursuant to a registration on Form S-3, the Company agrees to:

        (a)    use its best efforts to make and keep public information available, as those terms are understood and defined in Rule 144, at all times commencing after the effective date of the registration statement for its Initial Public Offering;

        (b)    take such action, including the voluntary registration of its Common Stock under Section 12 of the Exchange Act, as will permit Holders to use Form S-3 for the sale of their Registrable Securities, such action to be taken as soon as practicable (but not later than 90 days) after the end of the fiscal year in which the registration statement for the Initial Public Offering is declared effective;

        (c)    use its best efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

        (d)    furnish to any Holder forthwith upon request (1) a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time more than 90 days after the effective date of the registration statement for its Initial Public Offering), the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or as to its qualification as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (2) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (3) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the Commission

15

which permits the selling of any such securities without registration or pursuant to such form.

8.  Assignment of Registration Rights. The rights to cause the Company to register Registrable Securities pursuant to Sections 2 and 3 may be assigned by any Holder to a transferee, and by such transferee to a subsequent transferee, but only if such rights are transferred (a) to an Affiliate or other Permitted Transferee of such Holder or (b) in connection with the sale or other transfer of Registrable Securities having a value at the time of such transfer of not less than an aggregate of $1,000,000 or some lesser amount, if such lesser amount represents the value of all the Registrable Securities then held by such Holder. Any transferee to whom rights under this Agreement are transferred shall (i) as a condition to such transfer, deliver to the Company a written instrument by which such transferee agrees to be bound by the obligations imposed upon Holders under this Agreement to the same extent as if such transferee were a Holder under this Agreement and (ii) be deemed to be a Holder hereunder.

9.  Limitation on Subsequent Registration Rights. The Company shall not, without the prior written consent of the Holders of at least seventy five percent (75%) of the then outstanding Registrable Securities, enter into any agreement with any holder or prospective holder of any securities of the Company that would allow such holder or prospective holder (i) to include securities of the Company in any registration statement, unless under the terms of such agreement such holder or prospective holder may include such securities in a registration statement only on terms subordinate to the terms on which Holders of Registrable Securities may include shares in such registration or (ii) to make a demand registration.

10.  Future Changes in Registration Requirements. In the event that the registration requirements under the Securities Act are amended or eliminated to accommodate a "Company registration" or similar approach, this Agreement shall be deemed amended to the extent necessary to reflect such changes and the intent of the parties hereto with respect to the benefits and obligations of the parties, and in such connection, the Company shall use commercially reasonable efforts to provide Holders of Registrable Securities equivalent benefits to those provided under this Agreement.

11.  Covenants of the Company. The Company agrees as follows:

11.1  Information Rights.

11.1.1. Access to Records. The Company shall, and shall cause each Subsidiary, if any, to afford to Bain Capital, Battery Ventures, each PCP Investor, as long as the PCP Investors or their Permitted Transferees hold (pursuant to the PCP Warrants, the Series A Preferred Stock issuable upon exercise thereof and the Common Stock issuable upon conversion of the Series A Preferred Stock) at least 75% of the shares of Common Stock, on a Fully Diluted Basis, originally issuable upon exercise of the PCP Warrants, each Investor that, together with its Affiliates, holds at least five percent (5%) of the Common Stock of the Company on a Fully Diluted Basis, and CIGPF I Corp. as long as the Warrant it holds is exercisable for or has been exercised for at least seventy five percent (75%) of the Common Stock of the Company originally issuable upon exercise of its Warrant, and each of their respective officers, employees, advisors, counsel and other

16

Doc# 20584875

authorized representatives, reasonable access during normal business hours, upon reasonable advance notice, to all of the books, records and properties of the Company and its Subsidiaries, if any, and to all officers and employees of the Company and such Subsidiaries.

11.1.2. Financial Reports. The Company shall, and shall cause each Subsidiary, if any, to provide to Bain Capital, Battery Ventures, each PCP Investor, as long as the PCP Investors or their Permitted Transferees hold (pursuant to the PCP Warrants, the Series A Preferred Stock issuable upon exercise thereof and the Common Stock issuable upon conversion of the Series A Preferred Stock) at least 75% of the shares of Common Stock, on a Fully Diluted Basis, originally issuable upon exercise of the PCP Warrants, each Investor that, together with its Affiliates, holds at least five percent (5%) of the Common Stock of the Company on a Fully Diluted Basis, and CIGPF I Corp. as long as the Warrant it holds is exercisable for or has been exercised for at least seventy five percent (75%) of the Common Stock of the Company originally issuable upon exercise of its Warrant, the following:

11.1.2.1      Monthly Reports. As soon as available, but not later than 20 days after the end of each fiscal month beginning with the report for the month of January 2004, a consolidated balance sheet of the Company as of the end of such period and consolidated statements of income and cash flows of the Company for such period.

11.1.2.2      Quarterly Reports. As soon as available, but not later than 20 days after the end of each quarterly accounting period, a consolidated balance sheet of the Company as of the end of such period and consolidated statements of income, cash flows and changes in stockholders' equity for such quarterly accounting period and for the period commencing at the end of the previous fiscal year and ending with the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period of the preceding fiscal year, and including comparisons to the budget or business plan, all prepared in accordance with GAAP, subject to normal year-end adjustments and the absence of footnote disclosure.

11.1.2.3      Annual Audit. As soon as available, but not later than 180 days after the end of each fiscal year of the Company commencing with the fiscal year ended January 31, 2004, audited consolidated financial statements of the Company, which shall include statements of income, cash flows and changes in stockholders' equity for such fiscal year and a balance sheet as of the last day thereof, each prepared in accordance with GAAP, and accompanied by the report of a firm of independent certified public accountants selected by the Company's Board of Directors in accordance with Section 11.4 hereof (the "Accountants"). The Company and its Subsidiaries, if any, shall maintain a system of accounting sufficient to enable its Accountants to render the report referred to in this Section 11.1.2.3.

11.1.2.4    Annual Budget and Operating Forecast. As soon as available, but not later than 45 days prior to the beginning of each fiscal year commencing with the fiscal year ended January 31, 2006, an annual budget and operating plan for such fiscal year together with management's written discussion and analysis of such budget. The budget shall be accepted as the budget for the Company for such fiscal year when it has been approved by the Board of Directors of the Company. Management shall review the budget monthly and shall advise each Investor entitled to receive the annual budget at such time and the Board of Directors of all material changes therein, and all material deviations therefrom.

11.1.3. Observer's Rights. Each of Bain Capital and Battery Ventures, for so long as such Investor, together with its Affiliates, owns at least thirty percent (30%) of the shares of Series A Preferred Stock purchased by them (or Common Stock issued on conversion thereof) under the Purchase Agreements shall have the right to have one (1) individual (each an "Observer") attend any meeting of the Board or any committee thereof at any time during which such Investor does not have an executive thereof serving on the Board of Directors of the Company. No Observer shall have the right to vote on any matter presented to the Board or any committee thereof. The Company shall give each Observer written notice of each meeting thereof at the same time and in the same manner as the members of the Board or such committee receive notice of such meetings, and the Company shall permit each Observer to attend as an observer at all meetings thereof; provided, that in the case of telephonic meetings, each Observer need receive only actual notice thereof at the same time and in the same manner as notice is given to the directors; and provided, further, that such Observer may be excluded from that portion of any meeting reasonably required in order to preserve attorney-client privilege for communications with the Company's counsel. Each Observer shall be entitled to receive all written materials and other information given to the directors in connection with such meetings at the same time such materials and information are given to the directors. If the Company proposes to take any action by written consent in lieu of a meeting of the Board, the Company shall give written notice thereof to each Observer prior to the effective date of such consent describing the nature and substance of such action. The Company shall pay all reasonable expenses including, without limitation, airfare and hotel expenses in accordance with the Company's then applicable travel policies, but shall not pay any other compensation to an Observer, in connection with such Observer's attendance at meetings of the Board of Directors.

11.1.4. Reportable Events. The Company shall provide notice to Bain Capital, Battery Ventures, each PCP Investor, as long as the PCP Investors or their Permitted Transferees hold (pursuant to the PCP Warrants, the Series A Preferred Stock issuable upon exercise thereof and the Common Stock issuable upon conversion of the Series A Preferred Stock) at least 75% of the shares of Common Stock, on a Fully Diluted Basis, originally issuable upon exercise of the PCP Warrants, each Investor that, together with its Affiliates, holds at least five percent (5%) of the Common Stock of the Company on a Fully Diluted Basis, and CIGPF I Corp. as long as the Warrant it holds is exercisable for or has been exercised for at least seventy five percent (75%) of the Common Stock of the Company originally issuable upon exercise of its Warrant, of a Reportable Event (as

18

Doc# 20584875

hereinafter defined) as soon as possible and in any event no later than five (5) days following the occurrence of said event. The following events shall be "Reportable Events":

        11.1.4.1      receipt by the Company of an offer to buy a controlling interest in the capital stock of the Company or a significant amount of its assets;

        11.1.4.2      receipt by the Company or any Subsidiary of notice of the resignation or serious illness of any of its officers;

        11.1.4.3      the commencement of any lawsuit involving the Company or any Subsidiary in which, in the case of a lawsuit involving claims for damages, the aggregate of such claims is in excess of $100,000;

        11.1.4.4      the receipt by the Company or any Subsidiary of a notice that the Company or such Subsidiary is in default under any loan agreement to which it is a party; and

        11.1.4.5      the existence of any known material default by the Company under this Agreement or any other Transaction Document.

11.2    Subsequent Equity Issuances. The Company will grant the Investors that hold Series A Preferred Stock any rights, preferences or privileges granted to subsequent purchasers of any capital stock of the Company to the extent that any such rights, preferences, privileges or other terms are superior, in the good faith judgment of the Board of Directors of the Company, to any of the rights, preferences or privileges granted to the Investors in connection with the issuance of the Series A Preferred Stock, whether in the Certificate or in any other agreement.

11.3    Non-Compete and Confidentiality Agreements. The Company will require (i) each member of the senior management of the Company and each of its Subsidiaries, prior to the commencement of his or her employment, to sign a non-compete, confidentiality and proprietary and invention agreement (in the form attached as Exhibit E to the Purchase Agreements or in a form substantially similar thereto), and (ii) all key consultants, prior to the commencement of any work on behalf of the Company or any Subsidiary, to sign confidentiality and proprietary and invention agreements reasonably acceptable to the Investors holding 75% of the then outstanding Series A Preferred Stock.

11.4    Internal Accounting Controls. The Company will maintain a system of internal accounting controls similar to those maintained by corporations of established reputation in the same or similar business.

11.5    Indemnification of the Board of Directors; Directors and Officers Insurance Policy; Key Man Insurance Policy.

        11.5.1. The Company will reimburse all directors of the Company for all reasonable out-of-pocket expenses, including without limitation, airfare and hotel expenses, in connection with attending meetings of the Company's Board of Directors and all committees thereof and all reasonable out-of-pocket expenses otherwise incurred

19

in fulfilling their duties as directors, subject to compliance with the Company's then applicable travel and other expense reimbursement policies. To the extent provided by Delaware law, the certificate of incorporation and by-laws of the Company shall at all times require (i) the indemnification and reimbursement of expenses of all of the Company's directors against liability for actions and omissions to act in their capacity as directors of the Company to the maximum extent that such individuals may lawfully be so indemnified by the Company and (ii) the exculpation of the Company's directors from liability to the Company and its stockholders for monetary damages for breach of their fiduciary duties as directors.

11.5.2. The Company will maintain in full force and effect a directors and officer liability insurance policy issued by an insurer or insurers of recognized responsibility, insuring its directors and officers against such losses and risks, and in such amounts, as determined by the Board of Directors of the Company.

11.5.3. The Company will maintain in full force and effect a "key man" insurance policy issued by an insurer or insurers of recognized responsibility for the Chief Executive Officer and the President in amounts and on other terms reasonably acceptable to Investors holding at least seventy five percent (75%) of the then outstanding Series A Preferred Stock, subject to the availability of such insurance on terms that such holders of the Series A Preferred Stock deem to be cost-effective. The Company agrees to use commercially reasonable efforts to obtain such insurance within 90 days after the date hereof.

11.6    Third Amended and Restated Certificate of Incorporation.

(a)    In order to effect any amendment, modification, restatement or waiver of the Third Amended and Restated Certificate of Incorporation (the "Certificate") or By-laws of the Company (whether by amendment to the Certificate or By-laws of the Corporation or by reclassification, merger, consolidation, reorganization or otherwise) that alters, changes or repeals the rights, preferences or privileges of the capital stock of the Company outstanding as of the date of this Agreement, in addition to the approval and consent rights provided in the Certificate, (i) the written consent of the Investor holding the Warrant issued to CIGPF I Corp. (the "Warrant Investor"), so as long as such Warrant is held by CIGPF I Corp. or its Permitted Transferee, and is exercisable for at least seventy five percent (75%) of the Common Stock originally issuable upon exercise of the Warrant is required, provided, however, that consent of the Warrant Investor shall not be required for any amendment, modification, restatement or waiver of the Certificate of Incorporation or By-laws of the Company, unless such amendment or waiver affects the Warrant Investor or the Warrant Investor's Shares in a manner different than the Investors that were originally issued Series A Preferred Stock or the Series A Preferred Stock and in a manner adverse to the interests of the Warrant Investor as an equity investor in the Company, it being understood that no such consent shall be required for an amendment or waiver that adversely affects the Warrant Investor and the Investors that were originally issued Series A Preferred Stock in a similar manner given their relative and different equity interests in the Company; and (ii) any consent required under Section 7.14 of the Stockholders Agreement is required.

(b)     Notwithstanding anything in Section 16(a)(i) of this Agreement to the contrary and notwithstanding the right of the Warrant Investor to consent to adverse amendments, modifications and waivers as more specifically set forth herein, no Warrant Investor consent to any amendment, modification, restatement or waiver is required for the Company to be entitled to authorize and issue without the Warrant Investor's consent additional series of equity securities that are either (i) pari passu in preference and right or (ii) senior in preference and right to the Series A Preferred Stock.

11.7    Termination of Rights. The provisions of this Section 11 shall terminate upon the closing of a Qualified Public Offering.

12.     Notices. All notices, requests, consents and other communications required or permitted hereunder shall be in writing and shall be hand delivered or mailed postage prepaid by registered or certified mail or by facsimile transmission to the Company at:

Fingerhut Direct Marketing, Inc.

> 4400 Baker Road
> Minnetonka, MN 55343
> Attention:      Edward Woźniak
> Facsimile No.: (952) 294-2761

with a copy to:

> Lindquist & Vennum P.L.L.P.
> 4200 IDS Center
> 80 South 8th Street
> Minneapolis, MN 55402
> Attention:      Charles P. Moorse
> Facsimile No.: 612-371-3207

to each Investor at its address set forth on Exhibit A hereto, with a copy to:

> Ropes & Gray LLP
> One International Place
> Boston, Massachusetts 02110
> Attention:  Joel F. Freedman, Esq.
> Facsimile No.: (617) 951-7050

or such other address as may be furnished in writing to the other parties hereto. Any notice, request, consent and other communication shall for all purposes of this Agreement be treated as being effective or having been given when delivered if delivered personally, upon receipt of facsimile confirmation if transmitted by facsimile, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and postage prepaid as aforesaid.

**21**

13.    Entire Agreement. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and supersedes any and all prior communications or agreements, whether written or oral, with respect to such subject matter.

14.    Amendments, Waivers and Consents.

(a)    Except as otherwise expressly provided herein, any provision of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only by the written consent given (i) as to the Company, only by the Company; (ii) as to the Holders, only by the Holders of seventy five percent (75%) of the then outstanding Registrable Securities (with the Company to deliver copies of such written consent to any Holders who did not execute the same); and (iii) as to the Investors, only by (x) the holders of seventy five percent (75%) of the then outstanding Series A Preferred Stock, (y) the Warrant Investor, so long as its Warrant is held by CIGPF I Corp. or its Permitted Transferee, and is exercisable for at least seventy five percent (75%) of the Common Stock originally issuable upon exercise of such Warrant, and (z) any consent required under Section 7.14 of the Stockholders Agreement; provided, however, that consent of the Warrant Investor shall not be required for any amendment or waiver of any provision of this Agreement unless such amendment or waiver affects the Warrant Investor or the Warrant Investor's Shares in a manner different than the Investors that were originally issued Series A Preferred Stock or the Series A Preferred Stock and in a manner adverse to the interests of the Warrant Investor as an equity investor in the Company, it being understood that no such consent shall be required for an amendment or waiver that adversely affects the Warrant Investor and the Investors that were originally issued Series A Preferred Stock in a similar manner given their relative and different equity interests in the Company.

(b)    Notwithstanding Section 14(a)(ii)(y) to the contrary and notwithstanding the right of the Warrant Investor to consent to adverse amendments, modifications and waivers as more specifically set forth herein, no Warrant Investor consent is required for the Company to be entitled to authorize and issue additional series of equity securities that are either (i) pari passu in preference and right or (ii) senior in preference and right to the Series A Preferred Stock (with the Company to deliver copies of such written consent to any Investors who did not execute the same).

(c)    Notwithstanding anything in this Agreement to the contrary, (i) the right of Bain Capital to an Observer pursuant to Section 11.1.3 may not be amended, modified or waived in any manner without the prior written consent of Bain Capital and (ii) the right of Battery Ventures to an Observer pursuant to Section 11.1.3 may not be amended, modified or waived in any manner without the prior written consent of Battery Ventures.

15.    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the personal representatives, successors and assigns of the respective parties hereto. Notwithstanding the foregoing sentence, the Company shall not have the right to assign its obligations hereunder or any interest herein without obtaining the prior written consent of the Holders of a majority of the then outstanding Registrable Securities, provided in accordance with Section 14.

16.   General. The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

17.   Severability. If any provision of this Agreement shall be found by any court of competent jurisdiction to be invalid or unenforceable, the parties hereby waive such provision to the extent that it is found to be invalid or unenforceable. Such provision shall, to the maximum extent allowable by law, be modified by such court so that it becomes enforceable, and, as modified, shall be enforced as any other provision hereof, all the other provisions hereof continuing in full force and effect.

18.   Counterparts. This Agreement may be executed in counterparts, all of which together shall constitute one and the same instrument.

19.   Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The parties hereto intend that each representation, warranty, and covenant contained herein shall have independent significance.

20.   WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, THE INVESTORS AND THE COMPANY HEREBY WAIVE, AND COVENANT THAT NEITHER THE COMPANY NOR THE INVESTORS WILL ASSERT, ANY RIGHT TO TRIAL BY JURY ON ANY ISSUE IN ANY PROCEEDING, WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE, IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, ANY OTHER AGREEMENT OR THE SUBJECT MATTER HEREOF OR THEREOF OR IN ANY WAY CONNECTED WITH, RELATED OR INCIDENTAL TO THE DEALINGS OF THE INVESTORS AND THE COMPANY HEREUNDER OR THEREUNDER, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN TORT OR CONTRACT OR OTHERWISE. The Company acknowledges that it has been informed by the Investors that the provisions of this Section 20 constitute a material inducement upon which the Investors are relying and will rely in entering into this Agreement. Any Investor or the Company may file an original counterpart or a copy of this Section 20 with any court as written evidence of the consent of the Investors and the Company to the waiver of its right to trial by jury.

21.   Jurisdiction. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal or state court located in the State of New York, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have

23

to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12 shall be deemed effective service of process on such party.

22.    Non-Disclosure. Each Investor (other than a PCP Investor) agrees to use the same degree of care as such Investor uses to protect its own confidential information to keep confidential any proprietary or other information furnished to such Investor that the Company maintains in confidence (so long as such information is not in the public domain), except that such Investor may disclose such proprietary or confidential information (i) to any partner (limited or otherwise), subsidiary or parent of such Investor for the purpose of evaluating its investment in the Company as long as such partner, subsidiary or parent is advised of the confidentiality provisions of this Section 22, (ii) at such time as the Company voluntarily discloses such information to the public or such information otherwise enters the public domain through no fault of such Investor, (iii) that is communicated to it free of any obligation of confidentiality, or (iv) that is developed by Investor or its agents independently of and without reference to any confidential information communicated by the Company. The PCP Investor agrees to be bound by the non-disclosure agreements it has made in the Subordinated Note Agreement. Notwithstanding the foregoing, the parties hereto may disclose to any and all persons, without limitation of any kind, the tax treatment and the tax structure of this transaction, and all materials of any kind related to such tax treatment and tax structure.

23.    Amendment to February Agreement. By execution and delivery of this Agreement, the Company and each of the undersigned Investors who were parties to the February Agreement hereby approve and consent to this Agreement as an amendment of the February Agreement approved in accordance with Section 14 of the February Agreement. This Agreement supersedes and replaces in its entirety the February Agreement.

[The remainder of this page has been intentionally left blank]

Doc# 2058487\5

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**THE COMPANY**

FINGERHUT DIRECT MARKETING, INC.

By: _____

Name:   Brian Smith

Title:    Chief Executive Officer and President

[Signature Pages - Investor Rights Agreement]

**THE INVESTORS**

BAIN CAPITAL VENTURE FUND, L.P.
By: Bain Capital Venture Partners, L.P
   its general partner.

By: Bain Capital Investors, LLC
   its general partner

By: _____
Name: *Michael Krupka*
Title: Authorized Person

BCIP ASSOCIATES III, LLC
By: BCIP Associates III
   its manager

BCIP ASSOCIATES III-B, LLC
By: BCIP Associates III-B
   its manager

By: Bain Capital Investors, LLC
   their Managing Partner

By: _____
Name: *Michael Krupka*
Title: Authorized Person

BROOKSIDE CAPITAL PARTNERS FUND,
L.P.

By: _____
Name: *Phil Carter*
Title: *Managing Director*

RGIP, LLC

By: _____
Name:
Title: Managing Member

BATTERY VENTURES VI, L.P.
By: Battery Partners, VI, LLC
   General Partner

By: _____
Name:
Title:

BATTERY INVESTMENT PARTNERS
VI, LLC

By: _____
Name:
Title: Member Manager

_____
Kermit L. Stofer

PETTERS COMPANY, INC.

By: _____
Name:
Title:

FAC ACQUISITION, LLC

By: _____
Name:
Title:

Signature Page to Investor Rights Agreement

26

## THE INVESTORS

BAIN CAPITAL VENTURE FUND, L.P.
By:  Bain Capital Venture Partners, L.P
        its general partner.

By:  Bain Capital Investors, LLC
        its general partner

By: _____
Name:
Title:   Authorized Person

BCIP ASSOCIATES III, LLC
By:  BCIP Associates III
        its manager

BCIP ASSOCIATES III-B, LLC
By:  BCIP Associates III-B
        its manager

By:  Bain Capital Investors, LLC
        their Managing Partner

By: _____
Name: _____
Title:   Authorized Person

BROOKSIDE CAPITAL PARTNERS FUND,
L.P.

By: _____
Name:
Title:

RGIP, LLC

By: _____
Name:
Title:  Managing Member

BATTERY VENTURES VI, L.P.
By:  Battery Partners, VI, LLC
        General Partner

By: _____
Name:
Title:

BATTERY INVESTMENT PARTNERS
VI, LLC

By: _____
Name:
Title:  Member Manager

_____
Kermit L. Stofer

PRTTERS COMPANY, INC.

By: _____
Name:
Title:

FAC ACQUISITION, LLC

By: _____
Name:
Title:

Signature Page to Investor Rights Agreement

26

Doc# 20514875

## THE INVESTORS

BAIN CAPITAL VENTURE FUND, L.P.
By: Bain Capital Venture Partners, L.P.
its general partner.

By: Bain Capital Investors, LLC
its general partner

By: _____
Name: _____
Title:   Authorized Person

BCIP ASSOCIATES III, LLC
By: BCIP Associates III
its manager

BCIP ASSOCIATES III-B, LLC
By: BCIP Associates III-B
its manager

By: Bain Capital Investors, LLC
their Managing Partner

By: _____
Name: _____
Title:   Authorized Person

BROOKSIDE CAPITAL PARTNERS FUND,
L.P.

By: _____
Name:
Title:

RGIP, LLC

By: _____
Name:
Title:  Managing Member

BATTERY VENTURES VI, L.P.
By: Battery Partners, VI, LLC
General Partner

By: _____
Name: Oliver D. Curme
Title: Member Manager

BATTERY INVESTMENT PARTNERS
VI, LLC

By: _____
Name: Oliver D. Curme
Title: Member Manager

_____
Kermit L. Stofer

PETTERS COMPANY, INC.

By: _____
Name:
Title:

FAC ACQUISITION, LLC

By: _____
Name:
Title:

Signature Page to Investor Rights Agreement

26

Doc# 2658485

## THE INVESTORS

**BAIN CAPITAL VENTURE FUND, L.P.**
By: Bain Capital Venture Partners, L.P
    its general partner.

By: Bain Capital Investors, LLC
    its general partner

By: _____
Name: _____
Title:  Authorized Person

**BCIP ASSOCIATES III, LLC**
By: BCIP Associates III
    its manager

**BCIP ASSOCIATES III-B, LLC**
By: BCIP Associates III-B
    its manager

By: Bain Capital Investors, LLC
    their Managing Partner

By: _____
Name: _____
Title:  Authorized Person

**BROOKSIDE CAPITAL PARTNERS FUND, L.P.**

By: _____
Name:
Title:

**RGIP, LLC**

By: _____
Name:
Title:  Managing Member

**BATTERY VENTURES VI, L.P.**
By: Battery Partners, VI, LLC
    General Partner

By: _____
Name:
Title:

**BATTERY INVESTMENT PARTNERS VI, LLC**

By: _____
Name:
Title:  Member Manager

_Kermit J. Stofer_
Kermit L. Stofer

**PETTERS COMPANY, INC.**

By: _____
Name:
Title:

**FAC ACQUISITION, LLC**

By: _____
Name:
Title:

Signature Page to Investor Rights Agreement

26

Doc# 20534871S

## THE INVESTORS

BAIN CAPITAL VENTURE FUND, L.P.
By: Bain Capital Venture Partners, L.P
    its general partner.

By: Bain Capital Investors, LLC
    its general partner

By: _____
Name: _____
Title:    Authorized Person

BCIP ASSOCIATES III, LLC
By: BCIP Associates III
    its manager

BCIP ASSOCIATES III-B, LLC
By: BCIP Associates III-B
    its manager

By: Bain Capital Investors, LLC
    their Managing Partner

By: _____
Name: _____
Title:    Authorized Person

BROOKSIDE CAPITAL PARTNERS FUND, L.P.

By: _____
Name:
Title:

RGIP, LLC

By: _____
Name:
Title: Managing Member

BATTERY VENTURES VI, L.P.
By: Battery Partners, VI, LLC
    General Partner

By: _____
Name:
Title:

BATTERY INVESTMENT PARTNERS
VI, LLC

By: _____
Name:
Title: Member Manager

_____
Kermit L. Stofer

PETTERS COMPANY, INC.

By: _____
Name: Thomas J. Petters
Title: Chief Executive Officer

FAC ACQUISITION, LLC

By: _____
Name: Thomas J. Petters
Title: Manager

Signature Page to Investor Rights Agreement

**THE INVESTORS (continued)**

RTB HOLDINGS, LLC

By: _____
Name:  Thomas A. Petters
Title:  Manager

_____
Theodore Deikel

_____
Brian Smith

PRUDENTIAL CAPITAL PARTNERS II, L.P.

By: Stetson Street Partners, L.P., its general partner

By: _____
     Vice President

PRUDENTIAL CAPITAL PARTNERS
MANAGEMENT FUND II, L.P.

By: Mulberry Street Holdings, LLC, its general
    partner

By: Prudential Investment Management, Inc., its
    managing member

By: _____
    Vice President

PRUDENTIAL CAPITAL PARTNERS
(PARALLEL FUND) II, L.P.

By: Stetson Street Partners, L.P., its general partner

By: _____
    Vice President

CIGPF I CORP.

By: _____
Name:
Title:

CHERRY TREE SECURITIES, LLC

By: _____
Name:
Title:

PIPER JAFFRAY & CO

By: _____
Name:
Title:

EPSILON GLOBAL
EQUITIES LIMITED

By: _____
Name:
Title:

Signature Page to Investor Rights Agreement

Doc# 2058487\5

**THE INVESTORS (continued)**

RTB HOLDINGS, LLC

By: _____
Name:
Title:

~~Theodore Deikel~~

~~Brian Smith~~

PRUDENTIAL CAPITAL PARTNERS II, L.P.

By: Stetson Street Partners, L.P., its general partner

By: _____
     Vice President

PRUDENTIAL CAPITAL PARTNERS
MANAGEMENT FUND II, L.P.

By: Mulberry Street Holdings, LLC, its general
    partner

By: Prudential Investment Management, Inc., its
    managing member

By: _____
     Vice President

PRUDENTIAL CAPITAL PARTNERS
(PARALLEL FUND) II, L.P.

By: Stetson Street Partners, L.P., its general partner

By: _____
     Vice President

CIGPF I CORP.

By: _____
Name:
Title:

CHERRY TREE SECURITIES, LLC

By: _____
Name:
Title:

PIPER JAFFRAY & CO

By: _____
Name:
Title:

EPSILON GLOBAL
EQUITIES LIMITED

By: _____
Name:
Title:

Signature Page to Investor Rights Agreement

**THE INVESTORS (continued)**

RTB HOLDINGS, LLC

By: _____
Name:
Title:

_____
Theodore Deikel

_____
Brian Smith

PRUDENTIAL CAPITAL PARTNERS II, L.P.

By: _____
Name:
Title:

PRUDENTIAL CAPITAL
PARTNERS MANAGEMENT
FUND II, L.P.

By: _____
Name:
Title:

PRUDENTIAL CAPITAL PARTNERS
(PARALLEL FUND) II, L.P.

By: _____
Name:
Title:

CIGPF I CORP.

By: _____
Name:   James F. Vicecunte
Title:   Vice President

CHERRY TREE SECURITIES, LLC

By: _____
Name:
Title:

PIPER JAFFRAY & CO

By: _____
Name:
Title:

EPSILON GLOBAL
EQUITIES LIMITED

By: _____
Name:
Title:

Signature Page to Investor Rights Agreement

THE INVESTORS (continued)

RTB HOLDINGS, LLC

By: _____
Name:
Title:

_____
Theodore Deikel

_____
Brian Smith

PRUDENTIAL CAPITAL PARTNERS II, L.P.

By:  Stetson Street Partners, L.P., its general partner

By: _____
        Vice President

PRUDENTIAL CAPITAL PARTNERS
MANAGEMENT FUND II, L.P.

By:  Mulberry Street Holdings, LLC, its general
       partner

By:  Prudential Investment Management, Inc., its
       managing member

By: _____
        Vice President

PRUDENTIAL CAPITAL PARTNERS
(PARALLEL FUND) II, L.P.

By:  Stetson Street Partners, L.P., its general partner

By: _____
        Vice President

CIGPF I CORP.

By: _____
Name:
Title:

CHERRY TREE SECURITIES, LLC

By: _____
Name:
Title:

PIPER JAFFRAY & CO

By: _____
Name:
Title:

EPSILON GLOBAL
EQUITIES LIMITED

By: _____

Name:
Title:

Signature Page to Investor Rights Agreement

Doc# 20584871S

27

Exhibit A

NAMES AND ADDRESSES OF INVESTORS

**BAIN CAPITAL VENTURE FUND, L.P.**
**BCIP ASSOCIATES III, LLC**
**BCIP ASSOCIATES III-B, LLC**
c/o Bain Capital, LLC
111 Huntington Avenue
Boston, MA 02199       .
Phone:  617-516-2000
Fax:  617-516-2010
Attention:  Michael Krupka

**BROOKSIDE CAPITAL PARTNERS**
**FUND, L.P.**
c/o Bain Capital, LLC
111 Huntington Avenue
Boston, MA 02199
Phone:  617-516-2000
Fax:  617-516-2010
Attention:  Dom Ferrante

**RGIP, LLC**
c/o Ropes & Gray LLP
One International Place
Boston, MA 02116
Phone:  617-951-7000
Fax:  617-951-7050
Attention:  R. Bradford Malt

**BATTERY VENTURES VI, L.P.**
**BATTERY INVESTMENT PARTNERS**
**VI, LLC**
c/o Battery Ventures
20 William Street, Suite 200
Wellesley, MA 02481
Phone:  781-577-1000
Fax:  781-577-1001
Attention:  Oliver Curme

**PETTERS COMPANY, INC.**
**FAC ACQUISITION, LLC**
**RTB HOLDINGS, LLC**
4400 Baker Road
Minnetonka, MN 55343
Phone:  952- 932-3161
Fax:  952-975-4047
Attention:  David E. Baer

**Theodore Deikel**
4400 Baker Road
Minnetonka, MN 55343
Phone:  952-
Fax:  952-

**Brian Smith**
c/o Fingerhut Direct Marketing, Inc.
4400 Baker Road
Minnetonka, MN 55343
Phone:
Fax:
Attn:  Brian Smith

Kermit L. Stofer
c/o Strategic Partners
10 Post Office Sq., Suite 600
Boston, MA 02109
Phone:  617-
Fax:  617-

**CHERRY TREE SECURITIES, LLC**
301 Carlson Parkway
Suite 103
Minnetonka, MN 55305
Phone:  952-893-9012
Fax:  952-893-9036
Attn:  Gordon F. Stofer

**EPSILON GLOBAL EQUITIES
LIMITED**
c/o Oppenheimer Wolff & Donnelly LLP
Plaza VII, Suite 3300
45 South Seventh Street
Minneapolis, Minnesota 55402-1609
Phone: 612-607-7000
Fax: 612-607-7100
Attn: Michael D. Zalk

**PIPER JAFFRAY & CO.**
800 Nicollet Mall
Minneapolis, MN 55402-7020
Phone: 612-303-6000
Fax: 612-303-1354
Attn: Paul Jevnick

**CIGPF I CORP.**
c/o Citigroup Global Markets, Inc.
390 Greenwich Street
4th Floor
New York, NY 10013
Phone: 212-723-6270
Fax: 212-723-8855
Attn: Ari Rosenberg

[PGP INVESTOR]
[address]

[address]
[address]